UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| vs. | : | CRIMINAL NO. 3:22CR90 (AWT) |
| JOSEPH AMADEO | : | January 4, 2024 |

## REPLY TO THE GOVERNMENT'S SENTENCING MEMORANDUM

Joseph Amadeo, the Defendant, respectfully submits this reply to the government's sentencing memorandum. By limiting his reply to these points, Mr. Smith does not waive any argument previously raised. The undersigned submits two character letters that were not available at the time the memorandum in aid of sentencing was filed. *See* Exhibit A. Of note, the parties met for a proffer session in March 2021. The Defense signed a proffer agreement which stated in relevant part:

> The Government may use Client's proffer statements:

>> …in connection with Client's sentencing, in which event the Government will ask the Court not to consider Client's proffer statements in determining Client's sentencing guideline range…

PROCEDURAL BACKGROUND

Joseph Amadeo first contacted and met with the undersigned on March 5, 2021. He was distressed about law enforcement having executed a search warrant at his home earlier that week as well as his behavior that lead to the warrant execution. The undersigned initiated contact with government counsel (current government counsel was not assigned until over a year later). The parties agreed to meet for a proffer session, in which Mr. Amadeo would truthfully and completely convey his conduct leading up to the March 2, search warrant execution; this included any sex offense or sexual contact involving the Defendant.

- 2 -

On March 24, 2021, the Defense met with the government for the proffer session. The meeting was not only for Mr. Amadeo to offer details about his conduct, but also to tender websites, usernames (his and others), passwords, and names of chatrooms. In other words, the meeting was also to assist the government in their efforts to combat the pervasive child pornography industry. The parties agreed that the government should convey a formal target letter, which occurred on March 30, 2021.

Of equal importance, sometime between the March 2021 proffer and his May 2021 presentment, Mr. Amadeo, while helping to move furniture in his home found a thumb drive. Local law enforcement returned the thumb drive to Mr. Amadeo after his 2013 conviction – under the impression it was free of contraband. Unfortunately, the device contained child pornography. Mr. Amadeo immediately agreed to surrender the device to the local police department. In fact, Mr. Amadeo remained cooperative throughout his case, and signed a consent to search form of his seized devices. *See* Exhibit B (Computer Forensics Consent Worksheet).

OFFENSE CONDUCT

For the most part the government detailed the same offense conduct it submitted for use in the Presentence Report. *See* Presentence Report ¶¶ 6-15. The information included the high number of images and videos determined to be contraband. That alone does not tip the scales in favor of a guidelines sentence. "[I]t is generally assumed a greater number of images equates to a more severe obsession, which heightens the risk an individual with ASD will act on their sexual urges. Despite this widely held belief, findings from available empirical studies are not consistent with this association (Mahoney, 2009; Stabenow, 2011)." Clare S. Allely, Sally Kennedy, Ian Warren, A legal analysis of Australian criminal cases involving defendants with

autism spectrum disorder charged with online sexual offending, 66 *International Journal of Law and Psychiatry* 1, 2 (2019) https://doi.org/10.1016/j.ijlp.2019.101456. Though not obligated, the government did not explain that reviewing Mr. Amadeo's devices the government failed to find any search terms referencing child pornographic images.

That is, at the proffer when asked what gender, age, or category Mr. Amadeo looked for he responded "females...not toddlers...no age range." While adding, "there was no specific stuff I looked for. I did not specifically search. I went to a chat room and opened every picture and saved. Some I barely looked and just saved. Some it barely registered what I looked at." "Much anecdotal evidence shows individuals with ASD charged with CEM (child exploitation material) offenses often have thousands of images or videos in their possession, many of which remain unopened or are simply hoarded. There is also no established link between consuming extreme sexual content and an increased risk of dangerousness (Osborn, Elliott, Middleton, & Beech, 2010)." Alley et al. A legal analysis of Australian criminal cases, at 3.

As Mr. Amadeo has previously submitted, the devices law enforcement seized contained, games, adult pornography, child pornography, music files, stories, and miscellaneous no pornographic images ("cute cats, interesting tattoos," etc.). The music files took up the most space. The child pornography was less than 1% of what was recovered from the devices. "Mogavero (2016) identified several studies suggesting a significant proportion of deviant or sexual off ending amongst those with ASD is often driven by symptoms inherent to ASD as opposed to malice." *Id.*

RELATED CONDUCT

Put simply, there is no related conduct. Mr. Amadeo adamantly disputes the information regarding any sexual contact with V1 and V2. He requests a hearing with the complaining

witnesses-in order for the Court to asses facts and credibility-or the lack thereof.

There are clearly some circumstances where an evidentiary hearing is appropriate. Although such hearings are governed by § 6A1.3, they are still referred to generically as "*Fatico hearings*," *see, e.g., United States v. Myung Ho Kim*, 193 F.3d 567, 575–76 (2d Cir. 1999), the name arising from the seminal Second Circuit decision addressing pre-guidelines sentencing hearings, *see United States v. Fatico*, 579 F.2d 707, 713 (2d Cir. 1978) (holding that due process does not prohibit use at sentencing of information obtained from unidentified informants). *See also United States v. Fatico*, 603 F.2d 1053, 1057 & n.9 (2d Cir. 1979) (rejecting argument that reasonable doubt standard applicable to factual disputes at sentencing). When deciding between such a hearing and another means of obtaining the information, the court must consider "'the nature of the dispute, its relevance to the sentencing determination, and the applicable case law.'" *United States v. Brinkworth*, 68 F.3d 633, 640 (2d Cir. 1995) (quoting § 6A1.3, comment.)

