UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA            No. 3:22-cr-90-AWT

       v.

JOSEPH AMADEO,
                          Hartford, Connecticut
               DEFENDANT      JANUARY 4, 2024

- - - - - - - - - - - - - - - - x


SENTENCING - VOLUME I


B E F O R E :

    THE HONORABLE ALVIN W. THOMPSON, SENIOR U.S.D.J.



A P P E A R A N C E S :


    FOR THE GOVERNMENT:

        DOJ-USAO
        157 Church Street, Suite 25th Floor
        New Haven, CT  06510
        BY:  AMANDA S. OAKES, AUSA
           SHAN PATEL, AUSA


    FOR THE DEFENDANT:

        FEDERAL PUBLIC DEFENDER'S OFFICE
        265 Church Street, Suite 702
        New Haven, CT  06510
        BY:  TRACY HAYES, ESQUIRE


                     Alicia A. Cayode Kyles, RMR
                     Official Court Reporter

1                         I  N  D  E  X

2    WITNESS                                          PAGE

3    Dr. George Geysen

4          By Mr. Hayes...................................7

5          By Ms. Oakes.................................38

6          By Mr. Hayes................................57

7          By Mr. Hayes................................62

8                         *  *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                (The Court entered at 12:04 p.m.)
 2            THE COURT:  Good afternoon.  Please be seated
 3   everyone.
 4            MR. HAYES:  Good afternoon, Your Honor.
 5            THE COURT:  We're here for sentencing proceedings
 6   in the matter of United States of America v. Joseph
 7   Amadeo, Docket Number 3:22-cr-90.
 8            Would counsel please state their appearances for
 9   the record and identify anyone at counsel table with you.
10            MS. OAKES:  Good afternoon, Your Honor.
11            Assistant United States Attorney Amanda Oakes for
12   the Government.  I'm also joined by Assistant United
13   States Attorney Shan Patel.
14            THE COURT:  Thank you.
15            MR. HAYES:  Good afternoon, Your Honor.
16            Tracy Hayes on behalf of Joseph Amadeo, who's
17   present and before Your Honor this afternoon.  In the
18   audience are his parents as well, who are here in support.
19            THE COURT:  Thank you.
20            And I'll just note for the record I believe that
21   all of the requirements -- oh, I'm sorry.  I forgot to
22   mention that Mr. Wackerman is here from the Probation
23   Office.  He's covering for Mr. Togninalli who is the
24   author of the Presentence Report in this case.
25                I note for the record that all of the
```

1    requirements with respect to victim notification have been

2    met in this case based on the things I've read.

3              MS. OAKES:  They have, Your Honor.

4              THE COURT:  Okay.  I got an email from the

5    Defense saying that Dr. Geysen might be here and he might

6    testify.  What is the status of that?

7              MR. HAYES:  Your Honor, he's -- actually he's on

8    his way.  We contacted one another several times this

9    morning.

10             THE COURT:  So you are expecting him to be here

11   shortly?

12             MR. HAYES:  Yes, Your Honor.

13             THE COURT:  Okay.  I did have a procedural

14   question about that, so maybe we can discuss that and

15   he'll come in while we're talking.

16             MR. HAYES:  Yes, Your Honor.

17             THE COURT:  When you use the word "testify" that

18   suggests he's going to get on the witness stand, you're

19   going to ask him questions, and the Government will have

20   the opportunity to cross-examine him.

21             MR. HAYES:  Yes, sir.

22             THE COURT:  Is that what is intended?

23             MR. HAYES:  That's how I see it, Your Honor, yes.

24             THE COURT:  Okay.  Whatever you want to do --

25             MR. HAYES:  Judge, the only other time I've done

1  this at sentencing is, frankly, before Your Honor and

2  that's what we did, this was several years ago, in that

3  matter, so I would see it the same.

4          THE COURT:  Well, just because I did it before

5  doesn't mean it's right.

6          MR. HAYES:  I took it as it was right, Your

7  Honor --

8          THE COURT:  Okay.

9          MR. HAYES:  -- but I understand.

10          THE COURT:  It's what will serve your purposes

11  best.

12          MR. HAYES:  Yes.

13          THE COURT:  This may be him coming in now?

14          MR. HAYES:  Yes, that's Dr. Geysen.

15          THE COURT:  Okay.  So if we're going to do that,

16  then one way to proceed might be just to take him before

17  we go any further and --

18          MR. HAYES:  Now.

19          THE COURT:  -- then we have that all as basis for

20  proceeding to the sentencing, as if we had a *Fatico*

21  hearing.  I understand he may give some expert opinions?

22          MR. HAYES:  Yes, sir.

23          THE COURT:  Okay.  In that case I think that

24  would be the most appropriate thing to do.

25          Do you want a couple of minutes to confer with

1  him before we start?

2        MR. HAYES:  Just a couple.

3        THE COURT:  Okay.

4        MR. HAYES:  Thank you, Your Honor.

5        (Pause)

6        MR. HAYES:  Thank you, Your Honor.

7        THE COURT:  So you can call him as a witness.

8        MR. HAYES:  Thank you, sir.  Thank you.

9        Your Honor, I'm calling Dr. George Geysen to the

10  stand.

11        THE COURT:  Geysen?

12        THE WITNESS:  Geysen, yes.

13        THE COURT:  Okay.  Thank you.

14        THE CLERK:  Please raise your right hand.

15        **GEORGE GEYSEN,**

16        called as a witness, having been first duly

17        sworn, was examined and testified as follows:

18        THE WITNESS:  I do, yes.

19        THE CLERK:  Would you please state your name for

20  the record and indicate the town and state in which you

21  live or work?

22        THE WITNESS:  My name is Dr. George Geysen and my

23  office address is 381 Hubbard Street in Glastonbury,

24  Connecticut.

25        THE CLERK:  Thank you.

```
 1              THE COURT:  Please be seated, sir.
 2              MR. HAYES:  Your Honor, is it okay if I stand at
 3    the podium?
 4              THE COURT:  Certainly.
 5                   DIRECT EXAMINATION BY MR. HAYES
 6    Q.  Dr. Geysen you've introduced yourself.  Can you please
 7    tell us -- you indicated, Dr. Geysen, what are you --
 8    what's your specialty?
 9    A.  Forensic psychology, mainly trained and licensed as a
10    psychologist in Connecticut.  It's just a general license
11    and then people specialize, so I'm a clinical and a
12    forensic psychologist.
13    Q.  Okay.  And I should ask, can you please give us some
14    background on your education so that we have that for the
15    record?
16    A.  Sure.  I graduated from Central Connecticut State
17    University with honors in 1994 with a bachelor's in
18    psychology.  Then I was admitted to the University of
19    Hartford where I completed a master's in clinical
20    practices and then a doctorate in psychology degree in
21    2001 and I was licensed by the State of Connecticut in
22    August of 2002.
23    Q.  And is it fair to say you've been practicing since
24    2002?
25    A.  Yes, although, you know, during training there's some
```

1   practice, supervised practice, that happens and so forth,

2   training, but independently licensed as of 2002.

3   Q.  And can you give us some background on your career,

4   what did you -- were you in private practice when you

5   first started?  Did you practice at a facility, an agency?

6   A.  My first paid position was with the State of

7   Connecticut actually, it was with the Department of then

8   Mental Retardation, 1998.  I worked there for a few years,

9   completed postdoctoral study, became licensed, and then

10  moved into state service at the Whiting Forensic Hospital

11  Connecticut Valley Hospital Middletown.  I was there for

12  three years as a staff psychologist on one of the units,

13  all along practicing in group practice outside in the

14  community, children, families, so forth.

15      In 2006 I left Whiting CVH and opened up an

16  independent practice of clinical and forensic psychology

17  in Glastonbury where I remain today.

18  Q.  And in terms of your field, why would someone contact

19  you and need an evaluation?  What do you do?  What do you

20  offer?  What are you looking for?

21  A.  I'm often contacted -- I've done mostly primarily work

22  with public defender services since about 2003 or 4 under

23  supervision, but began working with the Office of The

24  Public Defender around the state, became specialized in

25  the assessment and treatment of sex offenses and became a

1    clinical member of the Connecticut Association for the

2    Treatment of Sex Offenders, which I'm also -- I still

3    remain.  I'm actually on the board now as we sit.

4        So my practice became, forensic practice became more

5    specialized, not only just general forensic practice but

6    also specialized not only in my work with developmentally

7    disabled adults but also developmentally disabled adults

8    with criminal issues and a risk assessment and so forth,

9    and so it just kind of emanated from there.

10   Q.  In your practice do you treat I guess ongoing -- do

11   you offer ongoing treatment?

12   A.  Yes, uh-huh.

13   Q.  Okay.  And in your practice, have you had any

14   experience with individuals who are on the autism

15   spectrum?

16   A.  Yes.

17   Q.  Could you -- before we go into that some more, could

18   you tell us what that is, what that means when someone is

19   on the autism spectrum?

20   A.  It's what used to be called a persuasive developmental

21   disorder, but it used to be called really just plainly

22   autism.  It comes from the 40's, 50's.  Over the years

23   it's been refined.  It became a pervasive developmental

24   disorder autism, and then it became an autism spectrum

25   disorder.  Now we're back to in the DSM-5 autism spectrum

```
 1   disorder I think is the formal classification, but
 2   restricted range of social interests, interaction,
 3   repetitive behaviors, extreme interpersonal difficulty,
 4   emotionally -- regulating emotion and social and
 5   interpersonal difficulty.  It's a chronic and pervasive
 6   and lifelong psychiatric disability.
 7   Q.  Is that something that -- so when you say that, you
 8   said "lifelong", does that mean that one doesn't age out
 9   of this at some point?
10   A.  No, not typically.  I've not heard that.  I mean
11   typically the challenges are managing behavior as the
12   individual progresses throughout the lifespan, so
13   different challenges, like for all of us come up, but also
14   for persons with autism spectrum disorder.  But they have
15   a very difficult, you know, kind of range of ability to be
16   able to deal with them.  And so different things come up
17   and those are typically managed in treatment and so forth,
18   but it's not something that you grow out of.
19   Q.  What about -- can you take medication and get better?
20   A.  Yeah, well, autism spectrum disorder is a chronic and
21   pervasive psychiatric disorder but typically people also
22   have other disorders as well, so -- and a lot of times the
23   symptoms that are associated with co-occurring disorders
24   are treated psychiatrically through medication and
25   whatever.
```

1   Q.  And so when you say "co-occurring", could you give us

2   an example of that?

3   A.   Sure.  A person with autism spectrum disorder may also

4   have an anxiety disorder.  They may also have a major

5   depressive disorder.  They may have significant

6   interpersonal dysfunction and personality disorder,

7   impulse control disorders.  A lot of these things are

8   managed psychiatrically to different degrees by

9   professionals in the community and clinics and so forth.

10  Q.  And so when it's -- when we hear "autism spectrum",

11  I'm trying to get a sense of the meaning.  Is everyone

12  who's on the spectrum, are they all the same?  Do they all

13  have the same sort of presentation?

14  A.  No, certainly not.  I mean it's a spectrum.  So, I

15  mean, we have people who are sort of, used to be called

16  higher functioning.  Those persons with that condition

17  were also considered to have Asperger's disorder.  That's

18  no longer considered a diagnosis really.  It's been sort

19  of replaced and now like many psychiatric disorders in the

20  DSM itself are now on the spectrum -- select mood

21  disorders for example, autism spectrum disorder, thought

22  disorder.

23  Q.  And so you, you indicated that you also specialized in

24  evaluating people who have -- charged with sex offenses?

25  A.   Uh-huh.

1    Q.   Have you had experience with people who are charged

2    with sex offenses who are also on the autism spectrum?

3    A.   Yes, some.

4    Q.   Some.  And, but you have -- you've seen that?

5    A.   Yes.

6    Q.   Okay.  And could you give us a sense of maybe, is

7    there an age range, is it someone who's younger, a minor,

8    a teenager, an adult?  What have you seen?

9    A.   Well, most of my experience with that population

10   really comes through my work with the Department of

11   Developmental Disabilities and so a lot of times I'd see

12   persons who were on the autism spectrum, but who are also

13   intellectually disabled, maybe mildly or borderline

14   intellectually disabled and oftentimes would require a

15   plan of services involving a team of providers, different

16   therapies, occupational therapies, psychiatrists,

17   psychologists, behavioral analysis and so forth and so

18   it's -- in my mainstream clinical practice at presently I

19   don't do any treatment with persons who have autism

20   spectrum disorder.  I would probably refer them out.  It's

21   become kind of a highly-specialized area of clinical work.

22   Q.   Okay.  And do you recall at some point -- well, strike

23   that.  Let me ask you this.

24        So --

25              THE COURT:  I sort of got lost --