Regarding the My Little Pony underwear found in his room, Mr. Amadeo explained during the proffer, "I got the sex toy 2-3 years ago, I can't recall when. I noticed adult panties were too loose. I got smaller panties for it…size 6 or 7…My Little Ponies for the torso."

V1 tells the story that when she was 17 or 18 years old she caught Mr. Amadeo going through her drawer. It should be noted that the two families were no longer social at that time as V1's parents divorced. During the proffer Mr. Amadeo stated when playfully throwing V1 and V2 in the water, he "might have touched the small of the back or top of breast, because of how I grabbed them. I might of brushed against the vagina. Statistically probable but not intentional."

PREVIOUS CONVICTION

Mr. Amadeo never said, "I know that it is wrong to look at pornography involving kids. I am the type of person that always follows the rules. I like the excitement of knowing that I can

look at these types of photos and get away with it" to law enforcement during his 2012 arrest incident. Jane Amadeo, Mr. Amadeo's mother was present in the police vehicle during the interrogation, and asserts Mr. Amadeo never made those statements. The information was not made or memorialized in a formal fashion. More, it was not recorded or reduced to written form with Mr. Amadeo's endorsement.

The government argues, incorrectly, that Mr. Amadeo "has previously been convicted of this very same offense," and that the previous conviction was a "sex offense." To the contrary, Mr. Amadeo was not previously convicted of the very same offense and does not have a previous sex offense conviction. To be precise, Mr. Amadeo was convicted in December 2013, of risk of injury to a child in violation of Connecticut General Statutes Section 53-21(a)(1).

GUIDELINES CALCULATION

As the Court is well aware, after *United States v. Booker*, 543 U.S. 220 (2005), it has discretion, having considered the advisory Guidelines, to impose a non-Guidelines sentence. This Court's "considerable discretion" includes the discretion to vary from the advisory Guidelines range based solely on policy disagreement with the Guidelines, particularly where, as here, the governing Guideline is based on policy considerations rather than the Sentencing Commission's traditional role of applying empirical expertise. Even Probation asserts: "In fashioning its sentence, the Court may wish to consider that Joseph Amadeo has not served any prior periods of imprisonment, and whether a sentence within the advisory guideline range is greater than necessary to accomplish the purposes of a criminal sentence in light of the parsimony clause of 18 U.S.C. § 3553(a)."

The Court should reject the government's proposed 13-level total increase in Mr. Amadeo's base offense level for various enhancements as the base offense level of 22 is itself

more than necessary to cover the specific characteristics of paragraphs 28 through 31 and is otherwise sufficient, given the mandatory minimum five-year sentence, to impose an appropriate sentence.

However, should the Court decide to impose such a substantial enhancement to the base offense level as suggested in the PSR, we respectfully submit that Mr. Amadeo should receive a "cumulative effects" downward departure or a non-Guidelines sentence because these substantially overlapping enhancements severely impact a sentence at the high end of the Sentencing Table. The Second Circuit has held that a downward departure is appropriate in cases where the addition of substantially overlapping enhancements results in a significant increase in the sentencing range minimum (as it does at the higher end of the sentencing table). *See United States v. Lauersen*, 362 F.3d 160, 164 (2d Cir. 2004) (*Lauersen II*), *vacated and remanded*, 543 U.S. 1044 (2005) (for further consideration in light of *United States v. Booker*, 543 U.S. 220 (2005)).

Here, the several proposed enhancements are, as a practical matter, overlapping with the base offense level itself, as well as with each other, because, as we discuss virtually all defendants convicted of receipt or possession of child pornography have done so via computer, have downloaded hundreds of images (simply given the nature of the technology), have "distributed" images (because downloaded images are, by default, stored in a "shared" file), and have downloaded images that will be considered "sadistic" because of the inevitability that some images of the many hundreds that are automatically downloaded pursuant to a general request for child pornography will depict sexual activity with prepubescent children, even though the search terms used do not suggest the defendants have sought out sadistic material.

Because the accumulation of such substantially overlapping enhancements, when

imposed upon a defendant whose adjusted offense level translates to a high sentencing range, presents a circumstance that is present to a degree not adequately sentencing range, presents a circumstance that is present to a degree not adequately considered by the Commission, the Second Circuit permits district courts to consider mitigating the impact of enhancements by granting downward departures. *Id.* at 344 (quoting 18 U. S.C. § 3553(b)(1)). *See also United States v. Jackson*, 346 F.3d 22 (2d Cir. 2003) (granting cumulative effects departure). Of course, post-*Booker* the Court can accomplish the same result through a non-Guidelines sentence.