```
 1              MR. HAYES:  I'm sorry, Judge.
 2              THE COURT:  -- at some point.  You asked does he
 3   have any experience working with people on the spectrum
 4   who've been charged with sex offenses.
 5              MR. HAYES:  Yes, sir.
 6              THE COURT:  He said "some"
 7              MR. HAYES:  Yes.
 8              THE COURT:  And then I thought your next question
 9   was sort of going to flesh that out, but I sort of didn't
10   follow how his answer responded to that.
11              MR. HAYES:  So let me, if I can get back to that
12   and then I'll go specifically here.
13   Q.  (By Mr. Hayes)  And so you say "some".  In terms of
14   the overlapping -- I'm going to call it ASD --
15   A.  That's -- yeah, fine.
16   Q.  -- autism spectrum disorder and sex offenses?
17       You said "some".  Do you have a sense of maybe how
18   many you've seen over time?
19   A.  Yeah, I would say between 30 and 50 persons, but I
20   would say also primarily within the context of a
21   consultant who -- State of Connecticut DDS, I would see
22   them as part of a team of providers.  I'd be brought in as
23   a consultant and I would do evaluations and so forth.  And
24   over the years, since 2003, probably 50 persons.
25   Q.  And, have you, yourself --
```

1          THE COURT:  And I'm sorry --

2          MR. HAYES:  Yes, sir.

3          THE COURT:  -- but you also mentioned people who

4     were intellectually disabled.  Are they included in that

5     50 persons?

6          THE WITNESS:  Yes.

7          THE COURT:  What percentage of them are?

8          THE WITNESS:  Yeah, I would say as far as persons

9     who had a co-occurring disorder who were intellectually

10    disabled but also so on the autism spectrum, that's a

11    pretty small portion.  I would say it's probably, you

12    know, 5 to 10 out of the 50 people over 20 years.  And

13    keep in mind, my practice has dwindled away.  I moved from

14    that, moved more into general forensic practice at this

15    point, so.

16         THE COURT:  So 40 to 45 of the people that you

17    treated who are on the spectrum were charged with sex

18    offenses do not have intellectual disabilities?

19         THE WITNESS:  I'm sorry.  Can you restate that,

20    please?

21         THE COURT:  Sure.

22         You said 30 to 50 persons and we took 50.  And I

23    asked what subset of those -- and those are people who are

24    on the spectrum and are charged with sex offenses?

25         THE WITNESS:  Yes.

1          THE COURT:  Okay.  And I asked what percentage of

2    those are people who have intellectual disabilities, you

3    said 50 to 10.

4          THE WITNESS:  I'm sorry.  I misunderstood that.

5          Of the subset of persons of about 50 persons in

6    my clinical practice, since I began, I've probably

7    treated, which is what we're looking for here, 50 adults

8    with intellectual disabilities and of that group, who have

9    had sex offenses -- so treated and/or evaluated as a

10   consultant 50 adults, at least 50 adults with intellectual

11   disabilities.  And probably of that, maybe 15 percent also

12   had a diagnosis that was on the autism spectrum.

13         THE COURT:  Okay.

14         THE WITNESS:  So that is sort of a subset of the

15   intellectually disabled.

16         THE COURT:  So that's 7 to 8 people?

17         THE WITNESS:  Possibly.  Yes, that sounds about

18   right, yes.

19         THE COURT:  All right.

20         THE WITNESS:  Can I just add though --

21         THE COURT:  Sure.

22         THE WITNESS:  -- we also have to keep in mind

23   that the base rate is so extremely low and such a -- you

24   know, a person having an intellectual disability who's

25   also on the spectrum who's charged with a sex offense is a

1    very, very small number, so.

2            THE COURT:  Yes.

3            THE WITNESS:  And so over 20 years of practice

4    seven persons is actually a lot.

5            THE COURT:  Okay.

6    Q.  (By Mr. Hayes) And in your practice, you're not -- or

7    do you diagnose someone with autism?

8    A.  Yes, I can.

9    Q.  Okay.

10   A.  I'm trained and licensed to do that.

11   Q.  Have you done that in your practice or have you --

12   A.  Yes.

13   Q.  Okay.  Okay.  And in this matter with Joseph Amadeo --

14   you're familiar with Mr. Amadeo?

15   A.  Yes, I am.

16   Q.  Could you tell us when you first, if you recall, when

17   you first met with Mr. Amadeo?

18   A.  I first met Mr. Amadeo I believe in actually 2012.

19   Then I was in my private practice.  I was actually in

20   another office in Killingworth and I met him and his

21   parents.  I was referred -- he was referred to me for an

22   evaluation by the Office of Public Defender Tom Ullmann

23   who at that time was New Haven, and that's when I first

24   met Joe.

25   Q.  And what were you asked to do at that time when you

1  first met Joe, do you recall?

2  A.  Yeah, well, at that time Joe had been charged with an

3  offense involving, you know, receiving or collecting child

4  pornography and there was an inquiry about psychosexual

5  risk evaluation to sort of assess his level of risk to

6  possibly reoffend potentially and what might that look

7  like.  And so that requires an evaluation of a person

8  certainly, and so that brought me into his educational

9  history and his background and other evaluations he'd had,

10  but also into current, at that time current, with respect

11  to issues relative to reoffending.

12  Q.  Do you recall -- and so you also met with his parents

13  as well?

14  A.  Yes.  It's really sort of a compulsory part of the

15  work that I would do with a person who's developmentally

16  disabled or on the autism spectrum to just gather

17  collateral information and kind of ground some validity in

18  terms of reporting.  Their reporting can be a little, you

19  know, inconsistent so.

20  Q.  And do you recall your, I guess the results of your

21  evaluation at that time in 2012?

22  A.  I have a copy.  If I could refer to it, if that's

23  acceptable?  I mean, I do -- it's -- there are a number of

24  diagnoses.  I can't recall specifically each one of --

25            THE COURT:  It's not a memory test.  We all have

1    it.

2              MR. HAYES:  Thank you.

3              THE COURT:  Go ahead and refer to it.

4              THE WITNESS:  Oh, okay, yeah, I brought just to

5    refer to.

6              THE COURT:  This is the August 16, 2012, report?

7              MR. HAYES:  Yes, sir.

8              THE COURT:  Okay.

9              THE WITNESS:  August 16, 2012.

10             Yeah, I offered a diagnoses at that time being

11   mindful of the time period we're under DSM-4 at that

12   point, not DSM-5.  And a diagnosis of Asperger's disorder,

13   which is now autism spectrum disorder, kind of mild.

14   Anxiety disorder, not otherwise specified, meaning

15   generally it's kind of general and far ranging, a lot of

16   different pieces; ADHD attention deficit hyperactivity

17   disorder; learning disorder; adjustment disorder with

18   depressed mood, which I felt was chronic; and then, you

19   know, other conditions that sort of came up were deferred,

20   sort of personality.

21             You know, in some ways it's difficult to talk

22   about the personality.  His personality is very impaired,

23   but, you know, also he's a man with a psychiatric

24   disability so it's hard to sort of tease out.

25             THE COURT:  And just to be clear, Doctor, you're

1  looking at Page 20 of your report now?

2          THE WITNESS:  I am on Page 20 of my 2012 report,

3  yup.

4  Q.   (By Mr. Hayes) And you submitted that report?

5  A.   Yeah.

6  Q.   And years later you've been asked to re-evaluate

7  Mr. Amadeo for this matter?

8  A.   Yes.

9  Q.   Okay.  And you did that?

10 A.   Yeah, I was contacted by your office I believe June of

11 2021.

12 Q.   Yes.

13 A.   And you know, told that, you know, there had been some

14 new developments with Mr. Amadeo, would I consider

15 re-evaluating him, so yes, absolutely and did so during

16 the pandemic which meant managing, you know, a lot.  It

17 was a very difficult time, but also again met with his

18 parents.

19      And in some ways it's an interesting piece of work to

20 see parents and a family at one part of lifespan and then

21 10, 12 years later at a different so, and I was happy to

22 see them and I was happy to seem them today as well, so I

23 don't want to lose that part of this.  But I met with them

24 as well as Joe I think on three occasions in 2021 and then

25 did another evaluation.

1    Q.  Do you -- can you recall, in terms of the most recent

2    evaluation, did it differ, was it similar to what you had

3    seen previously?

4    A.  I mean both I would say.  It was similar in the sense

5    that it was really what I would call kind of clinically

6    the same sort of topography, you know, the type of

7    behavior that was being displayed, the thing that got him

8    to our attention was the same exact type of behavior that

9    he engaged in in 2012.

10       And so it's mixed in the sense that it's very much a

11   hallmark or, you know, a classic aspect really of a fixed

12   and repetitive pattern of stereotypical interests, which

13   is diagnostic, you know, and part of the disorder itself.

14   I wasn't that surprised, but I was a little -- you know, I

15   did note that the behavior had kind of broadened and

16   expanded and it ranged out a little bit in scope.  It was

17   generally a very private and solitary thing that he

18   engaged in on the Internet, but in terms of the topography

19   again, the different types of, I would say paraphilic

20   behaviors that were displayed were different and that was

21   noted by police in their reporting around that incident

22   when they searched the home.

23   Q.  Okay.  So you're not talking about -- when you refer

24   to "paraphilic", you're not talking about the actual

25   images themselves, you're talking about the items that

1  were found?

2  A.  Right.  Yeah, a number of different objects and items

3  were identified and found, which said to me that things

4  had kind of broadened in scope a little bit.  I wasn't

5  exactly sure what to make of it but it was notable.

6  Q.  So as you sit there now, are you aware that Mr. Amadeo

7  was also searching and/or collecting adult pornography as

8  well?

9  A.  I was not aware of that.

10 Q.  Okay.  So when you use the term "paraphilic", that

11 could be if he, Mr. Amadeo, Joe, were using what would be

12 the child pornography for, like, his gratification, is

13 that -- am I right there, am I?

14 A.  Yeah, I mean when we talk about paraphilic disorders

15 which are also a psychiatric condition separate in the

16 DSM-5, and when we're talking about a number of different

17 types of sexualized sort of behaviors, fetishes,

18 exhibitionism, voyeurism and so forth, but also, you know,

19 child pornography.

20    Typically it's in the range of what we might call

21 pedophilia but, you know, it's -- that's a very involved

22 and complex kind of evaluation and process and so

23 normally, you know, folks will end up with a couple of

24 different disorders and oftentimes those judgments will be

25 suspended for, you know, kind of future to be ruled out

1  and paraphilic disorder will be kind of offered instead.

2  Q.  In terms of the co-occurring disorders, did you see

3  any of that this time around in the most recent

4  evaluation?

5  A.  Yeah, certainly Mr. Amadeo started off our interview

6  basically telling me that he thinks -- you know, I asked,

7  so, Joe, how's it going, how you been, I haven't seen you

8  in 10 years or whatever.  He sits down and he says, you

9  know, essentially well, you know, my life is daily full of

10  thoughts about how I might kill myself.  Which, you know,

11  as a clinician who's known him I wasn't exactly surprised.

12  I was extremely dismayed, but I wasn't also alarmed.  I

13  wasn't going to react.  We had an evaluation to complete

14  and he was very consistent.  I wasn't really that

15  surprised.  That too was a fairly obsessive, repetitive,

16  ritualized pattern of behavior for him.

17  Q.  And when you use the term "obsessive", I don't recall

18  if you mentioned that Joe was diagnosed with compulsive

19  obsessive disorder?

20  A.  Obsessive-compulsive disorder.

21  Q.  I'm sorry.  I knew it didn't sound right when I said

22  it.

23  A.  Yeah.

24  Q.  Did you -- is that something you found?

25  A.  I don't know that I diagnosed him with that.  I mean I

1    think it's fair to sort of point out too that, you know,

2    diagnoses are not arrived at by myself independently of

3    everything else.  You know, it's typical to have data from

4    collateral information, from testing sources, from other

5    clinicians who've evaluated.

6         Again, you know, autism spectrum disorder is a

7    lifelong chronic disability, so it's not unusual in these

8    types of evaluations and these types of contexts to have a

9    variety of professionals who've sort of opined.  It's also

10   in some ways sadly, I think maybe even somewhat gratifying

11   to sort of have reaffirmed the fact that this is a

12   lifelong chronic condition.  You know, seeing him at

13   different points in time over 15 years, it doesn't really

14   change.

15   Q.  And so --

16             THE COURT:  So just to clarify one thing.  On

17   Page 7 of your report, just above the conclusion, two

18   lines above, you make reference to obsessive-compulsive

19   behavior.

20             THE WITNESS:  Yes.

21             THE COURT:  You said you did not diagnose him

22   with obsessive-compulsive disorder.  You just -- it was

23   behavior?

24             THE WITNESS:  Yeah, I'm sorry.  Is this the 2012

25   report?

1          THE COURT:  No, this is the current report.

2          THE WITNESS:  The current report.

3          THE COURT:  Yeah.

4          THE WITNESS:  Let's see.  Yeah, I mean certainly

5   it's possible for a person to engage in and display