Further, the recommended enhancements are in the majority of child pornography cases, "all but inherent in the offense of conviction." *Dorvee*, 616 F.3d at 186. The most striking example is the increase of two levels for use of a computer, perhaps the most widely applied increase in the entire Guidelines system. *See Dorvee*, 616 F.3d at 186 ("Of all sentences under § 2G2.2 in 2009, … 97.2% involved [the enhancement for use of] a computer); *see also* Bureau of Justice Statistics Bulletin: *Federal Prosecution of Child Sex Exploitation Offenses* (2006) at 5. As one expert in the field has stated, it is now nearly impossible to obtain child pornography through any means **other** than over the internet. *See At Issue: Child Sexual Abuse*, Angela Lewis, Ed., Greenhaven Press (2005). As a result, the Second Circuit has noted that the computer enhancement smacks of "double-counting [] because it effectively increases a defendant's sentence to reflect the kind of harm that has already been fully accounted for by the base offense level or other enhancements." *United States v. Tutty*, 612 F.3d 128, 132 (2d Cir. 2010) (internal citations and quotations omitted). Furthermore, because this enhancement is so widely applied, it *necessarily* fails to distinguish between offenders in any meaningful way.

The five-level enhancement for possession of more than 600 images is equally problematic. At least some enhancement for quantity applies in 96.6% of cases, *see Dorvee*, 616

F.3d at 186 n.9, rendering this increase, like the computer increase, incapable of differentiating between offenders. Even the dramatic five-level increase at issue here applies in more than 63% of cases. *See id.* at 186. Not only is this substantial enhancement not anchored in any real assessment of the seriousness of the offense conduct, but it also reflects a failure to comprehend the nature downloads, which often involve downloading a single compressed file containing hundreds of smaller documents, the contents of which may be unknown until opened. The enhancement misapprehends the ease with which files are accessed and saved, as what happened in this case.

Similarly, nearly 95% of all child pornography cases involve images of prepubescent children, *see Dorvee*, 616 F.3d at 186, so the enhancement for possession of images involving children under the age of 12 does nothing to distinguish between offenders or offense conduct, or to punish more serious crimes more harshly, or to account for the likelihood of recidivism or the risk to the community.

Finally, the enhancement for possession of images involving depictions of sadistic or masochistic conduct applies in 73.4% of federal cases. *See Dorvee*, 616 F.3d at 186. There is no evidence in this case that Mr. Amadeo affirmatively sought out sadistic or masochistic images or that such images made up a substantial portion of the images that he possessed. This enhancement, therefore, is not based as an assessment of Mr. Amadeo's culpability or future dangerousness. That this enhancement would apply with the same force if every image found in his possession involved sadistic content reflects the enhancement's utter failure to distinguish between offenders or offense conduct, or to punish more serious crimes more harshly.

HISTORY AND CHARACTERISTICS

The government inaccurately argues, "It is the Government's understanding that after his first conviction, the defendant received sex offender treatment and has continued to receive significant therapeutic treatment. Despite this treatment, the defendant has reoffended by committing the instant offense."

The sex offender treatment Mr. Amadeo received as a result of his 2013 case fell woefully short of what he needed, needs now, and what he will need in the future. Exhibit C. When asked how often he spent online accessing child pornography, Mr. Amadeo responded "it was not a daily occurrence, sometimes months in between, sometimes 2-3 times a week." When asked about the frequency of his access within a year, Mr. Amadeo stated, "It slowed down in recent months." Logically, the agents asked why. Here, Mr. Amadeo's answer was quite illuminating. "I don't know why. I don't know why I looked at images in the first place. Why do I have this; I can't turn it over to the FBI without getting into trouble so I should just delete it. Hoping to talk to a psychologist or get another person to help me understand why."

"While offenders with ASD can be expected to integrate in conventional therapeutic programs, it is likely that many if not all aspects of the treatment process fall short of meeting the needs of this client group. For example, programs carried out in groups bring the demand of interacting and learning with other offenders and the facilitators, which in itself is likely to be a challenge for ASD individuals convicted of a sexual offense.

Treatment programs that begin by seeking to create a good basis for the establishment of group cohesion, pro-change norms and positive relationships between group participants require social interaction. This necessity for social interaction means that ASD offenders are likely to experience difficulty from the start. Cognitive restructuring involves the process of identifying

and countering pro-off ending thinking.

Encouraging an offender with ASD to accept responsibility for their actions needs to be approached considerately as directly addressing problematic behaviors and attitude distortions can cause aversive reactions; criticism is less readily tolerated not because the individual is unwilling to accept it but because they are less well equipped for interpreting it and understanding the motivation of those offering advice (Ray et al., 2004)." Higgs & Carter, Autism Spectrum Disorder and Sexual Offending, at 116.

In October 2019, Mr. Amadeo sought therapy to address symptoms of anxiety and depression, as well as executive functioning and social skills with previous diagnoses of ADHD and ASD. Exhibit D.  The treatment did not fully address his behavioral health and cognitive concerns and lasted until sometime in 2021 – when Mr. Amadeo's supervision officer referred him to MAAS. PSR ¶ 61.  At MAAS, Mr. Amadeo meets with a licensed therapist and a psychiatrist who has successfully addressed his behavioral health issues.  He is prescribed Wellbutrin, Pristiq, olanzapine, and Buspar that has had a significant impact on Mr. Amadeo's mood and impulsivity control.