6   obsessive-compulsive behaviors and yet probably not meet

7   the full criteria for a diagnosis.

8          THE COURT:  Thank you.

9          THE WITNESS:  If that's what you're asking?

10          THE COURT:  Yeah, that's what I wanted to make

11   sure I understood.

12          THE WITNESS:  Uh-hmm, yes.

13          THE COURT:  Okay.

14   Q.   (By Mr. Hayes) So when you refer to I guess

15   obsessive-compulsive behavior, could you -- what did you

16   see in this case that led you to that observation?

17   A.   Well, I mean again this also kind of relates to the

18   current DSM-5 terminology.  We now have something, I

19   believe is proposed, called hoarding disorder.  But back

20   in 2012, you know, we didn't have hoarding disorder

21   necessarily.

22      But, you know, Mr. Amadeo was a collector.  He was an

23   obsessive collector, you know, very, very detailed.  He

24   would spend a lot of time in a very unusual somewhat odd

25   selection of objects that he would collect, but for me as

1    a psychologist that's a very peculiar and particular

2    obsessive fascination and a compulsive behavior.  I don't

3    know that it meets, you know, the diagnosis.

4         And actually, unfortunately sometimes in these kinds

5    of cases there are so many different diagnoses that to

6    just add another might not necessarily be prudent from a

7    clinical perspective.

8    Q.  In your most recent report or part of your evaluation,

9    you assessed Joe for I guess sex offense risk?

10   A.  Yes, recidivism, sex offense risk, recidivism.

11   Q.  Could you give a sense of what did that entail?  How

12   you assessed Joe?

13   A.  Well, I mean it entails receiving records that I've

14   been provided with.  It entails having Joe be transported

15   to my office.  He doesn't drive.  It was during COVID

16   which made it a little bit unusual, coming in wearing

17   masks and so forth, a barrier to kind of clinical sort of

18   intimacies so to speak, meeting with his parents, them

19   coming up, arranging time to come, also administering some

20   questionnaires to Joe.  I was fortunate to have had my

21   previous evaluation so I was able to kind of, in a sense,

22   download a lot of the basic psychosocial history.

23        I also, you know, realized that he had been offense

24   free for several years until he completed probation in

25   2018.  And so I was seeing him at a point where, you know,

1    years after that things had slowly devolved in his life I

2    would say, necessitating, you know, leading him to, you

3    know, the behaviors that got him again into trouble.

4         So I wanted to see, you know, what I had seen back in

5    2012, what had happened in the interim, but then also get

6    a fresh take on where he's at now and what are some of the

7    areas of concern.  Some things had changed that were

8    significant in my thoughts about Mr. Amadeo and some were

9    not actually.

10   Q.  In terms of Joe's risk of recidivism, do you recall

11   what your conclusion was in your previous 2012 --

12   A.  Yeah, I mean I'll have to get to it.

13        I'm sorry.

14        Actually, I stand corrected.  In the original

15   evaluation of 2012 it doesn't actually appear that I did a

16   sex offense risk assessment.

17   Q.  Okay.

18   A.  So I don't believe I actually offered an opinion about

19   that but, you know, likely described a number of different

20   aspects of his situation, his psychiatric disability and

21   so forth that might propensiate or might, you know, might

22   potentially relate to an act of reoffending.

23   Q.  So here, in the most recent report --

24   A.  Yes.

25   Q.  You did --

1    A.  Yes.

2    Q.  -- this?

3              THE COURT:  Let me just ask one question if I

4    can.

5              MR. HAYES:  Yes, yes.

6              THE COURT:  So, your -- on Page 21 in your

7    report, Paragraph Number 7, it says, "Treatment for

8    sexually offending behavior is not recommended."

9              If you had thought there was a risk, would you

10   have recommended treatment for sexually offending

11   behavior?

12             THE WITNESS:  You're on Page 21?

13             THE COURT:  Oh, I'm sorry.  Let me let you catch

14   up.  Page 21 of your 2012 report; Paragraph 7.

15             THE WITNESS:  Is there a number, Your Honor?

16             THE COURT:  Paragraph 7.

17             THE WITNESS:  Treatment is not recommended.

18             THE COURT:  And my question is, if you had

19   thought that there was a risk of future sexual, I forget

20   what the phrase was, would you have recommended it?

21             THE WITNESS:  The answer is yes --

22             THE COURT:  Okay.

23             THE WITNESS:  -- if I had felt it was a risk.  I

24   mean there's always a risk.  I don't ever believe it's a

25   zero risk --

1          THE COURT:  Right.

2          THE WITNESS:  -- of them, I mean, you know,

3    hypothetically speaking.  So there's always a risk but I

4    believe in the first evaluation I was really trying to

5    identify mitigating factors and so forth related to

6    sentencing with respect to his psychiatric disability.  I

7    was not asked specifically about sex offense risk as I was

8    in 2021.

9          MR. HAYES:  Judge, I think it's important --

10   Q.  (By Mr. Hayes) So when The Court says "risk" are you

11   thinking, are you thinking hands-on risk or are you

12   thinking similar behavior risk or is it the same?

13   A.  Well, again I was not, in 2012 was not asked really to

14   offer an opinion about sex offense risk.  I may have done

15   so kind of peripherally or alluded to it, but I wasn't

16   asked specifically, but -- and I'm sorry, I've lost your

17   question, Tracy.

18   Q.  No, that's fine.  I just wanted to get a sense of when

19   you talk about risk of reoffending is, are you thinking of

20   one who will have hands-on risk of reoffending?

21   A.  You know, when I do an evaluation of sex offense risk,

22   this may be just the way that I work personally or

23   professionally as a clinician, but I'm very much tied to

24   the exact nature of what type of behavior the person was

25   charged with.

1     As I said, there's a whole range of different sexual

2     offending behaviors.  I really abhor the term "sex

3     offender" actually because it doesn't really tell us

4     anything really about the person, so I likely, you know,

5     really focus on primarily on the person, the type of

6     offending behavior, and out of that would offer opinions

7     about recidivism based on the particular topography of the

8     behavior, factors related to their psychiatric

9     functioning, supports in their life and so forth,

10    containment, probation, and then would offer an opinion

11    relative to those factors -- I'm terribly sorry, and then

12    offer an opinion relative to supports in his life and

13    those, that whole range of factors.

14         An assessment is really a comprehensive

15    collection of different dynamic risk elements and static

16    risk elements and protective factors in a person's life.

17    Q.  (By Mr. Hayes)  So in your more recent 2022 report or

18    in your evaluation, you used I think it's called the

19    CPORT?

20    A.  Uh-huh.

21    Q.  Can you just give us a sense of what that is as a

22    tool?

23    A.  Well, one of the -- I mean deep schisms I would say

24    in, you know, sex offense risk related work is the issue

25    of contact versus noncontact versus, you know, persons

1    engaged in Internet-related type behavior versus people

2    engaging in actual hands-on activity.  And so to try to

3    assess that has been very, very difficult.  I mean so now

4    we're in the Internet age and social media, so now we have

5    tools that have been evolved and the CPORT was one of

6    those and, unfortunately, as is the case with a lot of

7    instruments in sex offense assessment area, they come in

8    from Canada, probably due to political reasons and social

9    climate and whatnot.  A lot of them are not normed on U.S.

10   populations and certainly when we get down to people,

11   adults involved in, you know, noncontact Internet-related

12   offending it's a very, very small base rate that we're

13   talking about.

14        So we adapt, most of us professionals adapt tools that

15   are published for use.  In this case the CPORT is

16   published but I don't believe it's been extensively peer

17   reviewed but people are using it so that looks at

18   computerized online pornography behavior.

19   Q.  And you did an assessment with Joe regarding what

20   would be hands-on behavior in the future?

21   A.  Yeah.  May I just turn back to the 2021 evaluation

22   because that's what we're talking about here.

23        So on Page 5 of that report -- well, I should say that

24   this morning in preparation for coming in I made some

25   edits and revisions, so this is not the actual original

1    document I submitted.  This is kind of an abbreviated

2    version.

3        But I'm looking at what I have to be Page 5 under what

4    I'm now calling sex offense risk and it talks about, you

5    know, just some general background about persons

6    engaging --

7             THE COURT:  Is that that what begins under the

8    heading:  Assessment of Sex Offense Risk?

9             THE WITNESS:  Possibly, yeah.  I may have altered

10   it.  Now on my document it says:  Sex Offense Risk.

11            THE COURT:  Okay.  In the second paragraph you

12   talk about CPORT?

13            THE WITNESS:  Yes.

14            THE COURT:  Okay.  So that's on Page 6 of what we

15   have on the docket?

16            THE WITNESS:  Yeah.

17            THE COURT:  Okay.

18            MR. HAYES:  Yes, Judge.

19            THE WITNESS:  Right.  So it talks about the tool

20   there.  It's a seven-item tool used to assess the

21   likelihood of future sex-related offending.  It was normed

22   on Canadian populations.  It requires more extensive

23   validation.

24            In this particular evaluation, because of the

25   nature of Mr. Amadeo's offense, charged offense, I felt it

1   was important to at least take a look at the computerized

2   aspect of, you know, the risk of computerized access and

3   so forth with regard to child pornography.  Then I went on

4   to do a more standard consideration of static factors and

5   dynamic risk factors and protective factors and so forth.

6   Q.   (By Mr. Hayes) And do you recall -- and it's in your

7   report, what your conclusion was in terms of Joe

8   reoffending in the future?

9   A.   Under my conclusion with respect to his sex offense

10  recidivism Mr. Amadeo's risk to engage in future

11  Internet-related, in Internet-related offense, if

12  unmonitored, appears unchanged --

13  Q.   Okay.

14  A.   -- when compared with that in his prior conviction,

15  2013.

16      Again, reminded that I didn't actually assess, but

17  looking at that aspect relative to that particular

18  evaluation and then this one, things really hadn't changed

19  very much.

20      So as I said earlier when I said in some ways it was,

21  it's gratifying to know that things are very, very stable,

22  but in another sense it's also a little dismaying

23  professionally, so.

24  Q.   So you talked about --

25              THE COURT:  I just want to understand this thing

1    about, you say he scored a 3 on the CPORT?

2              THE WITNESS:  Uh-huh.

3              THE COURT:  I know that there are  cautions about

4    using this tool, but since you did, I guess I'd like to

5    understand what is the scale for scoring on CPORT?

6              THE WITNESS:  Zero to 7 --

7              THE COURT:  Zero to 7.

8              THE WITNESS:  Yeah.  It's a 7-point scale, right.

9    So a 3 is somewhere in between and it does say that I

10   considered him, based on that finding, that correlates to

11   what's considered a moderate to high risk to reoffend in a

12   noncontact hands-off manner.

13             I went on to state that Mr. Amadeo's use I

14   thought was compulsive and impulsive, however, due to his

15   very extreme social skill deficits his risk for an actual

16   hands-on offense with another person is very low.

17             I mean, that's a very important thing to consider

18   and I don't want to get too deeply into it, but I mean I

19   do think that that really is the fear ultimately is that,

20   you know, some behavior that occurs in isolation over the

21   Internet, as troubling as that is, translates into the

22   actual world with humans.  And I don't know that it's ever

23   been conclusively proven or demonstrated that that

24   actually occurs, but that is the fear and the fear drives

25   a lot of this work in my opinion.

1            THE COURT:  The fear being that noncontact could

2    lead to?

3            THE WITNESS:  That the Internet is a gateway to

4    actually offending against a minor in the community.

5            THE COURT:  So what would it take to score a 6 or

6    7 on the CPORT scale?

7            THE WITNESS:  I'm not an expert on the

8    instrument.  I'd imagine more expressed interest in

9    certain types of child actors, male versus female, age

10   perhaps.  I don't -- I'm not an expert on the instrument.

11           THE COURT:  Okay.  How often have you used it?

12           THE WITNESS:  I'm sorry?

13           THE COURT:  How often have you used it?

14           THE WITNESS:  I believe this may have been the

15   only case that I've used it.

16           THE COURT:  Okay.  Alright.

17   Q.   (By Mr. Hayes) You talked about in your evaluation

18   ways to keep what we saw in this case from occurring

19   again.  Could you discuss some of that, controls if you

20   will, or --

21   A.   Are you talking about 2012, '13?

22   Q.   No, this current report.

23   A.   And I'm sorry, ways?

24   Q.   To keep Mr. Amadeo from reoffending.

25   A.   Right.  Well, let's see.

1      Yeah, under the recommendations in that report.

2  Q.  Uh-huh.