More, the fact that he has remained violation free since the March 2021 law enforcement encounter proves, as Dr. Geysen explained, that with the proper controls Mr. Amadeo will not access contraband online.  That starts with monitored access of Mr. Amadeo's online use and is buttressed with specific treatment for behavioral health, and one who has ASD and a sex offense. Exhibit E.

SENTENCING DISPARITIES

In the same way that the crack cocaine guidelines have been criticized for producing sentences that fail to comport with the § 3553(a) factors, with judges varying downward

accordingly, a similar trend has developed in this District and elsewhere in child pornography cases, both before *Dorvee* and now even more so with the Second Circuit's support. Judges in this District have granted down departures to defendants having pleaded guilty to possession and receipt of child pornography.

**Judge Egington**

- 46 months in 11CR170 AWT, 66 months in 11CR155SRU, 96 months in 09CR77WWE

**Judge Arterton**

- 1 year and 1 day in 11CR132JBA, 30 months in 13CR09JBA, 30 months in 13CR52JBA, 44 months in 10CR184JBA, 60 months in 12CR83JBA, 1 year and 1 day in 19CR10JBA

**Judge Bryant**

- 24 months in 11CR149VLB, 24 months in 12CR156VLB, 60 months in 12CR140VLB, 12CR215VLB

**Judge Chatigny**

- 1 year and 1 day in 11CR61RNC, 24 months in 13CR05RNC, 30 months in 12CR169RNC, 90 months in 12CR55RNC

**Judge Covello**

- 41 months in 11CR215AVC, 51 months in 12CR186AVC

**Judge Hall**

- 18 months in 12CR102JCH, 27 months in 12CR182JCH

**Judge Thompson**

- 3 months in 10CR240AWT, 36 months in 11CR40AWT, 46 months in 10CR123AWT

**Judge Underhill**

- 18 months in 11CR247SRU, 36 months in 09CR219SRU, 60 months in 12CR59SRU

- 12 -

In this case, for all these reasons as well as those discussed in Mr. Amadeo's opening sentencing memorandum, a sentence of 5 years' imprisonment is sufficient to meet the purposes of sentencing in this case.

THE DEFENDANT,
Joseph Amadeo

Dated: January 4, 2024

/s/   Tracy Hayes
Tracy Hayes
Assistant Federal Defender
265 Church Street, Suite 702
New Haven, CT. 06510
Bar No. phv06527
(203) 498-4200
Email: tracy_hayes@fd.org


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 4, 2024, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Tracy Hayes
Tracy Hayes

# EXHIBIT A

Honorable Alvin W. Thompson
United States District Court Judge
c/o Tracy Hayes, Assistant Federal Defender
Federal Defender's Office
265 Church Street, Suite 702
New Haven, CT 06510

RE: Joseph Amadeo

Dear Judge Thompson,

My name is Lisa Amadeo, I am a 42 years old college professor of Media Studies, a media consultant, and a mother, as well as Joseph's older sister.

I am writing with the hope that I can convey my experience with Joe and what I know to be true of his character. I believe Joseph has suffered with general mishandling and misdiagnosis of his mental illness and other disabilities that have impacted him greatly throughout his life.

In growing up with Joseph, I have witnessed his gentle, kind, and considerate nature in relationships with those around him. Although Joseph did not have any outside friends, I believe he feels very much in the dark as to how to approach social situations generally speaking, which, in my opinion, is what drove him to living a life mostly in the online space. This seemed like a safe haven for him when he was younger; a place where he could be social and spend time engaging with peers despite his social awkwardness. It seemed to me like he had found a way to access the world. I believe that this went awry when he stumbled upon aspects of the dark web. Due his social isolation and numerous documented issues with impulse control, OCD, and ADHD tendency to compulsively seek dopamine triggering experiences, as well as deep depression with suicidal ideations, he fell into an area of the world online that someone of his mental age cannot comprehend and should not ever be able to access.

I was devastated to hear that Joseph had again been collecting material online after he lost his job and was left in isolation during the pandemic. I believe that with the correct medication and psychiatric care he could have avoided this OCD-related relapse and that in many ways it was a cry for help from someone who has suffered long standing isolation and intrusive thoughts.

I do not discredit in any way the suffering of the victims or victims' families and understand that the matter is gravely serious. I have however observed in my research that someone with the diagnoses easily swayed by the tactics used by online perpetrators who put out pop ups that can be hard to resist with ADHD, aspergers, and OCD combined. I think the tactics and attention-grabbing techniques used by those who create and proliferate these materials are targeting to those suffering with mental health issues and social isolation. I am of course speaking from my own understanding and studies on this matter of addictive media use behavior broadly.