3  A.  I suggested that he required medical care and

4  psychiatric treatment for his psychiatric disability.

5      One of the challenges is, you know, insurance-related

6  social challenges, hard to find providers who have the

7  particular area of interest and specialization to treat

8  somebody like Mr. Amadeo.

9      And also, you know, sometimes, psychiatric medication

10  can be used in the management and treatment of what might

11  be considered sex offense risk, acting-out behaviors

12  impulsivity, judgment, that kind of thing.

13      I also suggested that he be considered for admission

14  to the Department of Mental health and Addiction Services.

15  So again, I was thinking more of community-based

16  management, closer education and support monitoring for

17  him.

18      As a man with a psychiatric disability I even

19  specified where, I thought Whiting.  Since I've worked

20  there I thought that would be a good place, if we could

21  arrange it.  And I think for a time actually we even tried

22  to arrange some case management support to get him an

23  intake interview and never came to pass.

24      I also thought that he should receive a careful and

25  thorough psychiatric evaluation to really consider

1    pharmaceutical measures designed to address attentional

2    deficits and he's a man with an attention deficit disorder

3    that's long standing.  That's typically psychostimulant

4    medication, but also his mood disorder, anxiety, and

5    possibly to help diminish his own sexual urges and desires

6    and that's really the province of a medical professional.

7    I'm not really qualified to talk about that, but sometimes

8    there's side effects that can diminish libido and so

9    forth.

10   Q.  And so at the time it's fair to say, based on what you

11   just told us from your recommendations that these things

12   weren't happening, he wasn't receiving those, that type of

13   medication and that type of treatment around the time you

14   were evaluating Mr. Amadeo?

15   A.  When I saw him in 2021, again, my assessment of his

16   history between 2012, 2013 and 2021, was that for a number

17   of years he was on probation and I'm not at all surprised

18   he was highly compliant with probation and monitoring.  He

19   even was able to apparently to work at a Dunkin' Donuts

20   restaurant for a period of time, although my understanding

21   was that, you know, that kind of devolved.  There was

22   conflicts and so forth, but and he struggled and

23   part-time, he doesn't drive, doesn't have a license, but

24   he was trying.  He was participating in counseling

25   intermittently.  And he successfully completed probation

 1    in December of 2018.  So I thought that's really kind of

 2    an outcome that indicates success.

 3        But also, you know, a number of other things happened.

 4    I think in the family as well.  His father had a medical

 5    condition that disabled him and found him at home which

 6    certainly impacted the family.  His mother was working but

 7    then she eventually learned that she was going to be laid

 8    off and I think things maybe become a little bit

 9    permissive in terms of Mr. Amadeo.

10        Here he was 30 some odd years old, had a very

11    restricted range of interests, didn't present a lot of

12    behavioral management challenges, and so I think probably

13    when things got a little laxed, then I think over time he

14    resorted back to his repetitive range of restricted

15    interests, you know, his behaviors, except that, as I

16    said, when I saw him in 2021 things had become a little

17    bit more broadened and, you know, just a little bit more

18    curious in terms of the collecting nature.

19            MR. HAYES:  Your Honor, I don't have any further

20    questions I'm not sure if the Court -- I could request

21    that Dr. Geysen be found an expert if that's, if The Court

22    prefers.

23            THE COURT:  I don't have a preference.

24            MR. HAYES:  I don't think we need to do that

25    here, Judge.

1              THE COURT:  Okay.  That's fine.

2              MR. HAYES:  But I have no further questions on my

3    end, but I don't know if The Court does.

4              THE COURT:  I just had one question.

5              Doctor, you mentioned a few minutes ago that some

6    things had changed between 2012 and when you saw

7    Mr. Amadeo more recently.

8              I didn't catch -- some things had changed that

9    were significant, I'm sorry.  What things were those that

10   were significant that had changed?

11             THE WITNESS:  I think then I began to talk about

12   some of the other protective factors and things in the

13   home, things that were really outside of Mr. Amadeo's

14   control that ultimately contributed to some challenges for

15   the family, you know, father's disability, it disabled him

16   and then mother, her loss of her job and so forth.

17             THE COURT:  Okay.  Thank you.

18             THE WITNESS:  You're welcome.

19             MR. HAYES:  Thank you, Your Honor.

20             THE COURT:  Okay.  Ms. Oakes.

21             **CROSS EXAMINATION BY MS. OAKES**

22   Q.  Good afternoon, Dr. Geysen.

23   A.  Hello.

24   Q.  I'm Amanda Oakes.  We met I think it was about a year

25   and a half ago.

1   A.  New Haven.

2   Q.  Yes, yes.

3      I have a few questions, some clarification.

4      Mr. Amadeo's IQ, that's -- it was approximately 112

5  and that's above average; is that correct?

6   A.  High average as assessed by Dr. Selden in 2008, yes.

7   Q.  So you said that was assessed by Dr. Selden?

8   A.  Yes.

9   Q.  Okay.  In your process, as a provider and arriving at

10  diagnoses, you know, you review a lot of documents; is

11  that correct?

12   A.  Uh-huh.

13   Q.  And, you know, reports and now here with Mr. Amadeo

14  there's documents that were received from other providers

15  that you've reviewed; is that correct?

16   A.  Yes.

17   Q.  Okay.  And perhaps diagnoses that they arrived at that

18  you reviewed?

19   A.  Yes.

20   Q.  And you relied on those and drafted in the report?

21   A.  They inform my understanding of the case, yes, but yes

22  essentially relied.

23   Q.  Okay.  So for clarification on the diagnoses, I

24  believe you said earlier that the ADHD that was not

25  diagnosed by you, that was diagnosed by another provider?

1    A.   Yeah, I believe it was actually diagnosed when he was

2    young, I think in high school actually.

3    Q.   And so you relied on that and put that in your report?

4    A.   Yes.

5    Q.   And the same thing for the autism diagnosis or the

6    Asperger's diagnosis?

7    A.   Yes.  I would say that -- yes.

8    Q.   So it wasn't you that did testing and diagnosed him,

9    it was another provider?

10   A.   Well, I don't know if I agree with that exactly.  I

11   think that I actually did diagnose.  I offered a diagnosis

12   as a licensed psychologist and the diagnosis is based on

13   number of factors, one including the opinion of prior

14   providers who evaluated him and informs my understanding

15   and ultimately my diagnosis.

16   Q.   And was one of those providers Dr. Selden?

17   A.   Yes.

18   Q.   And we received, I guess some of the documents that

19   you reviewed, we received a report from Dr. Selden and in

20   the documents that we received there weren't any -- there

21   was not a diagnosis of autism --

22   A.   I saw that.

23   Q.   -- or Asperger's?

24   A.   I have no explanation for why that, that particular --

25   truly do not.  I looked at it five times.  It just was

1   not -- either was copied or something happened.  It just

2   was not reproduced.

3   Q.  Sure.  And that was from years ago, right?

4   A.  Well, her report was done in 2008.  And I'm not a

5   neuropsychologist she is, so were we to reevaluate it

6   would have to be a neuropsychologist to do that.

7   Q.  Right, but I'm trying to have an understanding of when

8   you arrived at the diagnoses that you listed, so the ones

9   specifically for autism spectrum disorder, that was in

10  part based on Dr. Selden's diagnosis that she sent, right?

11  A.  In part, yeah.

12  Q.  And, but there wasn't a diagnosis?

13  A.  In part there was a report by Dr. William Sherman also

14  submitted.

15      This came about as a referral from the New Haven

16  Public Defender's Office.  Attorney Ullmann forwarded

17  those documents to me.  I think, you know, Dr. Selden's

18  neuropsychological evaluation was very particular to the

19  issue of learning disabilities and so forth, IQ, whatnot.

20      Dr. Sherman opined really more relative to Social

21  Security determination and psychological factors and

22  disability.

23      So couple of different people and I don't -- I didn't

24  scrutinize Dr. Selden's report relative to whether she

25  diagnosed or not diagnosed.  She may have.

1  Q.  But she did represent that he was diagnosed with

2  Asperger's, correct?

3  A.  Yeah.  And I think I also represented that at that

4  time, you know, in terms of the system of diagnostics, if

5  she was using a different system it wouldn't be

6  diagnosed -- the way she diagnosed him Asperger's no

7  longer applies in the current vernacular, so.

8        THE COURT:  You said in part your diagnosis was

9  based on Dr. Selden's?

10       THE WITNESS:  Yes.

11       THE COURT:  What else was it based on?

12       THE WITNESS:  Based on behavior observations,

13 based on reports from the school and educational

14 professionals, based on Dr. Sherman's evaluation, based on

15 my behavioral observations and psychological testing.

16 It's a multimodal approach to diagnose, offer a diagnosis.

17 Q.  (By Ms. Oakes) Sure.  And there's a lot of documents

18 to review, and you knew that the report that you drafted

19 would be submitted to The Court, right?

20 A.  Yes.

21 Q.  And it's important to be thorough and to be accurate

22 especially when providing documents for The Court,

23 correct?

24 A.  I try to, yes.

25 Q.  But you said a little bit earlier that there wasn't a

1    diagnosis, but yet you -- of autism that you represented

2    that in your -- there was not a diagnosis in Dr. Selden's

3    report that she had that you represented that he had been

4    diagnosed with autism?

5    A.   Okay.

6    Q.   So I want to go back a little to what you considered

7    when you were drafting the most recent evaluation report.

8    A lot of it, and it seemed like you did very intensive

9    interviews of Mr. Amadeo as well as his family; is that

10   correct?

11   A.   Yes.

12   Q.   And a lot of your evaluation is based on what they

13   said, right?  Or a lot of what you wrote about was based

14   on what they told you, correct?

15   A.   No.  I don't agree with that.  "A lot" -- can you

16   define "a lot"?

17   Q.   Many pages of your evaluation and you can look at it.

18   I know that you've, I think you modified the report which

19   we haven't received, but many pages lists, you know,

20   reports from the family about how he's doing --

21   A.   I'm not sure I agree with "many pages".

22   Q.   Okay.

23   A.   This morning when I edited I found three paragraphs.

24   You know, I mean I just think evaluating and meeting the

25   parents and so forth, especially because they are a

1   support system and monitoring system for him was

2   compulsory.  I think that had to happen.  So I mean to the

3   extent that it influenced my reporting in the second

4   evaluation, okay, fair enough.

5   Q.  Certainly.  I think it's important that you did

6   interview the parents and you did interview Mr. Amadeo.  I

7   think what I'm getting at is that there wasn't much of

8   anything else, you were crediting everything that the

9   family and Mr. Amadeo were telling you, right?

10  A.  Perhaps.  I mean, again my scope in the second

11  evaluation really was to consider factors relative to a

12  reoffense.  We're talking about reoffending behavior and

13  so, yeah, I think it's compulsory, it's mandated really by

14  anybody doing these evaluations to assess protective

15  supports, monitoring at home and so forth.  And so, yeah,

16  I think I naturally spent more time there, they're his

17  primary source of monitoring and support, so yes.

18  Q.  And -- but you understood that this is in the context

19  of a court proceeding and you evaluated him before he even

20  pled guilty; right?

21  A.  I think so, yes.

22  Q.  And you didn't do any testing for malingering or

23  feigning; is that correct?

24  A.  No.  That's not exactly correct.  Although I didn't

25  specify it in the report, the narrative discussing the

1    Millon Clinical Multiaxial Inventory in the first

2    paragraph talks about something called response style and

3    that's sort of code for -- malingering is a very specific

4    type of an evaluation.  There's lots of different types of

5    dissimilation and potential malingering, but they're all

6    aspects of a person's response style, how does the person

7    participate in the evaluation itself.  And so there is a

8    paragraph that addresses response style, which gets to the

9    aspect of malingering I didn't specify exactly in the

10   context of this evaluation.

11   Q.  And, Doctor, you were made aware, perhaps it was after

12   you drafted the evaluation report, that there was an

13   allegation of a hands-on offense that Mr. Amadeo had

14   sexually assaulted?

15   A.  I received that information on March 5, 2022.

16   Q.  And does that, knowing that, having that information

17   does that change your opinion at all as to Mr. Amadeo's

18   risk?

19   A.  No.  I had -- I had a number of questions about that

20   particular piece of information, you know, the validity,

21   the process around it.  And it didn't -- in my mind, the

22   way I understood Mr. Amadeo from a psychological

23   perspective, really went far outside the bounds of what I

24   think would have been normally expected, especially at

25   that point in time given the age ranges we're talking

1    about and the time period.