Again, Joseph has always demonstrated to be a caring, compassionate person among our family. I have never thought he has the capacity to harm anyone intentionally. I think despite his age, he has a lack of social and emotional maturity and is a person who has suffered from depression, anxiety and in finding his place in the world. I believe that Joseph would greatly benefit from mental health rehabilitation and quality attention and care that he has not received so far in his life, I truly believe that Joseph could become a rehabilitated and functioning member of society if the right combination of medication and psychiatric care can be provided for him.

Thank you for your time.

Sincerely,

Lisa Amadeo



11/30/23

Honorable Alvin W. Thomson
United States District Court Judge
Federal Defender's Office
265 Church Street, Suite 702
New Haven, CT 06510

Re: Joseph Amadeo

Dear Judge Thompson,

My name is Damian Paglia. I'm 46 years old and a father of three. I am a co-founder and Director of Integration and Community Services at West Rock Wellness, a mental health center in Westville. I work as a life coach, and I've known Joe's family for many years. I worked with Joe helping support him in developing social and emotional life skills. From working with him, I've observed Joe to be a sincere, kind, and compassionate person. My time spent with him included doing life skills activities in the world where he needed support due to a very high level of anxiety and isolation. From my observations, I believe Joe is operating on a much younger level than his age, which is the very reason he should have mental healthcare and emotional support. I would highly recommend that Joe receive the mental health care that he deserves, that would greatly affect his ability to participate as the kind and loving citizen that he is.

Warm Regards,

Damian Paglia

# EXHIBIT B



*Homeland Security Investigations*

**CYBER CRIMES CENTER**
**Computer Forensics Unit**

# Computer Forensics Consent Worksheet

I, __Joseph Amadeo__, have been asked to give my consent to the search of my electronic devices. I have also been informed of my right to refuse to consent to such a search.

I hereby authorize Homeland Security Investigations (HSI) to conduct a complete search of all electronic devices located at __HSI New Haven, 150 Court Street Suite 615, New Haven, CT, 06510 (see inventory in Attachment A)__.

I authorize HSI to search all electronic devices, including computers; tablets; storage devices and media, such as internal and external hard drives, flash drives, floppy disks, CDs, and DVDs; and mobile electronic devices, such as personal digital assistants, cell phones, and pagers.

I hereby consent to the search of the aforementioned items for any data, accounts, or material that is contraband or evidence of a crime.

I am the __owner__ (e.g., owner, user, system administrator, parent of user) of the electronic devices described above, and thus have standing to consent to this search.

I give this written permission voluntarily. I have not been threatened, placed under duress, or promised anything in exchange for my consent. I have read this consent worksheet and/or it has been read to me and I understand it. I understand the __english__ language and have been able to communicate with the HSI Special Agents/Officers.

I understand that I may withdraw my consent at any time for any reason.

Print Name: __Joseph Amadeo__   Sign and Date: __Joseph Amadeo__  11/9/21

Witnesses:

Print Name: __Carly Levenson__   Sign and Date: _____  11/9/21

Print Name: __Aissa Lago__   Sign and Date: _____  11/09/2021

Attachment "A" - Items to be Searched

Items turned into Law Enforcement 5/27/21:

001-WD Hard Drive

002-(2) Scandisk Micro SD cards

003-(2) Thumb drives (SanDisk and PNY)

# EXHIBIT C

The following is offered as a DSM-IV TR diagnosis for Mr. Amadeo:

## DSM-IV TR Psychiatric Diagnosis

| | | |
|---|---|---|
| Axis I | 299.80 | Asperger's Disorder |
| | 300.00 | Anxiety Disorder, Not Otherwise Specified |
| | 314.09 | Attention Deficit Hyperactivity Disorder, Type Not Specified |
| | 315.09 | Learning Disorder, Not Otherwise Specified |
| | 309.0 | Adjustment Disorder with Depressed Mood, Chronic |
| Axis II | 799.99 | Deferred. Schizoid, Self-Defeating and Depressive Personality Features |
| Axis III | | Insulin Dependent Diabetes Mellitus, Hypercholesterolemia, Hypertension |
| Axis IV | | Legal issues, Social Skill Deficits, Occupational Problems |
| Axis V | | GAF = 45 (at time of examination) |

# EXHIBIT D

**Clinical Intake**

**Name:** Joseph Amadeo              **DOB:** 9/9/1984          **Date of Intake:** 10/23/2019

**Presenting Problem:** Joseph is seeking therapy to address symptoms of anxiety and depression, as well as executive functioning and social skills associated with previous diagnoses of Attention Deficit Hyperactivity Disorder (ADHD) and Autism Spectrum Disorder (ASD). Specifically, he reports a lack of energy and enthusiasm, as well as a history of a vague wish to "disappear." In addition, Joseph notes that he frequently worries about the current political climate and also worries about and plans out conversations that will never happen.  He reports being discouraged with his current employment and would like to do something more rewarding and interesting. However, he notes that he does not interview well and has difficulty following through with the application process.