2    Q.  So because -- a hands-on offense did not fit into your

3    construction of your idea of Mr. Amadeo, you discredited

4    it, is that fair -- it didn't fit into your perception?

5    A.  Well, it wasn't -- the information was presented after

6    I completed my evaluation, to be clear.  I was not asked

7    to go in and revise the evaluation, including this

8    information and offer another opinion.  So my world, my

9    evaluation had been entered.

10        When I got the information on March 5, 2022, it really

11   stood at odds with everything that I knew about Mr. Amadeo

12   and his family and his family background and so forth and

13   I just found it to be so at odds with all that I had known

14   over 12 years with him, and had never come up in any other

15   context.  I just felt, you know, based on the allegations

16   of reported behavior by these two actors, underage

17   females, that it just stood at odds and I didn't feel it

18   really comported with the issues that I had been asked to

19   assess, and so it came afterward.  It wasn't included.  I

20   wasn't asked to revise it.  That sort of sits...

21        THE COURT:  You said it didn't comport with the

22   issue you had been asked to assess, I guess the question I

23   ask is, did it comport with the conclusion you had reached

24   with respect to the issue you had been asked to assess?

25        THE WITNESS:  I mean I really can't even answer

1    the question because it was not really, it was not a part

2    of the evaluation itself.  I was not provided with that

3    information before I submitted my final report to Attorney

4    Hayes.

5             Subsequent to submitting the report, four or five

6    months later came this other report of activity that was

7    highly discrepant, you know, with everything else that I

8    had known.  Up until that point everything about

9    Mr. Amadeo had been Internet-related offenses, primarily

10   collecting information, and that was consistent with the

11   way I saw him psychologically.

12            This was so highly, that the behavior, as

13   described and reported and alleged, was so discrepant to

14   really to all I'd known that I just felt like because I

15   hadn't been asked to really offer an opinion relative to

16   the validity or relative to how this contributes to risk,

17   I just, you know, sort of -- it just sort of stood to the

18   side.  I never included it.  I never revised my report.  I

19   was never asked to revise my report.  It sits in my file.

20            THE COURT:  Let me just frame this issue a

21   slightly different way.

22            If you -- if someone has done a report and some

23   information comes in subsequent to the report that is, I

24   think you said "highly discrepant" with what's your

25   knowledge base that you use to prepare the report, I'm

1    thinking there could be two possibilities.

2          One could be that the analysis that's been done

3    in preparing the report is there's such high confidence in

4    it that the conclusion is that this information that is at

5    odds with it cannot be credited.

6          The second possibility is that this information

7    is so at odds with what's in the evaluation report that it

8    calls into question the validity of the report, the

9    evaluation itself.

10          THE WITNESS:  Right.

11          THE COURT:  How do you --

12          THE WITNESS:  The former.

13          THE COURT:  Help me understand.

14          THE WITNESS:  The former case.

15          THE COURT:  I assumed you would say that.

16          But why?  Why should I conclude --

17          THE WITNESS:  Well, I mean to be clear, you know,

18    I was contracted and asked and paid to offer my opinion

19    relative to the issue of a sexual re-offense for

20    Mr. Amadeo given his arrest.  I did that.

21          I completed my evaluation report based on

22    documentation, historical archives, my own 2012 reporting

23    and offered my opinion.  I was paid for my efforts and the

24    work was concluded.

25          In March, 2022, some several months later, I

1    received communication from the Federal Public Defender's

2    Office with this, you know, please see attached, and this

3    report from, I forget, I think it might be have been

4    Department of Homeland Security perhaps, an investigation,

5    a report.

6              I was never asked would you consider revising

7    your report, we'd like to ask you to, you know, revise or

8    reconsider your evaluation, we'd like to again ask you to

9    reevaluate given this new information.  That was never

10   asked to me.

11             To me it was a piece of information that was

12   troubling, worrisome, highly discrepant.  I did comment, I

13   did email back the source and I said, you know, this is

14   interesting and so forth.  I think I may even have the

15   email here.

16             I was never asked to go any further with it, so I

17   wouldn't typically consider --

18             THE COURT:  Okay.

19             THE WITNESS:  I'm not independently going to go

20   in, in other words, and start reevaluating something if I

21   haven't been asked, so.

22   Q.  (By Ms. Oakes)  Dr. Geysen, today you said that you

23   modified the report, your original report, correct, and

24   you have a modified version of the report in front of you?

25   A.  Yeah, for my own use today in offering testimony,

1    right, I went through and selected out details.

2    Q.  But, again, learning that information you don't think

3    that or you should credit that or that you should consider

4    that for purpose of testifying today?

5    A.  I asked if it was okay to do that.  I had been

6    prepping and I wasn't told --

7              THE COURT:  Oh, I think it's a different

8    question.

9              THE WITNESS:  Actually, I'm not exactly sure.

10   Q.  (By Ms. Oakes) I'm sorry.  That was confusing

11             THE COURT:  Maybe -- I would just want to make

12   sure the record is clear.

13             As I understand it, you haven't really changed

14   your report, you just prepared experts of it for use in

15   testifying?

16             THE WITNESS:  Yeah, I winnowed the 2021 report

17   from however many pages down to about eight or nine.

18   Q.  (By Ms. Oakes) And just so I'm clear, knowing that

19   information, that there was this allegation, does not

20   change your opinion of Mr. Amadeo's risk?

21   A.  I'm sorry.  Can you repeat the question?

22   Q.  Okay.  Knowing that there's an allegation that

23   Mr. Amadeo sexually assaulted someone, that does not

24   change your opinion of his risk for future sex offenses?

25   A.  As offered in 2021 in my original evaluation, yes,

1    doesn't change that.

2    Q.  Okay.  And you said that it was highly discrepant,

3    that information was highly discrepant.  You were aware of

4    the underwear, the little girl's underwear that was found?

5    A.  Sure.

6    Q.  Okay.  So wouldn't you think that a sexual assault

7    allegation, in addition to child's underwear being found,

8    is not highly discrepant?

9    A.  I'm not sure the point you're making.

10   Q.  Okay.  What about the sex doll?

11   A.  What about what?

12   Q.  The sex doll that was found.

13          THE COURT:  And can we be clear when he was aware

14   because I --

15          MS. OAKES:  Yes.

16          THE COURT:  Okay.

17   Q.  (By Ms. Oakes) When -- again, can you please state

18   when you were aware of the sexual assault allegation?

19   A.  That March 5, 2022.

20   Q.  Thank you.  And you received report -- prior to

21   drafting the evaluation, the most recent one, you had

22   received reports, like, from Homeland Security that talked

23   about the search of Mr. Amadeo's residence?

24   A.  Yeah, it was a much more condensed version, you know,

25   bullets -- this happened, this happened, this happened,

1    that happened.

2    Q.  And in that report it talked about child's

3    underwear --

4    A.  Yes.

5    Q.  -- and sex toys being found?

6    A.  Yeah.

7    Q.  As well as writings, discussing child pornography?

8    A.  Yeah, uh-huh.

9    Q.  And you referenced that in your report?

10   A.  Uh-huh.

11   Q.  And, but later learning that a sexual assault hands-on

12   allegation you're saying that that's at odds with the

13   child's underwear that was found?

14   A.  I'm not sure the connection you're trying to make

15   there.

16   Q.  Okay.

17   A.  I don't necessarily see one as indicative of any way,

18   of anything else, ma'am.

19   Q.  Would your opinion change at all if you knew that the

20   Government found out about and identified the victim of

21   this allegation via information that was provided by

22   Mr. Amadeo, would that change your opinion at all?

23   A.  My opinion of what, relative to 2021?

24   Q.  Of whether or not that is discrepant.

25   A.  I mean we're into a whole other evaluation.  I can't

1   answer that.  It's purely conjecture, hypothetical.  I'm

2   sorry.  I wish I could, but I did my evaluation.  I

3   completed it in 2021 and I submitted it.  After that I was

4   provided with new information.  I wasn't asked to do

5   anything with it and now you're asking me today what I

6   would think about that.  Who knows what I would think

7   about it.  I would have to do another evaluation to see

8   what I would think about that.  I don't typically, de

9   novo, just thoughts arising.  I have information that I

10  sort of look to, but that information came after the

11  evaluation I completed and the information, as reported,

12  stood in, again, highly discrepant with all that I had

13  known with respect to his compulsive sexualized behavior

14  on the Internet.

15  Q.  And when you were evaluating Mr. Amadeo for this most

16  recent evaluation, you interviewed him, correct?

17  A.  Yes.

18  Q.  For approximately how many hours or how long did you

19  interview him?

20  A.  I believe I saw him on three occasions, August 4, 10,

21  and 30.  Probably, you know, interview time, total of four

22  hours maybe over those three visits interspersed with

23  psychological testing, questionnaires, meeting the

24  parents, that kind of thing too, so.

25  Q.  And over the course of that four hours, did you ever

1    ask Mr. Amadeo about the underwear?

2    A.   No, didn't ask.

3    Q.   Why not?

4    A.   I was evaluating the risk for reoffending on a

5    computer.  To me it impressed me as, you know, a curiosity

6    that this kind of information would be located.  I was

7    actually surprised that, you know, so much detail was

8    devoted in the report about this discovery and also paper

9    towels and so forth that were found.

10        And in the second report, there was, you know, it was

11   ages attributed to this and weights and so forth.  It was

12   quite a lot of fascination about what this My Little Pony

13   underwear actually represented.  It represented My Little

14   Pony underwear.  You know, that's what it represented.

15        I don't -- I mean, I was asked to evaluate his

16   computer use which, to me, was much more akin to some of

17   the other things that I was looking at relative to his

18   social interactions, restricted range of interests, his

19   autism, his ADHD, his impulse control.  He was -- in my

20   mind, he was a very socially isolated person and while I

21   found the information may be distressing, I didn't really

22   feel that it added to the evaluation of sex offense risk

23   for Internet-related -- an Internet-related offense.

24   Q.   Well, it wasn't clear from your evaluation what you

25   were being asked to evaluate him for, so I just want to

1    have clarification.  You were only asked to evaluate him

2    for risk of an Internet-related sex offense; is that

3    correct?

4    A.  Yes.  Yes.

5    Q.  And anything outside of that you don't consider,

6    correct?

7    A.  Yes.  I think and maybe perhaps, you know, truthfully

8    I had seen him in 2012 and sort of felt in that sense I

9    had kind of a lens through with which to look.  And in my

10   mind, again, you know, the behavior as alleged and as

11   charged was highly, highly similar to almost identical to

12   the type of behavior that he had been charged with in 2010

13   that I ultimately evaluated.  And so my, from a clinical

14   perspective to me, it was very consistent with his

15   psychiatric condition and didn't really -- I didn't, as I

16   said earlier, you know, hadn't really changed very much.

17   It may -- I mean -- yeah, it didn't change very much.  It

18   was very persistent and enduring.

19   Q.  And with the CPORT test that you administered, you

20   said that was the first time that you ever administered

21   that test?

22   A.  Yes, first and only.

23   Q.  First and only.  Okay.

24        One moment.

25           (Pause)

1    Q.  (By Ms. Oakes) Dr. Geysen, if you were -- the initial

2    request for the evaluation had been more expansive, so to

3    evaluate risk for sex offense in general, if you had been

4    provided with information about the allegation, would that

5    have been included in your report?

6    A.  Yes.  I mean, I would have -- again, it would depend

7    upon the referral question and what the entity who's

8    retaining me is asking me to evaluate.

9    Q.  And if, in fact, that allegation was substantiated,

10   could that have changed your opinion?

11   A.  What allegation you are referring to, I'm sorry?

12   Q.  The sex assault.

13   A.  The two female victims, underage victims?

14   Q.  Yes.

15   A.  That I received in March 5, 2022?

16   Q.  Yes.  If you had been provided a more --

17   A.  If I had been retained on March 6th, you're saying and

18   that information was included?

19   Q.  Or you had been given a wider prompt to evaluate for

20   because you said earlier that you were --

21   A.  Sure.  Yeah, I would say so.

22          MS. OAKES:  I don't have any other questions,

23   Your Honor.

24          (Pause)

25          THE COURT:  Anything else, Mr. Hayes?