**Pertinent History:** Joseph was diagnosed with ADHD at age 8, for which he was prescribed Ritalin. He received school support for Writing and Reading throughout his childhood and adolescence. Social challenges reportedly surfaced in middle school, however, Joseph was not diagnosed with Autism Spectrum Disorder (ASD) until he was 24 years old. Joseph has engaged in therapy in the past, and reports that some therapists were more helpful than others. In the past, he was prescribed medication for depression, but this was discontinued after a short time due to inefficacy and unwanted side effects. Joseph was diagnosed with Type 1 Diabetes when he was 18 years old, which is managed with insulin and diet. He graduated from high school on time and attended some college courses at Gateway; however, he was one course short of earning his degree as an Electronic Technician, and despite repeated attempts to take this course, he was unable to earn a passing grade. Eventually, he was not permitted to retake the course. Joseph has had a number of temp jobs over the course of the last decade and has been discontentedly employed with his current employer for the past 6 years. He has reportedly taken his driving test 4 times, most recently 6 years ago, and although he has passed the written portion each time, he has been unable to pass the driving portion as of yet.

**Observations:** Joseph presented as cooperative and friendly. He was dressed casually and appropriately, with scruffy facial hair; the hair on his head unwashed. His affect was primarily flat, though he did brighten a few times over the course of the session. His manner of speaking was monotone and louder than is typical, and his eye contact was inconsistent.

**Family/Psychosocial Assessment:** Joseph currently resides with his parents, who are still married, and his younger adult brother. His father is reportedly disabled and no longer works outside the home, and his mother is employed and works from home. Joseph has a sister as well, who lives in California. He attends a support group for adults on the autism spectrum once per month.

**Risk:** None at present; hx of SI

**Strengths:** Joseph has a good sense of humor and he enjoys being around other people. He has a positive and supportive relationship with his parents and brother, with whom he resides. He has good insight about his what challenges him, including executive functioning, anxiety, and social

communication skills. When asked to identify his strengths, he noted that he is intelligent and quite proficient in math.

*Involvement:* Joseph will independently engage in therapy, though his parents may communicate signs of progress or concern at any time.

*Tentative Goals and Plans:* Joseph would like to improve his organizational skills, so that he can develop a system that will support his ability to set goals and manage time, as well as improve overall executive functioning and self-advocacy skills. He would like to seek more rewarding employment. Additionally, he would like to address sleep patterns, as he tends to stay awake at night and sleep much of each day, and obtain his driver's license. Joseph would also like to improve his overall mood, and learn strategies to manage his anxiety.

*Expected Treatment Length:* Approximately 12 months to address initial goals; long-term treatment likely warranted, given the lifelong nature of ASD.

*Cultural Variables:* No significant cultural variables were noted.

*Educational or Vocational Problems:* Joseph is currently employed part-time at Dunkin' Donuts. He reports frustration about being under-employed, as well as negative dynamics with management. In addition, he reports difficulties applying for and obtaining alternative substantial gainful employment. As noted above, he has not been able to obtain a driver's license despite multiple attempts at taking the test. As such, he relies on his parents for transportation to and from his current place of employment, as well as any other potential options. He struggles to complete and return applications independently, and his social skills deficits make the interview process particularly challenging as well. In addition to these difficulties with social skills and executive functioning, some limitations also exist with regard to his diagnosis of Diabetes; he requires breaks for snacks, glucose checks, and medication, and the level and regularity of his activity must be carefully considered, as this can affect glucose levels.

Clinician Signature: *Amy Giguere Carney, LCSW*

Amy Giguere Carney, Licensed Clinical Social Worker

Amy Giguere Carney, LCSW
365 East Main St. Suite 2-8-E
Branford, CT 06437
(203)533-9833
acarneylcsw@gmail.com

**Summary of Progress as of 4/21/2021**

**Name:** Joseph Amadeo          **DOB:** 9/9/1984          **Date of Intake:** 10/23/2019

Joseph has been engaged in therapy on a biweekly basis for approximately 18 months. Upon initiating therapy, Joseph indicated that he would like to improve his organizational skills, so that he could develop systems that would support his ability to set goals and better manage his time, as well as improve overall executive functioning and self-advocacy skills. Additionally, he noted that he wanted to seek more rewarding employment, address unhelpful sleep patterns, and obtain his driver's license. Lastly, he hoped to implement strategies to improve his overall mood and better manage his anxiety.