```
 1              MR. HAYES:  Just I think it's -- if I may?
 2              THE COURT:  Sure.
 3          REDIRECT EXAMINATION BY MR. HAYES:
 4    Q.  I think it's important to point out, Dr. Geysen, that
 5    some of the records you reviewed, for the -- you call it
 6    the 2021 evaluation?
 7    A.  Yes.
 8    Q.  You had also received those same records previously
 9    for the 2012 evaluation, school records and --
10    A.  Nearly -- nearly totally, about the same.
11    Q.  Okay.  Is it fair to say that --
12    A.  Excuse me.  There was information in that second
13    referral that documented a successful completion of
14    probation I believe that wasn't in the 2012 evaluation --
15    interim.
16    Q.  But the diagnosis of Asperger's, you would have not
17    only relied on that for this 2021 evaluation but you would
18    have relied on that from the 2012 evaluation?
19    A.  Yes.
20    Q.  So you don't necessarily have those records in a file
21    in your office, is that fair to say?
22    A.  I probably have them archived somewhere, would take
23    some digging.
24    Q.  Okay.
25    A.  The original records you mean?
```

1    Q.   Yes.

2    A.   Yeah.

3    Q.   So at some point, and I don't know if you can recall

4    now, but at some point you might have had the full report

5    of the Asperger's conclusion from Dr. Selden?

6    A.   Yeah, I did get a copy.  I was somewhat surprised to

7    learn Page 7 and 8 they were missing afterward in

8    preparation for this particular testimony, but yes, I had

9    that.  I had Dr. Sherman's evaluation.  At that time I was

10   also very actively involved in consulting to the

11   Department of Developmental Disabilities.  It was a

12   particular reason I was selected, I think, to do the

13   evaluation because of my affinity with that population,

14   so.

15   Q.   Which population?

16   A.   The population of persons who are developmentally

17   disabled or have autism spectrum disorder.

18   Q.   And --

19   A.   I should also say too that at that point, excuse me,

20   I'm sorry.  I had also been doing psychological

21   consultative examinations for Social Security Disability

22   for about 10 years from, you know, 2004 and 5 to 2014, so,

23   I also have that affinity.

24        I believe that Attorney Ullmann selected me because I

25   was doing work with the New Haven Public Defender's Office

1    and when he selected me I had copies of a lot of the

2    information but not everything that I did in 2021.

3    Q.  And just to, I just want to make sure I understand.

4    Your conclusion that Mr. Amadeo is on the spectrum is not

5    only from the 2008 report from Dr. Selden or from

6    Dr. Sherman, but also of your -- your observations?

7    A.  Yes.

8    Q.  That is --

9    A.  I'd just like to add though, if I could, that those

10   are my observations but I just want to remind The Court

11   that he's a very complex psychiatrically disabled man who

12   has a number of psychiatric conditions.  I don't want the

13   autism spectrum disorder to over shadow other deficits

14   that are really functional in other areas and that might

15   be directly related to some of the issues before The Court

16   with regard to risk and so forth.  For example, attention

17   deficit disorder, impulsivity, proneness towards suicide,

18   you know with his major depressive disorder -- a number of

19   things, his personality dysfunction and so forth, so a

20   number of things on top of, or in addition to his autism

21   spectrum disorder for which he's receiving psychiatric

22   treatment I was able to learn.  I didn't know that and

23   apparently has responded favorably to at least a six-month

24   trial psychiatric medication.  None of those were

25   prescribed at the time I saw him in 2021.

1        After that evaluation I recommended that he have a

2   psychiatric evaluation.  And in 2022 he was referred to

3   MAPS.  I'm not exactly sure who they are, what they are,

4   but he seemed to have had a psychiatric consultation and

5   he's on four, I think four different medications.  I was

6   actually quite impressed by that information.

7        Again, didn't have that at the time I evaluated him.

8   It was a recommendation.  I'm happy to see that it's kind

9   of come forth.

10        I'm also happy to see that he hasn't engaged in any

11   behavior that, by report, that's troubling, reminiscent of

12   other behaviors.  And I think, you know, it seems to be

13   that when there's a lot of attention given and a lot of

14   structure and monitoring in place and a lot of treatment

15   and support, he's able to hold himself together fairly

16   well and not reoffend.

17              MR. HAYES:  Thank you.

18              THE COURT:  You referenced, you used the term

19   "his personality disorder".  Is that what you are were

20   talking being about in your 2012 report?

21              When you said "personality disorder", what did

22   you mean?

23              THE WITNESS:  Yeah, I meant that he has a number

24   of features of the way he sees himself relative to other

25   persons.  Some of that's restricted really because of his

1    autism, but some of it's also just personality

2    dysfunction.  You know, difficulty with attachment to

3    other people, sort of a schizoid, kind of unusual and odd

4    socially isolated way of being with others, you know, sort

5    of by himself and engaging over the Internet basically.

6              So yeah, just sort of disturbances in personality

7    function.

8              THE COURT:  And you mentioned in your current

9    evaluation under psychosocial history, in the third line

10   you talk -- you use the term "high-functioning autism".

11   Can you help me understand what "high-functioning autism"

12   is?

13             THE WITNESS:  Yeah, let me just find that.  That

14   stood out to me too.

15             This is in 2021 report?

16             THE COURT:  Yes.  It's pretty early on.  The

17   first section is:  Background and Referral.  Second

18   section is:  Psychosocial History.

19             THE WITNESS:  Right.

20             THE COURT:  It's in that section, the third line,

21   at least in my copy.

22             THE WITNESS:  Yeah, again, I revised it.  But my

23   response really to that term "high-functioning autism",

24   that really is, sort of emerges out of the context of the

25   Asperger's disorder and into what is now autism spectrum

1    disorder.  And the spectrum has, you know, low to high

2    levels of functioning and so I would say that that was,

3    you know, consistent with how other people saw him.

4    Asperger's is a higher functioning form of autism and so

5    that's essentially what it means.

6          THE COURT:  And when you say "functioning" what

7    are we talking about?

8          THE WITNESS:  You know, levels of impairment

9    across context either in disturbances with self and other,

10   communication issues, behavioral interests, and so forth.

11   Fewer things are seen, fewer things are concerning, and so

12   there's a higher level of functioning in the disorder.

13         THE COURT:  If you've high-level functioning

14   versus low-level functioning, which end of the spectrum

15   has more difficulty communicating and relating to

16   people --

17         THE WITNESS:  The low level I would say.

18         Yeah, I can see how that's confusing.  I can see

19   that.

20         THE COURT:  All right.  Okay.  I don't have any

21   other questions.

22         MR. HAYES:  I'm sorry, Your Honor.  I'm just

23   thinking about what The Court just asked.

24              **FURTHER REDIRECT EXAMINATION BY MR. HAYES**

25   Q.  And so in terms of high function -- when you say that,

1    maybe I missed it.

2        You testified earlier that as far as you know Joe

3    still doesn't drive?

4    A.  I'm sorry?

5    Q.  You testified earlier that as far as you know Joe

6    still does not know how to drive or does not drive?

7    A.  I don't know that I testified earlier to that, but I'm

8    not surprised to learn that's true.

9    Q.  Okay.  So when you say "high functioning", how does

10   that comport with someone who's high functioning?

11   A.  Well, I mean, again, that's a clinical term and a lot

12   of times these things are copied, you know, through

13   different professionals, you know, kind of report after

14   report.  I mean essentially, you know, autism spectrum

15   disorder is a spectrum disorder and it has a wide number

16   of different types of features.  Some of those features

17   may be more prominent than others, some may be --

18   sometimes these things are kind of arbitrary, high

19   functioning, low functioning.  I actually think probably

20   in the current DSM-5-TR which is just "text revision" I

21   actually think it's probably now considered autism

22   spectrum disorder, moderate, severe, whatever.  No one

23   even refers to high functioning, so -- but that just

24   happened in the last year, so.

25   Q.  If you had to consider, and I think you did this for

1    your report, Joseph, in serving time in prison, can you

2    foresee how what you described as some impairments, some

3    of his functionality or his functioning, some of the

4    disorder, ASD, how would that play in prison?

5    A.   Well, I mean I think being in prison, being

6    incarcerated is a very traumatic event.  I think, you

7    know, the stimulus of being, you know, transported,

8    meeting with, you know, professionals, clinicians, and

9    other correctional professionals evaluating him, placing

10   him in housing with someone else, another inmate perhaps.

11   I would say the way I understand Mr. Amadeo they would

12   be -- he would be provoked, triggered and popular pawn on

13   a number of levels.

14        And I think we can only speculate about, you know, how

15   deteriorating for him that would likely be from a

16   behavioral standpoint because of who he is.  I worry about

17   it and I've worried about it for quite some time.

18             MR. HAYES:  Thank you.

19             Thank you, Your Honor.

20             (Pause)

21             THE COURT:  Okay.  Thank you, sir.

22             THE WITNESS:  Thank you.

23             (The witness stepped down.)

24             THE COURT:  The court reporter's too polite to

25   say so, but I suspect that it's appropriate to take a

1    break for some time and then come back and pick up with

2    the sentencing.

3           MR. HAYES:  Yes.

4           THE COURT:  And that will give counsel an

5    opportunity to go over their notes and see how this works

6    into whatever other points you want to make once we get to

7    that.  So I'll let you all confer and let me know how soon

8    you want to get back together, okay.

9           MR. HAYES:  Thank you, Your Honor.

10          THE COURT:  We'll recess.

11          (The Court exited at 1:24 p.m.)

12          (* * * * *)

13          (The Court entered at 1:46 p.m.)

14          THE COURT:  Please be seated everyone.

15          So we'll pick up with the sentencing proceeding

16   at this point.

17          On April 19, 2023, Mr. Amadeo entered a plea of

18   guilty to Count One of an Indictment which charges him

19   with receipt of child pornography in violation of

20   Sections 2252A subsection (a)(2) and (b)(1) of Title 18 of

21   the United States Code.

22          The Court accepted the plea of guilty and entered

23   a finding of guilty.

24          A Presentence Report was prepared for The Court

25   by the United States Probation Office.  I have reviewed

1    that report and the two addenda to the report in

2    consultation with its author, Probation Officer

3    Togninalli.

4            Ms. Oakes, is the Government making a motion

5    pursuant to Guidelines Section 3E1.1(b) for the third

6    point for acceptance of responsibility?

7            MS. OAKES:  Yes, Your Honor.

8            THE COURT:  Thank you and the motion is granted.

9            Mr. Hayes, have you had an opportunity to read

10   the Presentence Report as amended?

11           MR. HAYES:  I have, Your Honor.

12           THE COURT:  And has your client read it or has it

13   been summarized for him by you?

14           MR. HAYES:  Both.

15           THE COURT:  Both?

16           MR. HAYES:  Yes, sir.

17           THE COURT:  And does the Defendant have any

18   corrections or objections to the report as amended at this

19   time?

20           MR. HAYES:  No, Your Honor.

21           THE COURT:  Okay.  I will, just so the record is

22   clear, I'm going to just mention -- well, let me come

23   back.

24           Ms. Oakes, have you had an opportunity to read

25   the Presentence Report as amended?

1          MS. OAKES:  Yes, Your Honor.

2          THE COURT:  And does the Government have any

3    corrections or objections to the Presentence Report as

4    amended?

5          MS. OAKES:  Yes, Your Honor.

6          The Government previously made an objection that

7    was noted in the PSR.  We wanted the inclusion of the

8    victim impact statement and information as to the

9    individual who's been identified as V1, it's the woman

10   that made allegation as to sexual assault.  That wasn't

11   included in the PSR.  We provided The Court with the

12   victim impact statement.  It was an attachment to our

13   sentencing memo.  We request for that to be added to the

14   PSR.

15         I think it's important when Mr. Amadeo goes to

16   BOP that they have all of the information available and I

17   think that this is an important piece of information.

18         The Government is not asking for an increase in

19   the guidelines and Mr. Amadeo most certainly has not been

20   charged with any offenses as to this individual, however,

21   I think it's important that that information be provided

22   to BOP and be a part of the record.

23         I also would request the same for the MAAS

24   Evaluation that was done because I believe that has, and

25   unless it is already going to be provided to BOP, but I

1  think that evaluation provides additional information as

2  to his medications and I just want, again, BOP to have as

3  much information --

4            THE COURT:  Sure.

5            MS. OAKES:  -- so that they can do a proper

6  assessment.

7            THE COURT:  Does the Defense have any position on

8  that, Mr. Hayes?

9            MR. HAYES:  Your Honor, I don't have any concerns

10  with the MAAS Evaluation, but I do have concerns with the

11  information from the purported victims.  It's not in the

12  Presentence Report.  It's really not in the addendum.

13            THE COURT:  Well, I think the request is that it

14  be included --

15            MR. HAYES:  Right.  Right.

16            And it wasn't originally.  We have no way to, for

17  The Court to question these victims, for Mr. Amadeo to

18  question these victims.  And this is alleged conduct

19  that's uncharged, that will never be charged, and it's

20  concerning here just because we -- in some way if The

21  Court's relying on that information, it would affect the

22  sentence here, so if that's going to happen, then we would

23  need to have those victims here, so that we could -- so

24  cross-examine them.

25            THE COURT:  The information does not affect my

1   analysis as to what the appropriate sentence should be.

2          I do agree with the Government that in conducting

3   an evaluation of Mr. Amadeo and at least making sure that

4   you bring up something that may lead to some insights in

5   terms of treatment, optimal treatment, knowing that that

6   information is out there would be relevant -- helpful, I'm

7   sorry, not relevant.

8          MR. HAYES:  Your Honor, could I say this about --

9          THE COURT:  Yeah.

10         MR. HAYES:  Part of my concern also is, those

11  victims, they were clearly minors at the time, that's in

12  what we have, but so was Mr. Amadeo.

13         THE COURT:  Yes.

14         MR. HAYES:  So even if that's helpful in terms

15  of -- if the argument is because of treatment purposes at

16  the Bureau of Prisons and even afterwards, he was a minor

17  and then we don't have anything like that since that time.

18  And then The Court also heard from Dr. Geysen and how he

19  was -- how he reacted to seeing that information, how that

20  was in discord with anything that he's ever seen from

21  Mr. Amadeo, from his evaluations of Mr. Amadeo.  And I

22  think -- again, that's part of my concerns.  They were

23  both, this set's victims, Mr. Amadeo were minors at the

24  time.

25         THE COURT:  Okay.  I will include that

1    information as an addendum along with the MAAS

2    Evaluation --

3            MS. OAKES:  Thank you, Your Honor.

4            THE COURT:  -- so I'm going to make it clear that

5    it is not information that's being included because it's

6    relevant to the factors to be considered in imposing

7    sentence, rather it's included so that people who are

8    talking with Mr. Amadeo and giving him treatment are aware

9    of the fact that those allegations have been made, okay?

10           MS. OAKES:  Okay.  Thank you, Your Honor.

11           THE COURT:  All right.  And then circling back to

12   the second addendum, there are a couple of things I just

13   want to mention.

14           There were objections by Defense that were made

15   after the second disclosure, a letter dated

16   September 21, 2023, I think, and I agree with the way that

17   Probation Officer Togninalli has addressed in the first

18   paragraph the paragraphs that are mentioned there.

19           I also agree with his comments in the second

20   paragraph and also with respect to the judiciary

21   sentencing information that's included in the Presentence

22   Report.

23           He does pick up on some comments that were made

24   with respect to modifications to the special conditions,

25   and I'm not going to change the Presentence Report, but I

1    am making that, two changes, that Mr. Togninalli indicated

2    he thought -- he agreed were appropriate, what was

3    Paragraph Number 9, which was duplicative and also the

4    fact that The Court has to approve with respect to

5    Paragraph Number 3 and Paragraph 102.

6         And then I have an additional one that I just

7    want to ask a question about.  Let me just see if I can

8    get you all to the right place.

9         It's Paragraph 102, subparagraph 16.  It says,

10   "You must consent to third-party disclosure to any

11   employer or potential employer with The Court's approval"

12   and then it says, "and community service site or other

13   interested party as determined by the Probation Office."

14        I guess I question whether all of that should be

15   with Court approval, and I don't know why those, that

16   distinction was made.

17        Is that standard language, Mr. Wackerman, as far

18   as you know?

19        PROBATION DEPARTMENT:  As far as I know, Your

20   Honor, the language used is the standard language

21   recommended by the Probation Office.

22        THE COURT:  Okay.  All right.

23        I guess what I'd -- I don't see any -- I mean "or

24   other interested parties" very broad, and I think

25   "community service site", I think if we're going to have

1   third party -- any third-party notification, it should be

2   with Court approval, so I'm going to change that.

3          Let me just take a second.

4          So I'll make it say:  You must consent to

5   third-party disclosure to any employer or potential

6   employer, community service site or other interested party

7   with The Court's approval of any computer-related

8   restrictions that are imposed.

9          MS. OAKES:  So, Your Honor, just for my

10  clarification, so you're removing "as determined by the

11  Probation Office"?

12         THE COURT:  Yes.

13         MS. OAKES:  Is that what you're striking?

14         THE COURT:  Yes.

15         MS. OAKES:  Okay.  Thank you.

16         THE COURT:  I guess taking into account this

17  discussion, I will adopt the factual statements contained

18  in the Presentence Report as amended as The Court's

19  findings of fact in this case.

20         And I guess it would be helpful to have the court

21  reporter make a written record with respect to this

22  discussion as to modifications as to the Presentence

23  Report and I direct the Clerk and the United States

24  Probation Office to append a copy of this written record

25  to any copy of the Presentence Report that is hereafter

1    made available to the BOP.

2              PROBATION DEPARTMENT:  Your Honor, I'm sorry.

3              THE COURT:  Yes.

4              PROBATION DEPARTMENT:  I apologize.  Just to be

5    clear, we're not revising the PSR?

6              THE COURT:  Correct.

7              PROBATION DEPARTMENT:  We are including what

8    Attorney Oakes asked for with a third addendum?

9              THE COURT:  Yes.

10             PROBATION DEPARTMENT:  Okay.  Thank you.

11             MR. HAYES:  Judge, can I just say this?  There is

12   one paragraph, it would be Paragraph 30 in the PSR, where

13   it says, "Mr. Amadeo used his computer to access,

14   download, and send child pornography videos and images."

15   But he didn't send any.  Everything else is true.  I don't

16   know if that's -- if that's significant because of

17   Paragraph 27 where it says, "Mr. Amadeo's conduct was

18   limited to receipt of material involving sexual

19   exploitation", "and he did not intend to traffic in or

20   distribute."

21             So I guess I'd -- it might not -- Paragraph 30

22   might not need to be amended because of Paragraph 27, but

23   I just wanted to point that out.

24             THE COURT:  I think that's covered by the first

25   paragraph in the second addendum.