During initial sessions, Joseph identified times of day when he felt most energized and created a plan to use those times to make to-do lists with a few key items, as well as set a time frame for completion. Goals included walking, practicing driving with his father, and contacting Ability Beyond Disability for assistance with employment. When he did not follow through between sessions, additional organizational strategies, such as the use of phone timers and entering tasks into calendars, were suggested. However, while it appeared that Joseph sincerely wanted to achieve these goals, he consistently struggled with follow through when attempting to manage his own time outside of sessions. After approximately 6 weeks of meeting biweekly with Joseph, his employment at Dunkin' Donuts was terminated. He reported being somewhat relieved about this, as he did not enjoy the position and found the environment to be particularly stressful; he had begun to seek alternate employment prior to this time for these reasons. Subsequently, he acted as an active participant in identifying potential employers, sharing insights about his limitations in obtaining employment, and brainstorming ways to overcome those barriers. It was during one of these sessions that Joseph disclosed that he had been in legal trouble 9 years prior, and he suspected that this history was undesirable to potential employers, thus making it more difficult to find a job. Additionally, he continued to struggle to implement the strategies laid out during sessions when left to his own devices in real time. It became clear that Joseph requires significant support in obtaining, completing, and returning job applications, as he was only able to fill out a limited number of applications over the course of 3 months. He did not receive callbacks from any of those potential employers, and he struggled immensely with following up with them. It is my impression that Joseph's difficulties with executive functioning and social skills, associated with his diagnoses of ASD and ADHD, are major preventative barriers to his ability to be substantially gainfully employed. Over the course of Joseph's therapy, he has also disclosed perseverative thinking patterns that often keep him stuck in negative cycles of thoughts and behavior. This clinician has attempted to engage him in evidence based Cognitive Behavioral Therapy strategies on many occasions, with very little success. Joseph's thinking is often quite concrete, which makes it difficult for him to change his thinking patterns; when encouraged to practice having more helpful thoughts, it is clear that cognitive rigidity associated with ASD and ADHD are barriers. He tends to use distraction as a technique to stop perseverative or negative thinking, and notes that he often finds himself distracted by whatever he has chosen for as long as 4 hours. Similarly, while he often clearly states what he knows to be in his best interest (e.g. exercise, earlier bedtimes, engaging in more social activity, implementing systems developed during sessions), he noted that it takes an immense amount of energy to do these things. He is insightful about his pattern of procrastination when tasks seem overwhelming, as well as his difficulty breaking tasks into smaller parts, but unable to push through with

enough consistency to change behavioral patterns. Joseph has noted that his sleep does improve for brief periods of time, and that the use of a weighted blanket helps. He has considered a psychiatry consult to attempt a new anti-depressant, but noted that he has tried 6-7 antidepressants in the past with little improvement.

Since the onset of the pandemic, goals have shifted away from seeking employment and more social interaction, as Joseph's Diabetes puts him in a higher risk category and social/physical distancing is the most effective way for him to stay healthy. During these months, goals have been targeted more toward using this time as a way to explore interests and build skills through online learning, practice driving with his father, and continue to try different strategies to interrupt negative thinking patterns. He has also used therapy as a way to process familial conflict and emotions about the challenges of his living situation. Progress is limited, but Joseph has largely remained engaged in the therapeutic process and reports that he finds it helpful to continue to explore his thoughts, behaviors, emotions, goals, and barriers. In February of 2021, Joseph unexpectedly missed a telehealth session, which has happened on occasion over the course of the past year. He reached out to resume sessions approximately 4 weeks later, resulting in a 6-week gap between sessions. When sessions resumed, Joseph reported a significant increase in anxiety and depression, including vague suicidal ideation, which seems to be in direct response to law enforcement raiding his home and seizing electronic devices, suspecting illegal activity. Due to the nature of the matter, it was recommended that Joseph meet with a therapist who specializes in internet and pornography addiction in order to determine whether this might be an appropriate target for intervention. In addition, although Joseph's suicidal ideation was conceptualized as a vague and passing wish, and he did not express a plan of any kind, this clinician contracted for safety by co-creating the following plan with Joseph: If suicidal ideation escalates and he feels unsafe at any point, Joseph will confide in his brother or parents, attempt to contact this clinician, or call 211 for assistance. It was also recommended that he receive a psychiatry evaluation as soon as possible to determine whether medication would be appropriate at this time. Joseph consented for this clinician to engage his mother via email so that she can help to facilitate this psychiatry evaluation. This email was sent the same day and included the aforementioned recommendations along with a list of potential psychiatrists.

Clinician Signature:

_Amy Giguere Carney, LCSW_

Amy Giguere Carney, Licensed Clinical Social Worker

_4/22/2021_

Date

Amy Giguere Carney, LCSW
365 East Main St. Suite 2-8-E
Branford, CT 06437
(203)533-9833
acarneylcsw@gmail.com

# EXHIBIT E

*Curriculum Vitae*

**George Geysen, Psy.D.**
**Clinical and Forensic Psychologist**

<u>**Office Address**</u>

ChangePoint, LLC                                        Office: (860) 633-0703
Clinical and Forensic Consulting              Fax: (860) 633-1741
74 New London Turnpike                          Email: drgeysen74@gmail.com
Glastonbury, CT 06033                             Website: www.changept.com

<u>**Education**</u>

May, 2001     Psy.D. Doctor of Psychology, Clinical Psychology, University of Hartford
May, 1996     M.A.   Master of Arts, Clinical Psychology, University of Hartford
May, 1994     B.A.    Psychology (Cum Laude), Central Connecticut State University

<u>**Licenses**</u>

Licensed Psychologist, State of Connecticut, #002429, Expires 8/31/16

<u>**Professional Memberships and Certifications**</u>

Professional Member: American Psychological Association
          Member of:    Division 12, Clinical Psychology
                                 Division 41, Psychology and the Law
                                 Division 42, Independent Practice
                                 Division 51, Men and Masculinity
                                 Division 56, Trauma Psychology