```
 1              MR. HAYES:  Okay.  I'm fine.  That's fine then.

 2              THE COURT:  Yeah.  That refers to the attached

 3     letter and it says that they are noted and incorporated

 4     into the Presentence Report via this addendum.

 5              MR. HAYES:  That's fine.  Thank you, Your Honor.

 6              THE COURT:  So that can also be part of the

 7     discussion up to the -- for the transcript, okay.

 8              Mr. Amadeo faces a possible maximum sentence of

 9     imprisonment for 20 years.  He faces a supervised release

10     term of as much as a life term.  If he violates his

11     conditions of supervised release, The Court then could

12     sentence him to additional time in prison of either as

13     much as two years or at least five years depending on the

14     circumstances.

15              Under Title 18 United States Code Section 2259

16     subsection (b)(2) The Court must order restitution.

17              Under Title 18 United States Code Section 3013, I

18     must impose a mandatory special assessment of $100.

19              The Defendant must pay an additional special

20     assessment of $5,000 pursuant to Title 18 United States

21     Code Section 3014, unless The Court finds he is indigent.

22              Finally, he is subject to an assessment under

23     Title 18 United States Code 2259A, subsection (a), in the

24     amount of up to $35,000 which would be used to fund the

25     Child Pornography Victim Reserve.
```

 1              I note that for this offense there is a mandatory

 2    minimum term of incarceration of 5 years and a mandatory

 3    minimum term of supervised release of 5 years.

 4              Ms. Oakes, is The Court's statement of the

 5    maximum sentence and the mandatory minimum sentence in

 6    this case accurate?

 7              MS. OAKES:  Yes, Your Honor.

 8              THE COURT:  And, Mr. Hayes, is that your

 9    understanding as well?

10              MR. HAYES:  Yes, sir.

11              THE COURT:  Thank you both.

12              Pursuant to Title 18 United States Code

13    Section 3553, one of the factors The Court must consider

14    in determining the particular sentence to be imposed in

15    this case is the Sentencing Guidelines.

16              The Presentence Report calculates the Total

17    Offense Level to be 30 and the Defendant's Criminal

18    History Category to be Category I.

19              Consequently, the advisory range under the

20    Sentencing Guidelines is as follows:

21              A term of imprisonment in the range of 97 months

22    to 121 months.

23              A term of supervised release in the range of

24    5 years to life.

25              A fine in the range of $30,000 to $250,000.

1            The $100 mandatory restitution.

2            And, restitution in an amount to be determined.

3            And then we'll talk about the other, the joint

4    victims -- the JVTA assessment and the other assessment to

5    be determined.

6            Mr. Wackerman, is The Court's statement of the

7    Sentencing Guidelines calculations in this case accurate?

8            PROBATION DEPARTMENT:  Yes, Your Honor.

9            THE COURT:  Thank you.

10           So before we proceed further, Mr. Hayes, I'd like

11   to give you an opportunity to make any statements you'd

12   like to make on behalf of Mr. Amadeo.

13           And, Mr. Amadeo, if there's anything you'd like

14   to say, sir, I would be certainly very interested in

15   hearing that.

16           MR. HAYES:  Thank you.

17           THE COURT:  And if anyone else wants to speak,

18   Mr. Hayes, just let me know.

19           MR. HAYES:  Thank you, Your Honor.

20           Your Honor, I've submitted sentencing memoranda,

21   reply motion.  In my submissions there were attached

22   numerous letters in support of Mr. Amadeo, letters from

23   family, friends, his clinician and others who have known

24   him for quite some time, since childhood.

25           We also submitted what's in the record are

1      records of his treatment, records about his evaluations,

2      school records, records from not only Dr. Geysen who The

3      Court just heard from but other doctors, so diagnoses from

4      early on, his behavior from early childhood, from school,

5      his educational background up until when he was finally

6      diagnosed.

7               And I say that because he went through all of

8      school in special education, but he was also tested for IQ

9      and in some respects you see that he had a very high IQ

10     but, again, he was in special education all throughout

11     school.

12              Over time, as he's evaluated each year or each

13     semester by the schools you can see his behavior started

14     to change.  We see a diagnosis early on of ADHD, and we

15     also see some other diagnoses.

16              As he got older there were some medical issues,

17     but it's not until he goes to college, and he stays there

18     for two years.  There's one class that he has a problem

19     with, which kept him from receiving an associate's degree

20     from formally graduating.  He did receive a certificate.

21              And it was after that, and all along his family,

22     his parents, would continue to have him tested but no one

23     really knew, none of the doctors, certainly not Joe nor

24     his parents that he would be on the spectrum.

25              So it wasn't until he met some doctor who

1    suggested, you know, this is what I see, he may be on the

2    spectrum.  At the time it was called Asperger's.  You

3    should have him formally tested.

4          So he's a young adult and finished all of his

5    schooling and that's when he finally gets tested.  And

6    it's apparent at that point what Joseph was dealing with

7    throughout his childhood leading up until his adulthood

8    and even now.

9          What's described by his parents, what's described

10   by doctors, even Joseph himself, of self-isolating

11   compulsive behavior with collecting images, music,

12   stories.  And it's not just collecting, it's collecting

13   and organizing.  And we're not just talking two or three

14   pieces.  Even with what we have in terms of what the

15   Government seized here in this case, the pornography,

16   barely, I don't even think it's 1 percent, 1 or 2 percent.

17   Everything else is music, music files, stories and the

18   like.  So we have somebody who was collecting.

19          Now, I'm not going to spend a lot of time on that

20   because I know The Court is well aware from my submission,

21   but I think it's important to talk about the Guidelines in

22   this case.

23          Judge, I think they're unreliable.  I think that

24   courts, federal courts in the country, much less courts

25   here in this district and in our circuit have found that

1   the Guidelines under 2G2.2 are unreliable.

2          And so I say that because even the Sentencing

3   Commission and the Second Circuit has found that there's

4   no clear rationality to the Guidelines, the 2G2.2

5   guidelines, right, in these types of cases in particular

6   where you have a case were there's non-production and so

7   here is receipt.  It could have been just possession for

8   that matter.  It meets the same criteria you have to

9   receive in order to possess, but it's nonproduction, and

10  so it doesn't comport with what we see with the

11  Guidelines.

12         The *Dorvee* has had -- the *Dorvee* case, again the

13  circuit courts in this district, judges here, and if I'm

14  not mistaken and I don't -- I can't speak for The Court,

15  but I know that The Court has dealt with this in the past

16  in terms of these same Guidelines and in terms of

17  sentencing.

18         I think it's also important to point out that the

19  Guidelines here result in 97 to 121 months.  Frankly,

20  that's higher than cases where we do have clients doing

21  touching, sexual assault, sexual assault of a minor, and

22  in some cases it may even be homicide cases where the

23  Guidelines are just higher.  And that's a fact, Judge.

24         I would say that the Government is well aware of

25  that in cases where you have hands-on sexual assault of a

1    minor that's charged federally the Guidelines are less.

2    And that's significant when we have Mr. Amadeo, even with

3    his previous commission of this type of behavior, even

4    when we have someone like Mr. Amadeo, particularly someone

5    like Mr. Amadeo who's on the spectrum, who has his

6    co-occurring behavioral health issues.  It's still

7    significant.

8           For someone to go from serving no time to The

9    Court presumably relying on the Guidelines where they're

10   looking at 8 years, 9 -- well, I think in this case, I

11   believe unless the Government has changed and I believe in

12   the Government's submission it recommended 97 months, so a

13   little bit over 8 years to 10 years.

14          Here there's a mandatory minimum as The Court has

15   pointed out but, Judge, at this point, with this case,

16   given the facts of this case, Mr. Amadeo's basically

17   served just about 3 years, 2 1/2 years and I say that in

18   this way, Judge.

19          When Mr. Amadeo was first encountered by the

20   agents, within that week we met.  We met with the

21   Government.  We had a proffer session and then within a

22   month or so he was charged formally.  He was placed on the

23   location monitoring device, but not just the device, he

24   was home and he had to remain home and he did not violate.

25          There were some concerns when his supervision

1    officer would come to the house, he wasn't being closely

2    supervised at home as he should of been, but there were no

3    concerns of criminal behavior, criminal violations, no

4    more interactions with the Internet in terms of what we

5    see here.

6            In fact, something that I believe the Government

7    must have forgotten, when Mr. Amadeo discovered that there

8    was a thumb drive I'll call it, that -- from his previous

9    2012 matter, that was returned to him that contained child

10   pornography.  He contacted me.  We contacted the

11   Government.  The local police went to the house that night

12   and seized that evidence.

13           So, we have somebody who had turned fully away

14   from this.  That's significant here.

15           Also what's significant is there's some quotes

16   that the Government contributes to Mr. Amadeo.  They are

17   all from the proffer.  All of the quote except from --

18           THE COURT:  They're all from?

19           MR. HAYES:  From the proffer.  All of the quotes

20   except for the 2011 or 2012 arrest.

21           And so, of course, The Court said this earlier

22   when questioning Dr. Geysen in terms of how he's framing

23   the issue here.  I use that same term, "framing".  So, of

24   course, they're not going to point out that Joe said or

25   Joseph said during the proffer that his interactions with

1   the dark web and looking at these child pornography images

2   had decreased over time, and in particular more within

3   that month or more within weeks of when the agents

4   encountered him.  When he was asked why he says, "I don't

5   know."  And he also further says, "I don't know why I was

6   doing this.  I wanted somebody to help me, tell me why I

7   was doing this."

8          He also said, which is not in the Government's

9   submissions, to be fair he said, "I thought about

10  contacting the FBI."  And, Judge, this is verbatim.  I

11  have the notes.  I would think the Government has the same

12  notes during this meeting.  "I thought about contacting

13  the FBI but I would of gotten into trouble and so I

14  didn't.  What do I do?"

15         So not only do I need to abate this crime, if you

16  will, but I need help.  I need to find out why I'm doing

17  this and I need help.  I need to stop doing this.

18         So I want to talk about that because that's --

19  again, it's important.

20         What we saw and so during the evaluation with

21  Dr. Geysen, during the meeting, during the proffer

22  session, all of the time until probably the last six

23  months that I've known Joseph, he was -- you could see the

24  depression in terms of, you know, our discussions when we

25  would contact one another, when I would see him, when I

1    would talk to him he talked about suicidal ideations

2    repeatedly, not just with me.  He talked about it with

3    Dr. Geysen.  Not just with me and Dr. Geysen, he talked

4    about it with his supervision officer, a senior officer.

5    She was concerned, contacted me about it and we had a

6    conversation about it.  So you had that, you had his

7    anxiety, you had his compulsive disorder.

8           Your Honor, every conversation that I would have,