Clinical Member – Connecticut Psychological Association
Clinical Member – Connecticut Association for the Treatment of Sexual Offenders (CATSO)
Clinical Member – Association for the Treatment of Sexual Abuses (ATSA)

<u>**Faculty Positions**</u>

*Adjunct Faculty (Past)*

University of Hartford Graduate Institute of Professional Psychology - Doctoral Program
Courses Taught: Forensic Psychology, Individual Psychotherapy

Southern Connecticut State University - School of Graduate Studies – Master's Program
Courses Taught: Psychology, Law & Ethics

<u>**Professional Employment**</u>

September 2006 – *Current,   Executive Director - ChangePoint, LLC, Glastonbury CT*
Deliver expert clinical psychological treatment and assessment for adults, couples and families. Provide forensic support services: Expert witness testimony, criminal responsibility evaluations, sex offense and violence risk assessment, substance abuse and psychodiagnostic examinations and parental fitness evaluations in child protective matters. Conduct safety sensitive psychological testing for public safety agencies and personnel selection, fitness for duty evaluations for law enforcement and correctional agencies, program evaluation and consultation to State Department of Developmental Services and the Department of Children and Families.

Dr. George Geysen - Curriculum Vitae                                          August 31, 2015
Page 2

8/06 – Current,   *Consulting Psychologist -Department of Developmental Services*
Provide consultation for behavioral programming, policy conformity and institutional review for
clinical and behavioral support services for persons with intellectual disabilities.

**Professional Contracts**

5/10 – Current, *Consulting Forensic Psychologist* – Concentra Medical Centers, East Hartford

- Perform psychological fitness for duty and return to work examinations for employees of the
  Department of Correction, the Department of Social Services and the Department of Mental
  Retardation who have been placed on administrative leave.

- Perform pre-employment psychological examinations of prospective candidates for
  conditional offers of employment for Connecticut State Police and the Department of Energy
  and Environmental Protection

9/06 – Current, *Forensic Psychologist* – Office of Public Defender Services, State of Connecticut

- Conduct violence and sex offense risk evaluations of juveniles, adults and developmentally
  disabled persons. Evaluate malingering, differential diagnosis, psychiatric mitigation and
  competency. Provide expert witness testimony as required and forensic support consultation

**Employment Experience**

10/02 – 6/12 *Consultative Examiner* Social Security Administration
Perform mental status and psychological examinations for Social Security Disability Services.

11/08 – 11/09   Clinical Psychologist - Department of Children and Families
Provide expert consultation and psychological, sex offense and violence risk evaluations for
male adolescents adjudicated delinquent in an enhanced security treatment facility.

10/03 - 11/06   Clinical Psychologist – Dept. of Mental Health - Whiting Forensic Services
Conduct individual and group psychotherapy for adults with criminal and sex offense histories
on inpatient basis. Perform forensic psychological evaluations, consult to treatment teams on risk
management, and prepare reports on release decisions for the Psychiatric Security Review Board.

11/02 – 9/06   Clinical Psychologist - ProviderCare Plus, South Windsor, CT
Provide integrative psychotherapy for adolescents and adults, disability evaluations of children
and adults and forensic evaluations of juveniles in group practice setting.

9/02 – 7/03   Psychologist - Wheeler Clinic -Northwest Village School, Plainville, CT
Perform psychotherapy for children and adolescents in a day treatment school. Conduct behavior
management plans, psychological evaluations, and consult with personnel and related agencies.

3/02 – 7/03   Psychotherapist - Wheeler Clinic, the Family Center, New Britain CT
Conduct counseling and parenting skills training and evaluations for family court as required.

10/01 - 10/02 Post-Doctoral Fellow - State of Connecticut, Dept. of Mental Retardation
Provide counseling, assessments and behavioral treatment plans for dually diagnosed and
developmentally disabled adults and psychoeducational support for staff and new employees.

Dr. George Geysen - Curriculum Vitae                                    August 31, 2015
Page 3

5/00 – 4/02     Substance Abuse Clinician - The Connection, Middletown, CT
Conduct intake assessments, provide psychotherapy to adults with substance abuse and co-occurring disorders, provide case management to the legal system.
8/98 - 10/01   Developmental Specialist -Department of Mental Retardation
Provide consultation, counseling, assessments and behavioral treatment plans for dually diagnosed and developmentally disabled adults, training and consultation for and to staff.

## Clinical Training

4/01 -4/02     Post-Doctoral Fellowship - State of Connecticut, Dept. of Mental Retardation
9/97 - 9/98     Pre-Doctoral Internship - Lincoln Medical and Mental Health Ctr., Bronx, NY
9/96 - 6/97     Clinical Practicum - Clifford Beers Guidance Clinic, New Haven, CT
5/96 - 6/97     Residential Counselor Mercy Housing and Shelter Corporation, Hartford, CT
8/95 – 6/96     Clinical Practicum Connecticut Children's Medical Center School, Hartford, CT
5/93 - 8/94     Rehabilitation Counselor - Institute of Living; Hartford, CT
12/92- 5/94     Parenting Group Counselor-Parent's Anonymous/Wheeler Clinic, Plainville, CT

*References, Publications and Presentations Available on Request*