9    particularly over the phone and oftentimes in person with

10   Joseph, he would always request to be able to interact

11   with his computer, not to peruse it so that he can

12   download those images.  Really, he wanted his music files.

13   Right, he wanted those types of things.  That's his

14   compulsive disorder.

15          I would tell him just give it some time, give me

16   some time.  Let's just work on that.  He not only did that

17   with me, he did that with Senior Officer Gordon as well.

18          I talk about that.  I talk about his depression,

19   his anxiety, his compulsive behavior, if you will and what

20   we saw with him on the spectrum.  And this was repeated,

21   just as you heard from Dr. Geysen, repeated behavior,

22   repeated.  And so just as Dr. Geysen didn't know that

23   things had changed, at some point he was receiving I guess

24   talk therapy, if you will, from MAAS.  And that's

25   indicated in one of the submissions from his clinician.

1           She suggested that he see a psychiatrist, which

2    he did.  And he was prescribed a new set of medications

3    and that has helped tremendously.  And my interactions

4    with Joseph are entirely different than they were a year

5    ago because of the medication.

6           So Joseph doesn't know that he needs medication.

7    I don't know necessarily, perhaps even Probation doesn't

8    know, the Government doesn't know, his parents don't

9    necessarily know.  It was the professionals who suggested

10   and the professionals who prescribed the medication, but

11   who did know was Dr. Geysen because he talked about it and

12   that was part of his conclusions and recommendations in

13   his evaluation, is that he needed some type of medication

14   and he needed that type of therapy that he hadn't been

15   receiving up to that point.

16          I should also state that prior to his encounter

17   with the agents, he received some type of talk therapy but

18   that wasn't for sex offense treatment whatsoever.  So

19   there was no reason for that to come up, that type of

20   treatment because, again, Joseph doesn't even know to ask

21   for that and that's not the person who would help him

22   receive that type of treatment.

23          At some point he did ask her, but this is what I

24   knew Joseph, can she recommend, can she refer him to

25   someone.  She couldn't and it wasn't until his supervision

1    officer referred him to MAAS.

2           And so we have all of this time where we have

3    this period of Joseph reoffending after he's on probation,

4    which he told the Government and the agents during the

5    proffer because he didn't have any controls at that point.

6    I mean, I guess we can say he had his parents, but he was

7    no longer on probation.  Those controls weren't what they

8    were when he was on probation.

9           I talk about that because if we see what's

10   happened these past 2 1/2, 3 years it's those same

11   controls which have kept him from violating, kept him from

12   reoffending, from offending in any way.

13          And that, again, takes me to the need for, if

14   anything here, a mandatory minimum sentence and not the

15   need for anything in terms of the Guidelines and what

16   we're looking at here.

17          Judge, I could -- I've done this in my filing, in

18   terms of, I could go through each of the 2G2.2

19   enhancements and talk to how -- two things, that are --

20          THE COURT:  Where in your filing are you?

21          MR. HAYES:  They're in the --

22          THE COURT:  What page are you --

23          MR. HAYES:  Judge, it's in the reply.

24          And so it starts with, if I'm looking at the

25   reply which was dated December 3, Your Honor.  I don't

1    know the docket number.

2         So I start off with the meeting.

3         THE COURT:  I may not have brought that in with

4    me, so why don't you go through that.

5         MR. HAYES:  So, I'm on specifically on Page 5.

6         THE COURT:  Uh-huh.

7         MR. HAYES:  And where it says "Guidelines

8    Calculation" so I start there and go through *Booker*,

9    *Dorvee*.  I talk about the 13-level increase in terms of

10   the enhancements.  So it's base offense is 22, we now have

11   a 13-level increase.

12        And talk about the proposed enhancements and --

13        THE COURT:  Actually, let me just --

14        Julia, can you bring that out for me.  I'm not

15   sure where my copy is.

16        LAW CLERK:  Yeah, I'm not sure which document

17   that is.

18        THE COURT:  What ECF Number is that?

19        MR. HAYES:  I don't know, Judge.

20        THE COURT:  December 3rd.

21        LAW CLERK:  I looked for December 3rd, there was

22   no filings for December 3, 2022.

23        THE COURT:  Do you have it?

24        MS. OAKES:  No.  We're also trying to figure out

25   it what it is.  I recall there being, there was a reply to

1    the motion to dismiss that's Docket Number 115, but I

2    don't believe that that's what Attorney Hayes is

3    referencing.

4            MR. HAYES:  Judge, I thought I filed it because

5    there are several exhibits that I believe The Court has.

6            LAW CLERK:  Which December 3rd are referring to?

7            MR. HAYES:  December 3, 2023.

8            And with that I filed several Exhibits, A through

9    E, I believe.

10           THE COURT:  Maybe we can just take a look at what

11   you're looking at.

12           MR. HAYES:  Sure, Judge.

13           THE COURT:  Maybe you can show it to counsel for

14   the Government first.

15           (Off the record discussion among Counsel.)

16           THE COURT:  How many pages is that, Mr. Hayes?

17           MR. HAYES:  So it is 12 pages.

18           THE COURT:  Why don't we just go make copies and

19   we will figure out the docketing question later.

20           We'll just pause for a second.

21           MR. HAYES:  Thank you, Your Honor.

22           (Pause)

23           THE COURT:  See if -- can you find that on the

24   docket?

25           (Pause)

1          THE COURT:  I am -- I don't remember reading

2    this.

3          Do people want a couple of days to sort of absorb

4    this information?

5          MS. OAKES:  I'd like the opportunity to go

6    through it, Your Honor.  However, I know this matter has

7    been continued multiple times and --

8          THE COURT:  I'm -- I have a lot of availability

9    the next several days.  I don't mean a long time.

10         MS. OAKES:  Okay.

11         THE COURT:  I meant -- what do I have tomorrow?

12         Oh, I have something.  We could do it late, late

13   tomorrow or we could do it I think Monday.

14         Can you get my phone off my desk.

15         I think I have another sentencing tomorrow

16   afternoon, but I can certainly pick up after that.  I

17   certainly have Monday available, I'm pretty sure.  I'm

18   going to double check --

19         MS. OAKES:  Okay.

20         THE COURT:  -- before I promise.

21         (Pause)

22         THE COURT:  Yeah, the only thing I have on Monday

23   that would be difficult to change would be I have a

24   revocation hearing at 2:00 o'clock, so I think other

25   things I could move around.

1    MR. HAYES:  Your Honor, if I may.  That

2  matter's --

3    THE COURT:  Tomorrow, I have a sentencing at

4  1:00, so I could go after 3:00, and then if that's -- I'll

5  just give you three options.

6    Tuesday is pretty crowded.  How about tomorrow or

7  Monday?

8    MR. HAYES:  Tomorrow I'm fine.  Your Honor,

9  Monday I'm fine.  That 2:00 o'clock matter on Monday is

10  mine.

11    THE COURT:  Oh, okay.

12    MR. HAYES:  Which I was going to make an

13  application to continue it.  I just needed to -- I'm down

14  here now.  I just needed to see my client at the facility.

15    THE COURT:  Okay.  So that frees that's time up

16  then.

17    MS. OAKES:  And the Government's available at any

18  time on Monday.

19    THE COURT:  Okay.  Well, let me tell you, I mean

20  what I'm getting is a *Dorvee* argument.

21    MS. OAKES:  Yes.

22    THE COURT:  And there is language that says you

23  should consider very carefully all of the elements and I'd

24  like to make sure that I have the thoughtful input of both

25  sides as I do so.  I mean, I've been thinking about it.  I

1    made my own notes, but I would like to make sure both

2    sides have a time to weigh in on that with -- now that we

3    have something else that I think we'll go ahead and -- do

4    you want us --

5            We don't believe it's on the docket, Mr. Hayes.

6            MR. HAYES:  I will file it, Your Honor.  I

7    apologize.  I can see myself writing this.

8            THE COURT:  Yeah.

9            MR. HAYES:  It was at night.  In my head I

10   thought it was filed because I knew what I was going to

11   rely on today.

12           THE COURT:  It will probably be easier to have

13   you file it than to have the Courtroom Deputy scan it in.

14   Okay.

15           MR. HAYES:  Thank you.

16           THE COURT:  So we'll get it filed and we'll come

17   back Monday at 2:00 o'clock.

18           MR. HAYES:  That's fine.

19           THE COURT:  Does that give everybody enough time?

20           MS. OAKES:  Yes, Your Honor, and then, obviously,

21   we haven't read through it, but we did start addressing --

22   we did address some of *Dorvee* in our sentencing memo, to

23   touch on it.  I know this issue gets raised frequently in

24   almost all of the child exploitation cases, but at least

25   our discussion of it is in our sentencing memo, that's

1    Docket 175 starting at Page 17.

2              And we'll be available on Monday.

3              Thank you, Your Honor.

4              THE COURT:  Okay.  What page was that, Ms. Oakes?

5              MS. OAKES:  It's a brief discussion.  It's

6    starting at Page 17, Your Honor, at the bottom of the

7    page.

8              THE COURT:  Yeah.

9              MS. OAKES:  And it's Docket Number 175.

10             THE COURT:  Oh, I'm looking at it now.

11             And just so you know, the way I look at *Dorvee*,

12   not -- a child pornography guidelines in light of *Dorvee*,

13   to be more precise, is I look at the components of what

14   goes into making up the sentence and then I look at, for

15   each component that, or I'll say enhancement, just to use

16   the Guidelines terminology, what does that translate into

17   in terms of additional months under the Guidelines.  And

18   then I make my own assessment of whether I think

19   independently and cumulatively where we wind up is a good

20   fit for the offense conduct or not.

21             And Mr. Hayes referred to the fact that I've

22   dealt with this before and I have.  And I've had cases

23   where I have imposed something way below the Guidelines

24   and I've had cases where I imposed the statutory maximum.

25   So it's not a formulaic approach and I think that's what

1    is meant by careful consideration.  Okay.

2              MS. OAKES:  Government agrees.  Thank you, Your

3    Honor.

4              MR. HAYES:  Yes, sir.

5              THE COURT:  So I will be interested in what

6    people have to say.

7              MR. HAYES:  Judge, I didn't use the cases --

8              THE COURT:  I'm sorry.

9              MR. HAYES:  I didn't use those cases where you

10   found the statutory max.  I did see them though.

11             Thank you.

12             THE COURT:  Well, this is not that situation.  It

13   was a very different case than this one.

14             And I will, just so you all know, we have as one

15   of the components of the calculation here, a two-level

16   decrease because it's receipt, so you all can be prepared

17   to address that as well, okay.

18             MR. HAYES:  Yes, sir.

19             MS. OAKES:  Thank you, Your Honor.

20             THE COURT:  All right.  I'll see you at 2:00

21   o'clock on Monday then.

22             We'll recess.

23             And you can have Mr. Togninalli switch in or not,

24   whatever you prefer.

25             PROBATION DEPARTMENT:  You might be seeing him,

1     Your Honor.

2              THE COURT:  Okay.  All right.  We'll recess.

3              (The Court exited at 2:39 p.m.)

4              (* * * * *)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3

4          I, Alicia A. Cayode Kyles, RMR, Official Court

5     Reporter for the United States District Court for the

6     District of Connecticut, do hereby certify that the

7     foregoing pages are a true and accurate transcription of

8     my shorthand notes taken in the aforementioned matter to

9     the best of my skill and ability.

10

11

12

13

14

15

16

17

18

19     /s/_____

20     ALICIA A. CAYODE KYLES, RMR
       Official Court Reporter
21     United States District Court
       450 Main Street, Room 320
22     Hartford, Connecticut 06103
       (860) 509-8743
23

24

25
```