UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          No. 3:22-cr-90-AWT

       v.

JOSEPH AMADEO,
                       Hartford, Connecticut
             DEFENDANT     JANUARY 8, 2024

- - - - - - - - - - - - - - - - x


SENTENCING - VOLUME II


B E F O R E:

    THE HONORABLE ALVIN W. THOMPSON, SENIOR U.S.D.J.



A P P E A R A N C E S:


    FOR THE GOVERNMENT:

        DOJ-USAO
        157 Church Street, Suite 25th Floor
        New Haven, CT  06510
        BY:  AMANDA S. OAKES, AUSA
            SHAN PATEL, AUSA


    FOR THE DEFENDANT:

        FEDERAL PUBLIC DEFENDER'S OFFICE
        265 Church Street, Suite 702
        New Haven, CT  06510
        BY:  TRACY HAYES, ESQUIRE


                  Alicia A. Cayode Kyles, RMR
                  Official Court Reporter

```
 1              (The Court entered at 2:01 p.m.)

 2              THE COURT:  Good afternoon.  Please be seated

 3    everyone.

 4              ALL COUNSEL:  Good afternoon.

 5              THE COURT:  We're here for a continuation of a

 6    sentencing proceeding from January 4th, in the matter of

 7    United States of America v. Joseph Amadeo, Docket Number

 8    3:22-cr-90.

 9              I'll ask people to identify themselves for the

10    record again.  For the Government.

11              MS. OAKES:  Good afternoon, Your Honor.

12    Assistant United States Attorney Amanda Oakes for the

13    Government.  I'm also joined by Assistant United States

14    Attorney Shan Patel.

15              THE COURT:  Thank you.

16              MR. HAYES:  Good afternoon, Your Honor.  Tracy

17    Hayes on behalf of Joseph Amadeo who's present and before

18    Your Honor this afternoon.

19              THE COURT:  Thank you.

20              And the record should reflect that Probation

21    Officer Togninalli is present with us today.  Probation

22    Officer Wackerman was covering for him on Thursday.

23              I believe that when we broke on Thursday, we had

24    identified the desirability of people taking time to read

25    the Defense's reply memorandum and I assume everyone's had
```

         1    an opportunity to do that and we can now pick up with

         2    Mr. Hayes' argument.

         3              MR. HAYES:  Thank you, Your Honor.

         4              Judge, I'm going to make effort not to repeat

         5    what I stated last week, but I think where we -- where I

         6    stopped I was discussing with The Court how the factors or

         7    the facts in this case are similar to *Dorvee*, the Second

         8    Circuit case.

         9              THE COURT:  The facts are similar to *Dorvee*?

        10              MR. HAYES:  Similar in the sense of the

        11    enhancements.

        12              THE COURT:  Or the concerns are --

        13              MR. HAYES:  Concerns.

        14              THE COURT:  Okay.  Because *Dorvee* the Guideline

        15    range was the statutory maximum as I recall.

        16              MR. HAYES:  Exactly.  In fact --

        17              THE COURT:  Okay.

        18              MR. HAYES:  -- I think it was an enticement case.

        19    In my head that's what I meant.  I apologize, Judge.

        20              THE COURT:  Okay.

        21              MR. HAYES:  And so my focus is on the

        22    enhancements in 2G2.2.

        23              THE COURT:  Uh-huh.

        24              MR. HAYES:  In my reply brief we -- so on Page 7

        25    it starts, where I start to lay out cases similar to

1    Mr. Amadeo's that are nonproduction child pornographic

2    cases.  And so on that page -- I'm looking at the second

3    full paragraph, somewhat in the middle, where it talks

4    about 97 percent of the cases involved enhancement for use

5    of computer.

6            And I started that section off by discussing sort

7    of these overlapping enhancements and the actual cases --

8    I'm sorry, and the actual charge itself and not only that,

9    but I think we would also call that sort of double

10   counting.

11           So the use of computer, the reason why I start

12   there, 97 percent of the cases that we see with child

13   pornography cases, again, nonproduction, have use of

14   computer.  And it says here, and I've always thought this,

15   how else are you going to obtain these images?  Sure

16   someone could print them out and distribute them, but I

17   have not seen that.  I'm not sure if The Court has seen

18   that.

19           The only thing I saw was, perhaps this was back

20   in mid 2000's when my client had images, I'm not even sure

21   where he got them from.  I guess maybe he purchased them

22   from a store at some point, but that's rare.  I don't

23   think we see that.

24           What we see are computers, whether you're using

25   your phone, whether you're using a laptop or a desktop, a

1    tablet of some sort.

2           And the reason why that's concerning is, and I'm

3    quoting here, it says, "As one expert in the field has

4    stated, it's now nearly impossible to obtain child

5    pornography through any other means than over the

6    Internet."

7           And that's sort of what I was discussing.

8           I also -- and that enhancement I should say, Your

9    Honor, is I believe it's a two-level enhancement.

10          THE COURT:  Yes, it is.

11          MR. HAYES:  The next enhancement is a five-level

12   enhancement for possession of more than 600 images.

13          There is no doubt that Mr. Amadeo collected and

14   saved, stored these images on what would be a thumb drive.

15   But I say that to say, as The Court heard, as The Court

16   has read through what we filed and The Court also heard

17   from our expert, Mr. Amadeo has, shall I say

18   obsessive-compulsive features if you will.  Whether or not

19   it's questionable if the disorder was actually diagnosed,

20   he has those features.

21          And so as we stated, not only does he collect

22   what we see here as child pornography images, but as we've

23   stated also, other photos, stories, music, other files,

24   games, and to that end the child pornography was 1 percent

25   of what was found in these collected devices, stored

1   devices.

2          So I want to say that with the five-level

3   enhancement, but also, Your Honor, what we don't have

4   here, and which would be more probing for The Court, even

5   much less for the Government, is if Mr. Amadeo was

6   exclusively looking for specific types of images where you

7   put in certain specific search terms.  We don't have that

8   here.

9          Yes, he collected.  We definitely have that, but

10  when one is downloading, whether it's from the dark web as

11  what was done here or just in general, you're just going

12  to get fed into your computer a large download of images

13  and videos.  And, Your Honor, I cannot say that Mr. Amadeo

14  was not aware that he had both images and videos, so he

15  was.  I do want to say that.

16          And so, what I have in that section, it starts at

17  the bottom of Page 7, and then at the top of Page 8, it

18  says, "Even the dramatic effect of a five-level increase

19  at issue here applies to more than 63 percent of the

20  cases."

21          So that's still an overwhelming, to me, majority

22  of the cases where you have that type of enhancement.

23  Sure we -- enhancement for 600 or more I should say.

24          Sure we do have some cases and I'm sure The Court

25  has seen it where someone's at the lower scale of the

1      number of images, but I would say as we see here the

2      majority of the cases, 63 percent or more than the

3      majority of the cases of 600 or more.

4              In terms of 95 percent of the cases, that's the

5      next paragraph, includes images of prepubescent children,

6      and so that's children under the age of 12.

7              And I make an effort to state there's nothing

8      here to distinguish between offenders or offense conduct

9      or to punish more serious crimes more harshly.  What I

10     mean by that again, it's not as though Mr. Amadeo was

11     looking specifically for types of images where you type in

12     some type of search term for a specific subset of these

13     child pornographic images.

14             And then, lastly, 73 percent of the cases involve

15     depictions of sadistic or masochistic conduct.  That goes

16     to the argument of when you're downloading you're not

17     using a search term to say send me these types of images.

18     You're taking what you get from your request.  To the

19     extent, Your Honor, that when we see these cases now,

20     particularly when we see videos, as The Court is aware,

21     series -- video series, so it's not as though you're

22     looking for specific series, you're just getting that in

23     terms of your -- whatever you've searched for, this is

24     what you're obtaining.  This is what's sent to you.  So

25     that's why now we're able to identify and sort of follow

1    these series and that's why we have restitution orders

2    because we know these series are, shall I say, ubiquitous,

3    frankly, in child pornographic cases that you see these

4    series in case after case.  So it's not as though we're

5    looking for anything specific and that's what I want to

6    point out.

7              So when I talk about --

8              THE COURT:  But to be clear, there is no

9    enhancement in this case for sadistic or masochistic

10   images, correct?

11             MS. OAKES:  No, Your Honor.  Because the

12   subsection --

13             THE COURT:  Because we have the --

14             MS. OAKES:  -- applied because there were

15   infants.

16             THE COURT:  Yes.

17             MS. OAKES:  However, it likely would apply here

18   as well.

19             Thanks.

20             THE COURT:  Right, yeah.

21             MR. HAYES:  So I still wanted to point that out,

22   Judge, because this is what I see often.  I think the

23   landscape has changed.  I'm sure for The Court, the

24   landscape has changed from when I first started to see

25   these types of cases to now, and so I think these are

1    concerns that I wanted to at least point out to The Court,

2    the similarities in terms of the enhancements with the

3    concern of the Second Circuit, the concern in *Dorvee*

4    cases, and even the concern of judges here in this

5    district and I talked about that last week as well.

6              Judge, to get to and I could talk about that more

7    if The Court wishes, if I could move on?

8              THE COURT:  It's your argument, not mine.

9              MR. HAYES:  Thank you, Judge.

10             I could move on to my next point.

11             I know last week and in my filings much was made

12   of what was said by Mr. Amadeo and much was made by me,

13   what was said by Mr. Amadeo in his 2012 matter.

14             THE COURT:  Uh-huh.

15             MR. HAYES:  And I know that The Court is aware of

16   the report.

17             The Government sent on -- to me, on Friday what

18   would be a handwritten statement and so when I look at

19   this handwritten statement I do want to, and I'm not sure

20   if the Government is saying that my client wrote the

21   statement, which he did not write it, but he signed --

22   endorsed it, if you will, as well as his mother endorsed

23   it as a witness.

24             When I look at the section in terms of what's

25   listed in the Presentence Report, which is what we've

 1    objected to, I think it's important to point that out.

 2            THE COURT:  Well, you didn't object to it.  You

 3    just said in your reply that he didn't say it.

 4            MR. HAYES:  That's correct, Judge.

 5            THE COURT:  Yeah.

 6            MR. HAYES:  Right.

 7            THE COURT:  You're talking about Paragraph 43 in

 8    the PSR?

 9            MR. HAYES:  Yes, sir.

10            THE COURT:  Okay.

11            MR. HAYES:  What would of, to me, would of been

12    helpful to have this early on so that I could have pointed

13    to it in preparation for today, but it's fine to have it

14    now.

15            Sorry, Judge.

16            So it's -- well, The Court does not have this

17    statement, but I'm looking at the bottom of Page 2 of

18    three pages.  It says --

19            THE COURT:  I do have the -- I did ask for what

20    the Probation Office relied on and I got a written

21    statement, so let me pull out what I did get.

22            MR. HAYES:  Judge, I think --

23            THE COURT:  What you're in -- I have something

24    that says that Mr. Amadeo provided the written

25    statement -- the following written statement.

1           The first paragraph begins, "I live at 26

2    Countryside Circle."

3           The next is, "I use computer games, movies."

4           The next one begins, "I would guess that I have

5    somewhere around 100 and 1,000 files."

6           And then the last one begins, "I know that it is

7    wrong to look at pornography involving kids."

8           Is that what you have in your handwritten

9    statement or not?

10           MR. HAYES:  Yes, sir.

11           THE COURT:  Okay.

12           MR. HAYES:  If I may just read this section just

13    to -- I believe The Court has the same thing.

14           THE COURT:  I'd like to make sure I do.

15           MR. HAYES:  Yes, sir.  Judge, I'm --

16           THE COURT:  So you're reading the paragraph,

17    what's the first sentence?

18           MR. HAYES:  Judge, you know, the thing is I don't

19    have, so what I'm looking at is not broken down into

20    paragraphs.

21           THE COURT:  Okay.

22           MR. HAYES:  It's just one long statement.

23           THE COURT:  Well, is there a statement, "I know

24    that it is wrong to look at pornography involving kids"?

25           MR. HAYES:  Yes.

1          THE COURT:  Why don't you start there.

2          MR. HAYES:  Can I start at the sentence before

3    then, that's what I want to point out.

4          THE COURT:  Sure, if you'd like.

5          MR. HAYES:  It says, I have never had sexual

6    contact with a child.  If I am aroused before I look at

7    the pictures and videos of kids I will -- and I'm not

8    sure, what I have is crossed out and there's something

9    written in there but, I'm not sure what it says, Your

10   Honor.

11         THE COURT:  The typed version says, "I will

12   remain aroused."

13         MR. HAYES:  See, but that's crossed out here and

14   there's something written in above it and there's what

15   appears to be initials of Mr. Amadeo.  So I'm not sure

16   what this -- I'm just not sure.

17         THE COURT:  Okay.

18         MR. HAYES:  "I know it is wrong to look at the

19   pornography involving kids.  I'm the type of person that

20   always follows the rules.  I like the excitement of

21   knowing that I can look at these types of photos and get

22   away with it."

23         I think what's also important, Your Honor, is

24   that it further says here, how Mr. Amadeo and so this is

25   what would be the last five lines or six lines, "I do not

1    encourage any of these actions and because of that, I

2    thought of it as a lesser crime."  I'm not sure if those

3    are his words, but that's fine.

4            THE COURT:  Is there a sentence before that that

5    begins, "Although there was victim involved in these

6    pictures"?

7            MR. HAYES:  Yes, yes.

8            THE COURT:  Okay.

9            MR. HAYES:  "I actually thought of reporting some

10   of the things I saw but thought if I did report it I would

11   get in trouble myself.  I can never see myself having" I

12   guess I want to say similar contact with a child "sexual

13   contact with a child," I'm sorry.

14           And then lastly the last line says, "Some of the

15   files I have were downloaded" according -- "accidentally

16   and others were ones that I had chosen randomly."

17           So I stopped there, Your Honor.  Some of what's

18   said in that statement and signed by Mr. Amadeo, he said

19   similarly this same type of thing here when we met with

20   the Government and the agents in terms of he didn't know

21   what to do with images that he had.  He knew that if he

22   would contact the FBI, that he would get in trouble.  He

23   just didn't know what to do.

24           What he had also said during the proffer session

25   was that his activity so waned over time and so within the

1    months leading up to his arrest he was not accessing the

2    Internet for this type of activity as much as he had

3    previously.

4            So I want to point that out, Judge.

5            On Friday the Government also tendered notes from

6    the proffer session.  So at the proffer session there was

7    Government counsel, myself, and Mr. Amadeo and there --

8            THE COURT:  When you say "tendered" you mean gave

9    to --

10           MR. HAYES:  Me.

11           THE COURT:  -- to you, not to me?

12           MR. HAYES:  No, sir.

13           THE COURT:  Okay.  So, just so we're clear.

14           MR. HAYES:  Yes, Judge.

15           Gave to me notes from the proffer session.  And

16   the two agents who were present, I know one was the case

17   agent.  I know he was here on Friday.

18           Both of the notes, if you will -- one's

19   typewritten, one is handwritten -- are two pages each,

20   really one's a page and a half.  The other one is maybe

21   two pages.

22           And I point that out because when I am at a

23   proffer session, virtually anything that comes out of my

24   client's mouth I'm writing down.  I have 11 pages,

25   11 pages and so when I talk about some of the details, it

1    gives more context to what Mr. Amadeo was saying during

2    the proffer session, in particular how he wished he could

3    of contacted the FBI, how he stopped accessing and stopped

4    that activity -- not stopped, but slowed down that

5    activity over time, how he wanted to know why he was doing

6    this and wanted to get help and couldn't get help and

7    didn't know where he should get help from.

8            So that's not reflected in the notes from the

9    agents, but that's reflected in my 11-page notes.  That

10   and other details about what was happening at the time and

11   what had been happening previously with Mr. Amadeo.

12           And again, I think it's important to note, I said

13   this last week and I'm saying it again now, in terms of

14   reflecting for Mr. Amadeo, for him reflecting on why he

15   was doing this, I don't -- even now, I don't think he

16   could explain to The Court why.

17           Does he know it was wrong?  Yes.

18           Did he know it was wrong as he was doing it?

19   Absolutely.

20           Did he know it was wrong in 2010?  Yes, Your

21   Honor he did.  He did.

22           The Court may recall a discussion of the

23   medication that Mr. Amadeo is now receiving, that he was

24   not receiving prior, and I just point to that again

25   because the expert in this case, my expert Dr. Geysen,

1    part of his conclusions and what he pointed to, his

2    recommendation, if you will, was that Mr. Amadeo see a

3    specialist, receive treatment, and receive perhaps

4    psychiatric medication or treatment, evaluation and then

5    treatment in terms of medication.

6          Part of what we tried to do in this case, there

7    was a discussion amongst the parties of finding a facility

8    for Mr. Amadeo to reside in frankly, as part of

9    mitigation, but we couldn't find anything, Judge.  I'm

10    wrong.

11          Our expert, Dr. Geysen, testified to working for

12    period of time at the Connecticut State mental health

13    institution and specifically he said the Whiting

14    institution.

15          What he had suggested to us was that we contact

16    the institution and see if we could, if Mr. Amadeo would

17    be appropriate for treatment there.  He couldn't because

18    this is a federal matter and they would only treat, if you

19    will, house and treat people who are involved in the state

20    and not federal matters.

21          In fact, I'd only been to Whiting once, that was

22    recently.  It was my client who was on violation was in

23    state custody and he was sent to Whiting and that was the

24    only time I had been there.  I didn't know what to expect,

25    but they do not house or treat or hold any federal

1    defendants.

2         The only other program that we found, Your Honor,

3    was in Florida, but we could not -- we didn't have the

4    funding because it's ongoing treatment and I think we have

5    one client there now, and he's -- I don't think he will be

6    there too much longer because it's funded by, partially by

7    Connecticut State and I believe partially by Florida, but

8    we didn't have that opportunity here.  It was nothing we

9    could do to get Mr. Amadeo into that program but we did

10   try and that took some time.

11        We not only talked to the Whiting institution,

12   this program in Florida, but we talked to other program

13   providers in terms of, again, residential treatment not

14   just outpatient treatment.

15        So not only did we do that, we talked to experts

16   at Yale.  We thought we could get some inroads there with

17   Dr. Baranoski.  She couldn't, she couldn't.  She said

18   she'll try and then she talked to I guess what would be

19   other doctors there but they could would not accept

20   Mr. Amadeo.

21        So we tried just about everything we could.

22   Again, that took some time.

23        THE COURT:  Why would they not accept him?

24        MR. HAYES:  I think -- not I think, because of

25   the type of conviction.  This was after he had pled guilty

1    and we were still trying to work on programs and so they

2    just wouldn't accept him because of that.  In terms of --

3    this is not an outpatient, Your Honor, this is -- this

4    would have been a residential treatment facility, but like

5    I said, we don't have anyone there, not with this type of

6    conviction.

7         So here's where we are.  We did try just about

8    everything.

9         There's a program that I knew of from the early

10   2000s in Minnesota.  They weren't helpful.  And so there

11   was nothing that we could find.

12        Your Honor, in terms of just giving some, again,

13   some context, I've already said that Mr. Amadeo is well

14   aware of his actions.  I just want to repeat that at this

15   point a sentence of 5 years, the mandatory minimum, which

16   I ask The Court to also consider that Mr. Amadeo's been on

17   supervision, pretrial supervision or presentencing

18   supervision for at least 2 years now, for at least --

19   actually, over 2 years now, 2 years 7 months, 2 years

20   6 months and that's significant.

21        So in a sense he's been serving a sentence for

22   quite some time.  So we have -- even if it's 2 years,

23   coupled with 5 years, that's 7.  That's significant,

24   Judge.

25        And I talk about that because, Judge, most of my

1    clients they will say if they've been arrested and we are

2    now arguing for release, they'll say, I'll even do home

3    confinement.  I'll even take a bracelet.  Of course you

4    will.  But I know that sometimes it's even better to be in

5    custody, frankly, than to be home because you can't do

6    much.  All right.

7            Mr. Amadeo couldn't do much to begin with.  It's

8    not as though he was independent and could drive around or

9    walk around or exercise.  He relied on his family.  He

10   relied on his parents.  And so he was home and he couldn't

11   do much there.  Now we're sending him into or he'll be

12   sentenced to the confines of a federal prison, a dangerous

13   facility, particularly with someone who presents as

14   Mr. Amadeo does with whatever deficits, wherever we want

15   to put those in terms of behavioral health or cognitive

16   deficits.

17           He presents in a way and The Court hasn't -- I

18   don't know if The Court has really heard from Mr. Amadeo

19   in the past, but The Court will hear from him today.  He

20   presents the same way.  He presented the same way from the

21   first day I met him.  What's different, again, I should

22   point out he did not have the treatment, the medication

23   regimen that he has now, so his presentation is different

24   now, but part of my fear is will he receive that same type

25   of medication?

1          THE COURT:  When did he start with that

2     medication?

3          MR. HAYES:  He started --

4          (Off the record discussion with Defense Counsel

5     and the Defendant.)

6          MR. HAYES:  Your Honor, I believe it was around

7     January 2023.  I believe it was around that time.

8          THE COURT:  I don't need an exact time.  I just

9     want to make sure I was in the right decade.

10          MR. HAYES:  But, Judge, I think just to point

11     out -- sorry, I should say this.

12          It says -- well, "care since September of 2021."

13     I know that he was receiving some medication, but not the

14     medication he needed until about a year ago because I

15     think there was a period where he would, the doctor would

16     experiment with types of medication in terms of helping

17     Mr. Amadeo with his anxiety, with his sleep, with his

18     depression.  And so I know that they were sort of testing

19     what medications would work.

20          But it wasn't until I meet with Mr. Amadeo that I

21     realize that he presented different than I ever noticed

22     before and it's not just me I think everyone says that.

23     Even Dr. Geysen was surprised that he was on medications,

24     that they helped.  He knew that they would help, but he

25     was on medications.

1          So I point that out because some of these same

2     medications won't be available in the Bureau of Prisons.

3     That's what we often see, that they might substitute one

4     medication for something they believe is just as good or

5     close and, frankly, less costly.  And -- but whether

6     Mr. Amadeo presented as he did before the medication, so

7     immediately upon his arrest here in this case or even now

8     he's still going to have trouble in the Bureau of Prisons.

9     Sure.  Could we -- could I say that just about any

10    defendant?  Perhaps.  But I think with Mr. Amadeo, it's

11    more obvious in terms of his interactions with others.

12    Where I'm patient with my client, that's one thing, that's

13    one-on-one interaction, but when he's in a facility that

14    presents levels of danger that he's never been exposed to,

15    that he has no one around him to talk to him and to guide

16    him and to help him, thrown to the wolves is one way of

17    putting it.

18          Even when I meet with Mr. Amadeo -- sometimes

19    we'll meet just one-on-one.  Sometimes we'll meet with his

20    parents and his parents will have to intervene in the

21    conversation with Joseph to get him to react quicker to

22    something that I'm telling him or showing him.  That just

23    happened earlier today.  That happens often.

24          And I say that to say he will not have that,

25    Judge.

```
 1              THE COURT:  Well, I thought you said when he has
 2    the medication it changes things.  Now, you're saying
 3    it --
 4              MR. HAYES:  So when I say --
 5              THE COURT:  Reacting --
 6              MR. HAYES:  Reacting to things, so, direction,
 7    instruction.  It's different.  With or without the
 8    medication it's going to be difficult, I should say that.
 9              THE COURT:  Okay.
10              MR. HAYES:  How he would respond and how he would
11    talk and communicate and think is different before the
12    medication and even now.
13              THE COURT:  Let me see if I understand --
14              MR. HAYES:  Sure.
15              THE COURT:  -- the point you're making.
16              Is the point you're making that Mr. Amadeo will
17    have a more difficult time in prison than a typical inmate
18    because even with the medication he has a difficult time
19    interacting as typical people do and without it he'll have
20    and an even more difficult time interacting the way people
21    that do in the Bureau of Prisons?
22              MR. HAYES:  Yes.
23              THE COURT:  Okay.  Fine.
24              MR. HAYES:  And with that, Judge, again, just to
25    say, I do not know if the same medications he is receiving
```

 1    now will be available.

 2              THE COURT:  Right.

 3              MR. HAYES:  Right, and that's also a concern of

 4    mine.

 5              Part of the defense work when you try to talk

 6    about prison, not talking about it from firsthand

 7    knowledge to my clients, I mean, where I know a client

 8    will be sentenced and designated to a particular prison

 9    and I can give them some, you know, encouragement but here

10    it's different.  I really don't know what to expect with

11    Mr. Amadeo.

12              He will not have someone to intervene on his

13    behalf.  He's not going to have someone with him all the

14    time to help him.  People are going to take advantage of

15    him and that's just honest.  His interaction with people

16    who he's not familiar with, even whether he sees them

17    everyday or not, that is going to be difficult.  And do we

18    know -- at the end of today, I will ask The Court to

19    recommend Danbury, but I don't know if he will get into

20    Danbury, Your Honor.  I don't know if there will be space

21    there or room there.  I just don't know what to expect and

22    that's what set this apart, one of the aspects that sets

23    this apart from other matters.

24              That said, Your Honor, I believe that I -- I

25    could talk until 6:00 o'clock tonight, but I believe I'm

1    finished and I know that Mr. Amadeo wants to address The

2    Court if this is the appropriate time.

3              THE COURT:  Yes.

4              MR. HAYES:  Thank you.

5              THE DEFENDANT:  So first I would like to state

6    that being on the autism spectrum I don't display emotions

7    normally, so despite in my showing on my face I do feel

8    deep regret.

9              Firstly, and most regret that the girls were

10   molested in the first place.

11             Second regret is that I was recorded for

12   re-victimization.

13             My third regret is --

14             THE COURT:  Sorry, I didn't understand the second

15   regret.  Could you state that again.

16             THE DEFENDANT:  That it was recorded for

17   re-victimization.

18             THE COURT:  Okay.

19             THE DEFENDANT:  Third regret is not thinking

20   while viewing and downloading these images.

21             And fourth regret is my part in the

22   re-victimization.

23             And I honestly don't know why I, you know, did

24   this.  I think it had some sort of stress reaction, but

25   I'm not sure.

1          THE COURT:  Had some what?

2          THE DEFENDANT:  Some sort of reaction to stress,

3   I'm not sure of that.

4          MR. HAYES:  And, Judge, I do want to point out

5   that although Joseph and I have talked about him talking

6   to The Court for way over a month now, I could -- I

7   didn't, I definitely didn't write this.  I didn't give

8   those points to him.  His parents didn't.

9          I remember when we met and discussed it, he

10  called me either later that day or the next day and he

11  read that to me.  He's had that, the same notes in his

12  pocket for over a month now.  He had them here last week

13  and he has them here now.

14          This is Joseph Amadeo.  And as close to as he

15  could express to The Court, those are heartfelt statements

16  of Mr. Amadeo in terms of him re-victimizing and sort of

17  understanding.

18          And, Judge, it's not just me or Mr. Amadeo saying

19  it, but even in the letter from his clinician from CASA

20  she says the same thing, that he recognizes and what his

21  behavior has done, not only that it was criminal and how

22  it affected other people.  He understands and he's

23  remorseful.  And so I do want to point that out.

24          And, Judge, lastly, I get it, that what's

25  aggravating here in this case -- well, setting the images

1    aside for one second, is the fact that this is the second

2    time.  This is the second sex offense conviction, if you

3    will, that Joseph has had.

4           What sets him apart from someone else where you

5    would see the second time I think is borne out in the

6    mandatory minimum.  The Government could of asked for

7    15 years, 10 years.  It's a 5-year mandatory minimum.

8    There's a reason why it's a 5-year mandatory minimum.

9           THE COURT:  I hope -- you said the Government

10   could of asked for 15?

11          MR. HAYES:  In terms of indictment, in terms of

12   the charge.

13          THE COURT:  His prior conviction was risk of

14   offense -- risk of injury to a minor, right?

15          MR. HAYES:  Yeah, I think they were going to try

16   to ask if not 15 at least 10, Judge.

17          THE COURT:  Okay.

18          MR. HAYES:  And I think some of it was because he

19   is -- well, at least at the period of time of the

20   encounter with law enforcement he was on the --

21          THE COURT:  Sex Offender Registry.

22          MR. HAYES:  Yes, sir.

23          And so I think some of the reason why it's a

24   mandatory 5 years in terms of as opposed to more, is

25   because of who Mr. Amadeo is and what he presents and in

 1    terms of his being on the spectrum.  And I think that's

 2    important and I think that has informed -- not I think --

 3    that has informed his behavior both the first time in 2010

 4    and even now.  And that's not an excuse.  That's informed

 5    his behavior.

 6              THE COURT:  When you say that "informed his

 7    behavior".

 8              MR. HAYES:  It formed his behavior, formed his

 9    actions I should say.

10              THE COURT:  Are you saying it contributed to the

11    offense, the commission of the offense?

12              MR. HAYES:  Yes, sir.

13              THE COURT:  That's what Dr. Geysen put in his

14    2012 report, but he specifically did not put that in his

15    current report.

16              MR. HAYES:  Judge, can I say this?

17              THE COURT:  What I'm -- just to be clear.  We had

18    testimony about what the scope of his report is now,

19    correct?

20              MR. HAYES:  Yes, sir.

21              THE COURT:  And he made it very clear that the

22    scope of his report is limited to -- let me just find

23    that, assessment of sex offense risk.  He specifically --

24    well, he made it very clear, I'll say, that he was not

25    talking at all about whether ASD was a contributing factor

1  in the commission of the offense.

2          I was specifically waiting to hear -- I mean, I

3  was going to ask the question if it hadn't been re-asked

4  when he was here.  The only things I've had that come into

5  the record about ASD contributing to commission of the

6  offense are arguments of counsel.

7          MR. HAYES:  Your Honor, so I'm not only

8  referring -- I'm not only relying on Dr. Geysen's

9  testimony.  In the report --

10          THE COURT:  What part of his testimony are you

11  relying on?

12          MR. HAYES:  Well, I'm saying I'm not only relying

13  on--

14          THE COURT:  Yeah, "not only relying on" it means

15  you are relying on it in part.  What part of it are you

16  relying on?

17          MR. HAYES:  I'm relying on it in whole, but I'm

18  also relying --

19          THE COURT:  Well, tell me what part of

20  Dr. Geysen's testimony you're relying on.

21          MR. HAYES:  All of it.  And his report.

22          THE COURT:  I'm sorry.  Don't tell me "all of

23  it".  Point me to something specific that shows that he

24  was giving an opinion as to ASD contributing to the

25  commission of the offense when he said the scope of his

1    engagement was limited.

2          MR. HAYES:  Judge, but it's also in his report

3    where he's, where the doctor points out what contributed

4    to these -- this behavior.  So whether or not he

5    testified, it's in his report.  So I --

6          THE COURT:  So you're pointing to things he said

7    but declined to give an opinion as to and you're picking

8    them out and you're giving me your interpretation of

9    things you read in his report?

10         MR. HAYES:  No, Your Honor.  It's not in my

11   interpretation.  It says in it in the report on Page 7.

12         THE COURT:  Where in his report does it say that

13   the ASD contributed to the commission of the offense?

14         MR. HAYES:  Maybe I'm misreading this, Your

15   Honor, but on Page 7 in the third full paragraph towards

16   the end, where it says, "Mr. Amadeo is not a sexual

17   predator.  He's a collector and hoarder.  He does not

18   engage in scheming planful conduct."

19         THE COURT:  You're on Page 7?

20         MR. HAYES:  Yes, sir.

21         THE COURT:  Of?

22         MR. HAYES:  His report.

23         THE COURT:  Under which caption, I'm sorry.

24         MR. HAYES:  So Page 7 is, I'm looking at the

25   third full paragraph.

```
 1              THE COURT:  Are you looking at Document 171?

 2              MR. HAYES:  Should be, Judge.

 3              THE COURT:  Hold on.

 4         Hold on, I did --

 5         Okay.  It's Page 10 of ECF document 171.  You're

 6    looking at the, right above the "conclusion"?

 7              MR. HAYES:  Yes, sir.

 8              THE COURT:  Okay.  And what sentence are you

 9    looking at?

10              MR. HAYES:  I started with the:  "He's not a

11    sexual predator.  He's a collector and a horder.  He does

12    not engage in scheming planful conduct.  Instead his

13    autism spectrum disorder, obsessive-compulsive behavior

14    and severely restricted social life drew him deeper into

15    the Internet and the behavior leading to his re-offense."

16              (Pause)

17              THE COURT:  I agree with you that language is

18    there, but he made it clear that nexus between the

19    commission of the offense and the ASD was not within the

20    scope of his engagement.  When he was asked he

21    clarified -- he made it clear.  He emphasized it was not

22    within the scope of his engagement.

23              MR. HAYES:  Your Honor, I'm not -- I don't know

24    what to say about --

25              THE COURT:  Well, you don't need to say anything.
```

1    I don't think this is a sentence that I can find as to be

2    a reliable opinion to the extent you're asserting it that

3    I should accept it as an expert opinion from Dr. Geysen.

4            MR. HAYES:  But -- okay.  I understand what The

5    Court has just said.  I am -- I submitted that report as

6    an exhibit.  This is what we relied on in terms of the

7    evaluation.  I made my representation.  I understand what

8    the doctor said on the stand, but this is his report and

9    he said that he reviewed his report.

10           I don't recall that portion --

11           THE COURT:  Well, he didn't make it clear whether

12   this was the -- this language was in the report that he

13   was testifying from because he told us when he came here

14   that he had gone through and taken certain things out of

15   the report.  That was never given to us, so I don't know

16   what is actually in the report that he was testifying

17   from.  So we have what's here.  We have what he actually

18   said when he was on the witness stand.

19           MR. HAYES:  Understood.

20           THE COURT:  When I say "here" I mean in this

21   document.

22           MR. HAYES:  I know.  I understand that, Your

23   Honor.

24           Judge, I'm relying on this report because --

25           THE COURT:  You can rely on it.

 1           MR. HAYES:  I don't see --

 2           THE COURT:  That doesn't make it persuasive.

 3           MR. HAYES:  I understand.  But this is my expert

 4    who's been in this type of work --

 5           THE COURT:  Well, if you're going to have an

 6    expert you have to disclose what the person is -- what

 7    opinions the person is being disclosed to give and he was

 8    only disclosed as giving an opinion as to risk assessment

 9    of sex offense risk.  That's the opinion.

10           MR. HAYES:  Judge, so perhaps it's not clear.

11           What the doctor, what his goals were, but what I

12    can say is that what he reviewed in terms of the documents

13    he reviewed, would of relied on in terms of how he came to

14    his conclusions and his recommendations, I don't think it

15    was just limited to sort of a risk assessment.

16           THE COURT:  Well, what did you hear him say when

17    he talked about the scope of his engagement?

18           MR. HAYES:  Judge, I just don't recall.  As I'm

19    standing up asking questions I didn't take notes.  I just

20    don't recall that, Judge.  But what I can say --

21           THE COURT:  I think it was in response to

22    question from counsel for the Government, not -- you

23    weren't standing up asking questions when he gave that

24    answer.  I believe that answer was in response to question

25    from counsel for the Government.

 1           Hold on.  Let me check my notes.

 2           Cross.  Yes.  It was in response to a question

 3    from counsel for the Government.  He was asked about the

 4    IQ, high average.  He was asked about whether he diagnosed

 5    the ASD.  He said it was not diagnosed by him but he does

 6    agree with Dr. Selden's diagnosis based on his own

 7    observations.  He said the scope in the second evaluation

 8    was to consider factors concerning reoffending.

 9           He was asked whether he looked at malingering --

10    so that came up during the Government's cross not while

11    you were asking questions

12           MR. HAYES:  Right.  And I have those notes.

13           And he was, everything --

14           THE COURT:  Well, his testimony is his testimony.

15    So we can...

16           MR. HAYES:  Judge, what I also have in terms of

17    further notes, he talked about --

18           THE COURT:  Well, the only thing that -- if

19    you're going to point to something additional that is --

20           MR. HAYES:  No.  I literally have asked to

21    evaluate computer use, impulsive control, ADHD.

22           THE COURT:  Yes.

23           MR. HAYES:  That's what I wrote.

24           THE COURT:  Yeah, and that was all in the context

25    of risk of re-offense.

1          MR. HAYES:  Sure.

2          THE COURT:  For a noncontact offense.

3          MR. HAYES:  Yes, sir.

4          THE COURT:  Okay.

5          MR. HAYES:  But I think that's -- I started

6    there, Your Honor.  I said that, to me, this is a second

7    time that that's -- setting aside just the criminal

8    conduct, if you will, the fact that this is a second time,

9    that's aggravating, but then I also tried to point out to

10   The Court that what has driven the behavior is all of

11   these factors, the mental health and the cognitive -- the

12   fact that Mr. Amadeo's on the spectrum and everything else

13   that accompanies it.

14          What's important, Your Honor, is while he --

15   during this two-year period or more than two-year period

16   when Mr. Amadeo was under supervision, where he is

17   restricted to his home, he has a curfew, but he wasn't

18   taking advantage of it, he's in his house, he's with his

19   parents, his use of a computer is restricted, he has a

20   supervision officer who shows up at his home randomly as

21   she's supposed to, he hasn't violated.

22          Then, during that period he starts to take

23   medication and his risk of recidivating even lowers and

24   lessens I should say.

25          THE COURT:  Why does his risk of recidivism lower

1   when he started to take the medication?

2        MR. HAYES:  I pointed this out last week, when

3   Mr. Amadeo was first -- when he first encountered law

4   enforcement for I'd say easily the first six months or so,

5   so he had two supervision officers.  He would ask could he

6   have access to his computer, right, and he would talk

7   about this every time he talked to one of his supervision

8   officers, every time, and he would do the same thing with

9   me, whether it was over the phone or in person and he

10   would just, how he would sort of present, what he would

11   talk about.

12        There's an example in the evaluation when he was

13   asked about his behavior in this case where he points

14   to -- "he" being Mr. Amadeo -- talks about George Floyd,

15   right, sort of this nonresponse.  And now, if you ask him

16   his answers will be different.  The medication has helped

17   tremendously.

18        So what I'm saying, the controls of supervision

19   and then the medication has helped tremendously and the

20   actual treatment, the ongoing treatment.

21        The Court may recall prior to this case, he was

22   receiving treatment but it was not for what we have here,

23   what we're dealing with here.  It was nothing of the sort.

24        So his -- in fact his, the specialist at the

25   time, his therapist, when she found out, you know, let me

1   see if I can help you find someone because I can't help

2   you.

3          So that type of specialized treatment Mr. Amadeo

4   was not receiving.  Not prior to, again, when he

5   started -- when he started to treat and receive therapy at

6   CASA and then when he saw the psychiatrist there and then

7   he started this new medication regimen. that's when things

8   have changed.  Things changed for Mr. Amadeo to definitely

9   what we see now.

10         And what I'm trying to convey to The Court is

11  that and the controls of this supervision, the type of

12  supervision are what Mr. Amadeo needs.

13         Incarceration -- more than what we have in this

14  case but also more than the mandatory minimum is not

15  necessarily, is not necessary with the facts here.

16         I will leave it there, Your Honor.  Thank you.

17         THE COURT:  Thank you.

18         Ms. Oakes, could you help me understand one of

19  the points that's being at least raised by the Defense.

20  There's this point about no search terms, et cetera, and

21  then there are points in the Government's memorandum about

22  the Tor site and the dark web.  So I want to make sure I

23  understand what the Government is contending that shows.

24         You don't have to answer it first, but I assumed

25  you were going to refer to it, but I just want to let you

1    know I'm particularly listening for that point so I

2    understand it.

3           MS. OAKES:  Yes, Your Honor.  Mr. Amadeo -- so

4    this whole investigation started as a national Tor dark

5    web investigation.

6           So the dark web, it's difficult to even

7    understand for me as a lay person how it exactly works,

8    because it is really only used by sophisticated

9    individuals.  So you don't happen upon the dark web.  You

10   have to get something -- you have to have programs

11   downloaded onto your computer, something called a Tor

12   Browser has been referenced a number of times.  So it is

13   a, essentially, like a VPN that is put on, that one would

14   download onto a computer or a device to enter onto the

15   dark web.

16          The dark web in many ways mirrors what we see,

17   like, as the regular Internet the www-dot.  You can see

18   those websites, but in addition you can also access a

19   number of hidden websites.

20          So the whole purpose of the dark web or one of

21   the purposes is that individuals -- you will evade

22   detection by using that.  So every time -- my

23   understanding, through speaking to the case agent on this

24   case and other individuals.  My understanding is every

25   time you go on a website, so if you're just on your

1    regular work computer and you go to Google, there's going

2    to be an IP address associated with that, that will link

3    back to the Wi-Fi that you're connected to and identify a

4    location and show that an individual accessed, you know,

5    Google from that computer.

6           When you're using the dark web, those IP address

7    that identify specific real locations don't exist, so

8    they're encrypted effectively.  So that would mean that if

9    an individual were to go on the dark web like Mr. Amadeo

10   did, his address, his IP address for his home is not going

11   to show up as specifically linked to a particular website.

12   How he was identified is through a lot of technical work

13   of the agents, is that specific nodes, so known access

14   points, known IPs that are associated with the dark web,

15   those were identified as coming from one of the computers

16   in Mr. Amadeo's home.

17          So it was showing that he or that someone in the

18   house was using the dark web, but again, the whole purpose

19   of the dark web is to evade detection, so a lot of

20   individuals that engage in criminal activity use the dark

21   web.  We find it's fairly common for sophisticated

22   individuals that are trading or downloading or

23   distributing child pornography to use the dark web as an

24   access point because it's extraordinarily difficult for

25   law enforcement to identify them.

1              Mr. Amadeo, the IP effectively from Mr. Amadeo's

2    home was part of a lead and the Government, with that

3    information, we got a pen to see if the IP address for

4    Mr. Amadeo's home was going to known Tor nodes, so those

5    are those known IP addresses and I'm sorry, I'm not an

6    expert on using the terminology with this, Your Honor, but

7    we effectively were able to identify and get eventual

8    search warrant for Mr. Amadeo's home and computer devices

9    therein based on an identification that someone from

10   Mr. Amadeo's address was using Tor, was going on the dark

11   web.  So that's how we were able to get the search

12   warrant.

13             THE COURT:  And the PSR says that a dark website

14   dedicated to child sexual exploitation, is that Tor?

15             MS. OAKES:  Yeah --

16             THE COURT:  So if you go to that website -- okay,

17   because I was asking what's the relevance that no search

18   terms were used and you're on a website -- okay.

19             MS. OAKES:  On the dark web it means that things

20   are not going to get included.  So when I saw the

21   reference to search terms I didn't understand why it was

22   made.  I think this is not -- so Mr. Amadeo's previous

23   case was a peer-to-peer case it was LimeWire which is --

24   it's similar to Napster.  That is a website or a system

25   that we were able to download things.  This was really

 1    popular years ago when folks were downloading music

 2    offline.  So that one you can see IP addresses on there

 3    and he was identified that way in the past.  Being on the

 4    dark web is a whole 'nother level.

 5           The average individual does know how to navigate

 6    it.  Does not know what "Tor" is, what a node -- they

 7    might have had a fleeting understanding of the dark web.

 8           We have a number of child exploitation cases in

 9    this district.  There's only a subset of them that

10    involved the dark web and it's indicative that Mr. Amadeo

11    was on there, shows the level of sophistication and

12    intelligence that he has as well as efforts to evade law

13    enforcement detection.

14           That's the big thing about these cases is that

15    folks use this to evade detection.

16           So going back to what you said earlier there

17    was -- the original hit came from a node that was -- that

18    was on a child pornography website on the dark web.  That

19    was a lead that Homeland Security was provided from a

20    foreign law enforcement agency.

21           So -- oh, I'm sorry, Your Honor.

22           THE COURT:  No, that answers my question.

23           MS. OAKES:  Okay.  So there's also a number of

24    things before I get to my remarks, just points I wanted to

25    make after hearing what Attorney Hayes said.

1          He made reference to only one percent of the

2    files on Mr. Amadeo's I guess devices being files of child

3    pornography.  I have no idea where that cite comes from or

4    the source of that or whether or not that is even true.

5          What is true is that there were over 20,

6    approximately 20,000 images and videos of suspected child

7    pornography that were found on numerous of Mr. Amadeo's

8    devices and that was through the search that Homeland

9    Security did of all of the devices that were seized from

10   Mr. Amadeo's residence.

11         And the actual number of known series is

12   referenced in the PSR.  So the "known series" means these

13   are real children that have been identified in other

14   investigations across the nation.  So he has, I believe,

15   over a few thousand of those that were hits.

16         THE COURT:  How many thousand did you say there

17   were?

18         MS. OAKES:  I believe -- let me make sure I that

19   I have --

20         THE COURT:  I believe I read 3600 some place.

21         MS. OAKES:  Yes, and that's correct.  I believe

22   that was just for images and I believe it's approximately

23   500 -- sorry, goes to Paragraph 15 of the PSR.  So at that

24   time we had to send all of the images and videos in

25   batches to NCMEC because there were so many that were

 1   found on Mr. Amadeo's devices.

 2          So it was 3600 known images and videos leading to

 3   428 known series.  I misspoke a little earlier, Your

 4   Honor.

 5          THE COURT:  So, the -- explain to me what a

 6   "known series" is again.

 7          MS. OAKES:  Yes, Your Honor.  So every time there

 8   is a law enforcement investigation in which child

 9   pornography is identified, those images across the nation,

10   whether or not it is a state or a federal case, they get

11   sent to the National Center -- or they're supposed to get

12   to sent to the National Center for Missing & Exploited

13   Children.  They maintain a repository of these images and

14   videos and so with each of the known serious, that means a

15   known file, that they have a case agent assigned as well

16   as the victim is known and that is how children and

17   victims are identified in every case.  So when we get

18   reports back or a victim impact statement it's coming from

19   those known series.

20          But that does not -- there are -- there's

21   millions and millions of images and videos that are

22   clearly child pornography.  Those children just have not

23   been identified.  And those get sent to the National

24   Center for Missing & Exploited Children as well.  And the

25   hope is that over time those children can get identified

1    as well.

2          So I guess the significance of the 428 known

3    series, that's a large amount to have, at least for known

4    images.  When I was talking to colleagues --

5          THE COURT:  But in terms of what should be

6    attributable to Mr. Amadeo --

7          MS. OAKES:  Yes.

8          THE COURT:  -- it's the 3600 known images and

9    videos?

10         MS. OAKES:  Yes, Your Honor, those are the ones

11   that are confirmed, so well above the 600 --

12         THE COURT:  Right.

13         MS. OAKES:  -- threshold.  However, of the 20,000

14   of the suspected images and videos, I'm sure the agent and

15   if we were to review them could testify that those appear

16   to be images and videos of actual minors.

17         THE COURT:  Okay.

18         MS. OAKES:  And to give you a scope of the amount

19   and what that means, the case agent and the forensic

20   analyst told me it took a long time to process these.  It

21   was so many that HSI's computers crashed -- HSI's in New

22   Haven computers crashed multiple times as they were trying

23   to parse through and download all of the child pornography

24   because it was such a significant collection.

25         THE COURT:  Okay.

1          MS. OAKES:  So, again, I did not understand what

2     the 1 percent was in reference to.

3          Additionally, Your Honor, going to Dr. Geysen,

4     the Government asked that you assign little if any weight

5     to his report and testimony.  I think it was clear from

6     his cross examination that he was basing his report on the

7     diagnoses that were purported by other providers, at least

8     as it goes to Dr. Selden there were the missing pages.

9     It's unclear whether or not there was even a diagnosis

10    so -- provided by that provider.  And then you see in his

11    report that missing pages and these sort of issues aren't

12    even noted or explained.

13         He opined as to Mr. Amadeo's risk of recidivism.

14    Now, I believe it was from The Court's questioning, he

15    said, that -- I think The Court inquired about the CPORT

16    test.

17         THE COURT:  Uh-huh.

18         MS. OAKES:  What it would be if it was a 6 or 7,

19    Dr. Geysen couldn't even answer The Court's question and I

20    believe he said that this was either the first or second

21    time that he even performed the CPORT test.

22         THE COURT:  I believe he said it was the first

23    time.

24         MS. OAKES:  Yes.  And which is concerning if

25    that's the -- he's attempting to opine on Mr. Amadeo's

1    risk of recidivism and as The Court pointed out earlier,

2    the basis of his opinion was extraordinarily narrow.

3            He said that it -- my recollection is that he

4    said it was based on, or he was opining on Mr. Amadeo's

5    risk of recidivism for an Internet-based offense, so

6    essentially child pornography, and he wouldn't even

7    consider anything outside of what was provided by Defense

8    counsel.

9            I attempted to ask him questions about the

10   allegations of the sex assault and he wouldn't even say

11   that he would necessarily change his opinion.  He said

12   that he would have to do another evaluation.  He also

13   stated that, you know, once he was paid his job was done.

14   And that he -- I believe he stated that he was hired

15   really for mitigation purposes generally, which is fine,

16   however, as a psychologist he wouldn't even take into

17   account additional information.

18           It also appeared that he credited almost

19   everything that Mr. Amadeo and his parents told him.  And

20   I believe in some of the Government's briefing and our

21   sentencing memo as well as our opposition to the motion to

22   dismiss, we point out how a lot of miss -- a lot of what

23   Dr. Geysen's statements were, were at odds or the

24   information that Mr. Amadeo provided to Dr. Geysen was at

25   odds with the information that he provided to the

1    Government during the proffer.

2         For example, that he had -- I think Dr. Geysen

3    said repeatedly that he was not offending after his first

4    conviction.  And as we've pointed out, during his proffer

5    Mr. Amadeo stated that he had been on the dark web for

6    approximately four years prior to the time of the proffer

7    which was, I believe in March of 2021.  Going back four

8    years, he would of still been on probation for his

9    previous case.  It doesn't seem like that was something

10   that he told Dr. Geysen or if Dr. Geysen even asked about

11   that.

12        And when I raised issues of the proffer, Your

13   Honor, just to be clear for purposes of the record, I'm

14   not raising this -- I'm doing it to clear up factual

15   disputes, not for The Court to assign a higher Guidelines

16   range or for purposes of calculating the Guidelines.

17        Additionally, as to Dr. Geysen he made a number

18   of recommendations for Mr. Amadeo such as sex offender

19   treatment and various other types of treatment and

20   therapies.

21        I think it was over a year and a half until

22   Mr. Amadeo even acted upon that.  So I know Attorney Hayes

23   was talking about how Mr. Amadeo, I think fairly recently

24   started taking medication.  Dr. Geysen's report, I

25   believe, was from back in -- his final report was back

1    from February 2022, but he was not evaluated at MAAS and

2    my understanding that that was at the direction of

3    Probation until late December of last year.  So we just

4    waited.

5          I also inquired of Probation, you know, we have

6    this recommendation for sex offender treatment.  Is there

7    treatment available?  Do defendants, you know, that are

8    pretrial go out and opt into getting sex offender

9    treatment locally and the response was yes, that that

10   happens.  So I don't know what sort of efforts Mr. Amadeo

11   attempted, but my understanding is that there is some

12   treatment available pre-indictment and, again, Mr. Amadeo

13   didn't even follow the directions or the suggestions of

14   his own psychologist.

15         Additionally, as to the autism spectrum causing

16   the underlying offense, I believe there's research -- we

17   wrote about it in one of our memos saying that there's

18   research that refutes that an ASD diagnosis affects a

19   subjects propensity to engage in criminal activity and I

20   didn't hear anything from Mr. --Dr. Geysen as to that.

21         And I will say, just to put on the record, Your

22   Honor, we had an unexpected meeting with Dr. Geysen a

23   couple years ago or year and a half or so ago I asked him,

24   I said, Are you have saying that Mr. Amadeo committed the

25   offense because he was autistic, and he said, No.

1            So I'll offer that to The Court.

2            However, I think that you've -- you heard enough

3    and there's only limited reference to this and I don't

4    think there's anything that has been provided that

5    would -- by Defense -- that would lead to a variance based

6    on a diminished capacity argument.

7            Okay.  I believe that was -- oh, I also just want

8    to make clear, it's -- just was unclear from my, from what

9    Attorney Hayes' remarks were a little bit earlier.  I

10   think Mr. Amadeo was no longer -- his position that he's

11   no longer saying that he didn't make the statements saying

12   that he liked getting away with it.  That seemed to be

13   like a challenge, something that he was challenging in his

14   previous brief or in the --

15           THE COURT:  In the reply.

16           MS. OAKES:  Yeah, it was in the reply and it

17   seems like he's now stepped away from that.

18           So, going on to actually my arguments, Your

19   Honor, the Government is requesting and we thought about

20   this case for a long time.  We're requesting a Guidelines

21   sentence here, a Guidelines sentence of imprisonment to be

22   followed by a lifetime term of supervision.

23           And the reasons for this, we've considered the

24   3553(a) factors.  I'm going to discuss some of them.  I

25   know we detailed -- The Court has received a lot of

1   briefing in this case and we detailed a lot of our

2   arguments.  I'm going to speak to a few.

3        As to the seriousness and the nature and

4   circumstances of this offense, receipt of child

5   pornography is a serious offense, period.  It will be

6   serious if there were two victims, three victims or four

7   victims.  Mr. Amadeo has hundreds here, if not thousands.

8   And as we've stated, he's harmed countless of these

9   victims by committing this offense.

10        As I stated earlier, HSI identified approximately

11   20,000 images and videos suspected of containing child

12   pornography and then later there were, you know, 3600

13   known images and videos of known series and these were on

14   CDs, DVDs, a hard drive, numerous thumb drives.  It wasn't

15   just limited to one device, they were scattered across

16   numerous devices and, in fact, that's exactly what he said

17   he did in his previous offense when interviewed by the

18   Connecticut State Police.

19        When I thought about the number of victims that

20   we're dealing with, it's hard to imagine, but when I was

21   thinking about it, I thought there's so many that if all

22   of them were here today they wouldn't (sic) fill the

23   gallery here.  There would not be enough room for them.

24   There probably would not be enough room for all of the

25   victims if we used up numerous courtrooms.  That's how

1   many victims that we're talking about here in this case.

2   They're real children.

3            As The Court received over 30 victim impact

4   statements, the harm that they've experienced as a result

5   of Mr. Amadeo's conduct is significant.  It's a completely

6   separate harm from the initial hands-on offense, but a

7   significant trauma that they experience.  Some of the

8   victims are too afraid to leave their house.  Some of

9   them, the psychological damage is so significant that they

10  have physical manifestations.  So some of -- there's one

11  victim that has seizures.  I mean this is the -- their

12  statements really speak to the impact as to each

13  individual, but it's extraordinarily significant.

14           Mr. Amadeo's conduct additionally contributes to

15  this market, contributes -- the market of trading and

16  downloading child pornography by participating in this.

17           As to his history and characteristics, this is

18  not, as The Court is well aware, this is not his first

19  offense.  He knew this was wrong.  Instead of ceasing the

20  conduct, he continued and got much more sophisticated.  So

21  taking the step of going onto the dark web, you don't see

22  that in every case.

23           And again, he -- the exact same circumstances --

24  he was in the basement of the residence at the same

25  location that he was the first time.  He was there doing

1    it again.

2           Mr. Amadeo is a highly-intelligent man.  I think

3    that, hopefully, was clear from what Dr. Geysen was

4    saying.  It was clear to the Government, in my experience

5    with him during the proffer, I had no issues whatsoever

6    communicating with him, Your Honor.  He maintained eye

7    contact and answered the questions that were asked of him.

8    And I think that's representative of Mr. Amadeo, at least

9    in the Government's view.

10          I believe that Mr. Amadeo does need treatment,

11   but treatment didn't work the first time.  I'm glad that

12   he's finally, you know, had his psychiatric evaluation

13   done at MAAS.  It's interesting to the Government that he

14   was prescribed medication.  I believe Dr. Geysen said that

15   he expected that Mr. Amadeo would of been prescribed

16   medication for ADHD, one of the diagnoses that he claimed.

17   However, that was not what he was prescribed medication

18   for from MAAS.

19          And, again, I know Defense has discussed at great

20   length the ASD diagnosis, however, there's no medication

21   to the Government's knowledge for that, if that is in fact

22   one of Mr. Amadeo's diagnoses and it's the Government's

23   hope when he goes to BOP that he will be able to have a

24   thorough evaluation done there and receive treatment.  We

25   previously provided to The Court, the affidavit of

1     Dr. Anthony and where she outlines everything, The Court

2     referenced in its ruling denying the motion to dismiss,

3     but I believe that provides a lot of information as to the

4     resources available at BOP.

5          Additionally, Your Honor, as to the sex assault

6     allegation, the Government provided that to The Court

7     because we believe it goes to the history and

8     characteristics, and I understand that The Court may not

9     be considering it for that purpose.

10          But just to be clear, the Government -- during

11     the proffer, Mr. Amadeo identified this individual.  And

12     during the proffer -- in followup to the proffer, the

13     agent went and interviewed her.  Mr. Amadeo said that he

14     might have had inappropriate touching contact with her and

15     her little sister when they were all minors.  And when the

16     agents went out and an interviewed this woman and her

17     sister, I'll refer to her as V1, stated that when she was

18     a child Mr. Amadeo sexually assaulted her.

19          Now, this is significant.  This is not someone

20     seeing, you know, hearing about Mr. Amadeo's arrest and

21     then coming to the Government, going to agents and

22     reporting this.  I think it is relevant or it goes to her

23     credibility.  She is a mental health professional that

24     works in the criminal justice system and is saying that,

25     and her victim impact statement was provided as an exhibit

 1    to the Government's sentencing memo for The Court because

 2    she talks -- and I think it's important -- she talks about

 3    her assessment of Mr. Amadeo, especially as to his ability

 4    to know right from wrong, but also the impact that she has

 5    experienced from this assault and how it's followed her

 6    for most of her life.  And I think it's the same, goes for

 7    children of sexual abuse or survivors of sexual abuse and

 8    it also speaks to what the victims in this case,

 9    Mr. Amadeo's victims, not talking about V1, but have

10    experienced the trauma.

11            There was a lot of discussion about the underwear

12    that was found.  In the Government's view, that was

13    provided to the Court in reference because it goes to

14    Mr. Amadeo's history and characteristics.  We've heard a

15    lot about or I think it's been said repeatedly by the

16    Defense that he's just a collector, he's a hoarder.  He

17    wouldn't hurt a child, but it's -- and it's almost that

18    the images and videos of depicting this child sexual abuse

19    were almost likened to the collecting of baseball cards.

20    Now, that's not exactly the Defense's words but I just

21    want to make that clear.  These are real children.

22            But the -- I think it is very relevant that

23    child's underwear was found, like, we're talking, I

24    believe between 13 and 15 pairs, not just the My Little

25    Pony.  Mr. Amadeo said, during the proffer, that he saved

1    some of this underwear.  He did say some of it was for his

2    sex doll, but he did said that he saved some of the

3    underwear for years.  And we believe that some of it may

4    have belonged to V1 and her sister which, again, goes back

5    to the allegations that they've made.

6         Deterrence and protection of the public here are

7    of paramount importance.  Again, this is not Mr. Amadeo's

8    first offense.  He just continued, he got more

9    sophisticated with time.  He was completely and totally

10   undeterred.  He received sex offender treatment by the

11   state.  He received restrictive probation conditions by

12   the state.  And we're here -- we're here again.

13        He's had plenty of opportunity and, to receive

14   treatment, and I think the fact that he has received

15   treatment, that he has had this previous case and that we

16   are still here today, I think it goes to the issue of his

17   dangerousness for the future if the previous thing that

18   should have deterred him didn't.

19        So finally, Your Honor, it's the Government's

20   hope that going to BOP, receiving treatment, being on

21   supervised release, receiving treatment there will stop

22   his conduct in the future, will stop him from doing this

23   because every time he goes on line and downloads one of

24   these images a child is harmed.  And I hope that that's

25   clear for him in the future.

1          But I think that all of the 3553(a) factors in

2    particular deterrence, the seriousness and nature of the

3    offense, protection of the public, they all go towards and

4    support a Guideline sentence in this case.

5          THE COURT:  I just wanted to ask, when you refer

6    to "protection of the public".

7          MS. OAKES:  Yes, Your Honor.

8          THE COURT:  You, after mentioning that, you said

9    each time someone -- well, you said each time someone

10   views one of these pictures the victim is harmed.  Is that

11   what your analysis is in terms of the protection of the

12   public?

13         MS. OAKES:  The protection of the public

14   analysis, I think goes to the likelihood that Mr. Amadeo

15   will engage in this conduct again in the future, but also

16   protection is, in the Government's view, of really high

17   priority because if he slips up or if he were to go and do

18   this a child would be harmed just by the viewing of one of

19   these image or videos.

20         THE COURT:  Okay.  So the protection of the

21   public is that children -- the victims will not be harmed

22   because these pictures that are already out there --

23         MS. OAKES:  Yes.

24         THE COURT:  He's not taking the pictures or

25   causing them to be made --

1          MS. OAKES:  Certainly.

2          THE COURT:  -- but the act of viewing them is the

3     harm?

4          MS. OAKES:  Yes, is an incredible harm and the

5     hope is that, and the Government believes that a lengthy

6     sentence, and that lengthy sentence is within the

7     Guidelines range, is what is necessary to protect the

8     public here because all other measures have failed.

9          And just one last thing I'll just make clear for

10    the record.  I believe we raised this in our objection to

11    the motion to dismiss.  There was a reference in

12    Mr. Amadeo's MAAS Evaluation, which I believe was from

13    January of 2023, when he was asked what he was doing for

14    most of the day.  It referenced reading and being on the

15    computer.  I checked in with Officer Gordon, who's his

16    Probation Officer about this, she reached out to MAAS to

17    get clarification.  Unfortunately, the psychiatrist that

18    did the evaluation is on maternity leave at this moment,

19    so we weren't able to get an answer, just to clarify if

20    that was really said.

21         However, the Government -- that would be in line

22    with everything that we've seen historically with

23    Mr. Amadeo that he would access a computer.  But the

24    Government's not asking The Court to make that finding for

25    purposes of sentencing.

1              THE COURT:  Okay.  Thank you.

2              MR. HAYES:  May I reply?

3              THE COURT:  Actually, yes, but just give me a

4    second to pull out a couple of things I had questions

5    about.

6              MR. HAYES:  Sure.

7              (Pause)

8              THE COURT:  Before you go into all the points

9    you're going to cover, Mr. Hayes, you requested a

10   designation FCI Danbury?

11             MR. HAYES:  Yes, sir.

12             THE COURT:  Have you checked as to whether FCI

13   Danbury has the nonresidential sex offender treatment

14   program?

15             MR. HAYES:  Yes, Your Honor, I have because I've

16   had other clients there who were serving lengthier

17   sentences.

18             THE COURT:  It does?

19             MR. HAYES:  Yes, sir.

20             THE COURT:  Okay.  Thank you.  And then I also --

21   the Government has argued for a lifetime term of

22   supervised release.  I'd like to hear from the Defense on

23   that.

24             And we have this back and forth about the

25   paragraph in Dr. Geysen's report that you were looking at.

1   If he had said that the scope of his engagement covered

2   whether there is a -- whether ASD was a contributing

3   factor to the commission of the offense I would of asked

4   him some questions following up on an article that the

5   Defense memos have cited on a number of occasions.  It's

6   an article by Mark Mahoney.

7           MR. HAYES:  Yes.

8           THE COURT:  I'm sure you remember that.

9           MR. HAYES:  He's a friend -- he's a colleague of

10   mine.

11           THE COURT:  Okay.  Well, in the Mahoney piece, he

12   says, "where the line between pornography and child

13   pornography demarcates a transgression against societal

14   mores and criminal laws for the non-Asperger's individual,

15   for the AS individual, the demarcation is blurred and they

16   are completely unaware that they have crossed a moral and

17   legal line."

18           But then he says, "AS individuals are in dire

19   need of explicit instruction.  Once rules are explained

20   and understood, the individuals are loathe to violate the

21   rules."

22           And then just so we're clear, I'm reading from

23   that 2009 article and that first part was from Page 39.

24   The second thing I read was from Page 37.

25           And then he continues on saying, under the

1    heading, "Low Likelihood of Reoffending", "Once the legal

2    rules and the social stigma surrounding child pornography

3    are clarified explicitly an AS individual is unlikely to

4    visit such lengths again.  Individuals with ASD are

5    extremely reliable because they are so rigid.  They do not

6    represent a risk to society."

7            When I read that, what I took from that, knowing

8    that Mr. Amadeo had it explained to him, was that it led

9    to the conclusion that ASD was not a contributing factor

10   here because he had it explained -- the rules were

11   explained to him as Mr. Mahoney said.  I would have of

12   Dr. Geysen about that had I even thought there was a

13   chance that he was opining as to ASD being a contributing

14   factor, so that's my conclusion.

15           I don't want to just spring that on you when I

16   give you my analysis, I'm disclosing it to you so if you

17   have anything to say in response I'm giving you the

18   opportunity to do so.

19           MR. HAYES:  Thank you, Your Honor.

20           Couple of things, Attorney Mahoney, I've known

21   him for some time and we talked a couple of times during

22   the course of this matter.

23           I thought about engaging him as an expert

24   frankly, but I didn't think I needed it and this goes to

25   what The Court, the last thing The Court left me with.  In

1    terms of Dr. Geysen's evaluation, I took it from what I

2    read in the evaluation on that, I think The Court said was

3    the tenth page, in the report it's the seventh page, right

4    above the conclusion, where Dr. Geysen refers to the

5    co-occurring mental health behavior or diagnoses and the

6    ASD, as I took it, as contributing factors.  That's how I

7    read it, Your Honor.

8              THE COURT:  Okay.

9              MR. HAYES:  I don't know what happened in the

10   previous matter other than sort of the reports that I

11   have, talking to my client, talking to his parents.

12             Judge, I say this often, what happens in the

13   state it's not the same as what we see here in the federal

14   system by any stretch.  The supervision's not the same.

15   Treatment's not the same.  And even if they go to the same

16   providers, it's just not the same.  Sentences definitely

17   are not similar.

18             What we have to offer here is more beneficial

19   than what Mr. Amadeo received when he was on state

20   supervision, so I do want to say that.

21             Judge, again, I acknowledge that.  What else can

22   I say about the first conviction other than I don't think

23   it was explained.  I'm sure -- did he know it was illegal?

24   Did he know his behavior was unlawful, wrong, and that he

25   had affected, it affected these minors?  Yes, Your Honor.

1    Yes.

2          But, Judge, I also say that when, during the

3    proffer when he's ask about his behavior in this case this

4    time, more recently, he says, "I don't know why."  And

5    that has to mean something, right?  So whatever he

6    received before, one, it lapsed so he's not receiving it

7    anymore; and two, he wants to know why he continues with

8    this behavior or he started this behavior again.  That has

9    to mean something.

10          And frankly he said, he wanted -- he needed a

11    psychiatrist or even his mother.  Literally, that's what I

12    have written down, literally.  So -- to help him

13    understand.

14          He didn't receive that, Judge.  I think now he

15    will receive that.  Remember, he wasn't incarcerated

16    before, Your Honor, it was supervision and treatment, but

17    now, he would receive treatment that would start with or

18    in -- while he's incarcerated and continue when he's

19    released.

20          That will get him and help him understand what

21    was happening, why he was doing it, and keep him from

22    continuing in that same behavior in the future.

23          So I -- I don't know if that answers what The

24    Court's inquiry -- Judge, I have not really talked to

25    Mr. Amadeo about lifetime supervision.

 1          I could turn to him and ask him.

 2          THE COURT:  If you like, sure.

 3          MR. HAYES:  If I may, Judge, that's just --

 4   obviously, it's a long time.

 5          (Off the record discussion with Defense Counsel

 6   and the Defendant.)

 7          MR. HAYES:  Judge, the preference, of course,

 8   from Mr. Amadeo is that he would prefer it not to be

 9   lifetime supervision.  I've only had that happen one

10   receipt matter, from a client of mine and Judge Meyer

11   actually imposed the sentence and he said, Look, if you

12   show that you can do well on supervision you can petition

13   The Court in the future.

14          Judge, we're asking for 5 years here.  The

15   Government said that a Guideline sentence, but in its

16   papers it said the bottom of the Guidelines, so I don't

17   know -- I'm asking for 5 years.

18          THE COURT:  Okay.  Five years supervised release?

19          MR. HAYES:  No, Your Honor.  I'm sorry.

20          THE COURT:  Oh, okay.

21          MR. HAYES:  Five-year sentence, prison portion of

22   the sentence.

23          THE COURT:  Right.

24          MR. HAYES:  Supervised release, if The Court

25   thought it was, if The Court believes that here it deems

1    lifetime supervision, and if that's what we have, that's

2    what we have, Your Honor.

3         Again, I would just ask The Court's open

4    mindedness in the future if Mr. Amadeo shows that he's

5    successful, that everything else is working.

6         Judge, again, I have to go back to this, the

7    victims here or the Victim 1 who says that she was

8    sexually assaulted.  During the proffer, Mr. Amadeo's the

9    one who gives not only the name but the last name, the

10   contact information of that -- of those -- that family.

11   And the Government also says right now --

12        THE COURT:  Can I just sort of frame the issue

13   here, in terms of what I see as material?

14        MR. HAYES:  Yes, sir.

15        THE COURT:  Just so you can, if you want to

16   address what you're worried I might be thinking, you know

17   exactly what I'm thinking.

18        Let me just make sure I get the time frame

19   correct here.

20        (Pause)

21        THE COURT:  I'm looking for the year in which the

22   Victim 1 gave us a time frame.  Mr. Amadeo would have been

23   around 12 years old for one of the incidents.

24        There are two components to that, as I understand

25   it.  One is the statement by Victim 1, about her, she and

1    her sister and Mr. Amadeo, and there being contact.  As I

2    under- -- my impression is, I'm trying to save time so I'm

3    not flipping through my papers.  She was in the range of

4    eight, nine and Mr. Amadeo was a few years older?

5          MS. OAKES:  Yeah, so --

6          THE COURT:  So he would have been around 12 or?

7          MS. OAKES:  Yes, I believe that's correct.

8          THE COURT:  Okay.  And then the second thing

9    relates to she states that she walked in and saw him going

10    through her underwear drawer and she was around 18?

11          MS. OAKES:  I believe 17 or so.

12          THE COURT:  17, 18.  Mr. Amadeo would have been

13    around 21, 22?

14          MS. OAKES:  Yes, Your Honor.

15          THE COURT:  Okay.  So what I'm -- Mr. Amadeo is

16    currently 38 years old.

17          MS. OAKES:  I believe he's 39, Your Honor, but,

18    yes.

19          THE COURT:  39 years old.  Okay.

20          I don't believe that I can come to any conclusion

21    about -- on this record -- about whether there's a risk of

22    Mr. Amadeo being engaged in any contact offense.

23          MR. HAYES:  Yes, Judge.

24          THE COURT:  That happened a long time ago.  We're

25    talking 20 years ago.

1        In the intervening time he was arrested on the

2   state charges and convicted on those charges.  There's

3   nothing in the record that shows, that suggests I'll even

4   say that there's a risk of contact offense.

5        The only thing that I'm looking at, the

6   information that comes out of that -- from V1 and V2 for

7   is it rebuts some arguments that were made by the Defense

8   in the motion to dismiss the indictment and indirectly

9   here.

10        And, secondly, there is a part in the Presentence

11   Report where Mr. Amadeo talks about -- and I'm looking

12   specifically at Paragraph 9.  It's almost towards the end,

13   the part that carries over at the top of Page 6,

14   "Underwear that fell out of a laundry basket that belonged

15   to two sisters that were family friends."

16        First of all, that just does not ring plausible

17   to me.

18        But secondly, even if it's true, the fact is that

19   they were retained for all those years.  And that, to me,

20   is relevant.

21        That's the only thing I'm looking at what I get

22   from those V1 and V2 or V1 statement.  So, just so you

23   know, so you don't have to address there's no evidence

24   that suggests risk of a contact offense.

25        MR. HAYES:  And I won't, Judge.  What can I say,

1    about, even if those two pairs of underwear that he kept

2    for years, I still ask The Court to consider there's no

3    more information, no more evidence, nothing before The

4    Court that there was any -- if The Court believes that

5    contact between V1 and V2, nothing else.  Nothing else

6    since that time and he was a minor for the most part,

7    because I think we have the ages and dates wrong, but I

8    would ask The Court to consider that.

9              The fact that he's holding onto it, I don't know

10   what else to say other than, Judge, he is a collector,

11   right, he hoards.  I mean that's the definition, Your

12   Honor, it is.  Whether -- I don't know.  For some people

13   the Government said baseball cards, I don't know.  For

14   some people that's what it is.  It could be something so

15   arbitrary.  And here, Judge, maybe it's not, right.  I get

16   that.  I'm just asking The Court to consider what do you

17   do?  Right?  He's -- obsessively hoards items, things.

18             And, Judge, just to get back to that whole idea

19   of the child pornography images, including the videos were

20   1 percent of what was found.  This is why I asked The

21   Court to consider, the Government said 20,000 --

22             THE COURT:  The Government is questioning where

23   you got the 1 percent figure from.  Can you help us to

24   understand that?

25             MR. HAYES:  From my client.

 1          THE COURT:  He said 1 percent?

 2          MR. HAYES:  Yes, Judge.

 3          And here's the thing -- well, the Government

 4   doesn't say anything about --

 5          THE COURT:  What was the basis of the -- how did

 6   he calculate 1 percent?

 7          MR. HAYES:  Who else would know but Mr. Amadeo?

 8          THE COURT:  I asked how did he calculate it?

 9          MR. HAYES:  Well, because he knows what he had.

10   He told the agents, Look, I have terabytes of media,

11   right, and so we're talking again music, stories, games,

12   right, all types of other items.

13          Of all of those things, Your Honor, 20,000 -- the

14   Government just said it, 20,000 suspected images of which

15   3612 were child pornography in nature.

16          So that's where, maybe -- I'm not great with

17   math, Your Honor, but when you -- 20,000?  And then if

18   we're talking terabytes, what else was on those?  The

19   Government doesn't tell us that.  And I think that's

20   important, Judge.  I just think it was important.

21          And just getting back to when we met during the

22   proffer, and Government said that Mr. Amadeo maintained

23   eye contact and he was highly intelligent.  It was

24   understood there, at the time, that he was on the

25   spectrum.  It was understood.  Everyone knew.  Everyone in

1    that room knew.  The agents knew.  Government counsel

2    knew.  We had a conversation about it.  That was -- they

3    had also been investigating him, so they knew of his prior

4    diagnosis, right.

5          And also, I think it's important the Government

6    said that there was an unexpected meeting with Dr. Geysen

7    and I with the Government and there was some

8    representations.

9          The question was, at the time, most of your

10   clients have mental health issues, yes, but this is not

11   just a mental health issue, Your Honor.  ASD is a

12   cognitive issue.  It's not mental health.  He has

13   behavioral health or mental health co-occurring diagnoses,

14   that you see often with depression, anxiety, everything

15   that we have here, but the ASD is cognitive.

16          So, yes, he scored high on his IQ exams, of

17   course he did.  Judge, he was in special education

18   throughout his entire childhood, throughout the entire

19   thing.  So how do you -- I'm not sure how you reconcile

20   that other than to consider someone is on the spectrum.

21   You're scoring high, right, in some ways, but you're in

22   special education and he doesn't find out until he

23   graduates from high school.  In fact, after he leaves

24   college that he's on the spectrum, right.

25          So, again, I understand that he may be highly

1    intelligent, that he may score well on some exams, but
2    there was a reason why he could not get his diploma from
3    a -- from the two-year college after his time there
4    because he couldn't pass a certain class and exam after he
5    was given -- I think he was given more than once to try to
6    pass that.
7              So I just -- I think it's important, Your Honor.
8              I think the question was -- the Government made
9    mention of research that refutes subject's propensity, but
10   the Government didn't ask Mr. Geysen about any of that
11   type of research, and perhaps Dr. Geysen wasn't the person
12   to give that opinion, but that was never asked.  So it --
13             Judge, around this country, I know this because
14   I've spent the past year and a half, two years, almost
15   three years with this.  District Courts throughout the
16   country are aware of how ASD impacts child pornography
17   cases and you see it -- you see cases that are dismissed.
18   You see cases where there is no mandatory minimum and
19   someone receives a below guidelines whether it's probation
20   or otherwise, even, again, in this district.
21             So perhaps we just don't know here because we
22   don't see it often enough.  Judge, I've seen enough cases
23   throughout the country, right, both from here to the West
24   Coast I've seen it and I just make that representation to
25   The Court.  In fact, there are YouTube channels put on --

     1            THE COURT:  The question isn't whether ASD

     2    impacts defendants who commit child pornography offenses.

     3    The question is whether ASD contributed to this

     4    defendant --

     5            MR. HAYES:  Sure.  Sure.

     6            THE COURT:  -- committing the offense.

     7            MR. HAYES:  Judge, and I think that --

     8            THE COURT:  Just so we're clear.

     9            MR. HAYES:  Absolutely, Your Honor, and it did.

    10    It did.

    11            I think that was presented here, Judge.

    12            Everything we have, someone's whose isolating

    13    himself, someone who's in his room by himself all day

    14    long, cannot get out of the house, cannot drive, can't

    15    maintain his job, the way he interacts with the managers

    16    at his job -- everything that we see, sure, this person

    17    collects, hoards, impulsive.  That's what Dr. Geysen said,

    18    his impulsivity, yes.  That's Mr. Amadeo, Your Honor.

    19            And then just -- the Government said that the

    20    information was at odds with what was provided to the

    21    Government and Dr. Geysen, not so sure of that.

    22            THE COURT:  I think the Government, Ms. Oakes

    23    said the information that was provided to Dr. Geysen was

    24    at odds with what was provided during the proffer session

    25    not that the information was at odds with what was

1   presented to Dr. Geysen and the Government.

2          MR. HAYES:  In -- I think -- if I'm not mistaken,

3   Your Honor, I believe that the reference might have been

4   to the victims in this, the V1 and V2, but I can move on.

5   I'm not certain.

6          Judge, the doctor's right.  He was tasked with

7   the evaluation that he gave us.  I did not give him any of

8   that additional information.  He did not know that until

9   we were preparing to meet with the Government, that day --

10   no, I'm sorry, a day or so before.  That's when I gave him

11   that information.  I did not ask him to rewrite his

12   evaluation because we were pressed for time.  We needed to

13   meet.

14          So there was no reason for him to do it at that

15   time and whatever we presented, well, this is the truth.

16   This is what he determined.  And so I'd ask The Court to

17   consider that.

18          So how could he opine other than he said?  It was

19   what -- he used the term "discrepant", right, with

20   everything he knew about Mr. Amadeo, from Mr. Amadeo and

21   from his family, everyone else he interviewed.  So -- and

22   this is the same doctor who has known him for some time

23   and evaluated him twice throughout his life and spent time

24   with him.

25          And so I think it's -- to have to opine as he's

1    on the stand with information about Victim 1 and Victim 2

2    that's difficult because I think you need to talk to

3    Mr. Amadeo and frankly talk to the family, read the

4    documents, see everything.  That's how we would do it,

5    Your Honor.  We don't do it while he's on the stand.

6         I tried to do that a couple months ago.  I was in

7    trial or at a hearing or something, and it just doesn't

8    work.  You can't do that and you need -- he's an expert.

9    He's going to take time.  It's rigorous work.  It's not

10   just oh, sure, let me just tell you this is what I think.

11   That's not how this works, Your Honor.

12       And beyond that, Judge, The Court asked about search

13   terms.  I bring up search terms because you don't

14   necessarily need those, but do we have cases that where

15   you do have search terms?  Yes.  But that's not what we

16   have here.  We just have general downloading of these

17   images and videos.  We don't have specific search terms as

18   though this is what we're looking for.  This is what I'm

19   looking for.  I think that, in this case for Mr. Amadeo,

20   does mean something.  He needs help.

21        Presumably the treatment he receives in custody

22   and what he will receive outside of custody when he's on

23   supervision, he will get that help.  He's starting to get

24   the help now, Your Honor.

25        Again, a sentence of 5 years is more than enough

1    for Mr. Amadeo.

2         Frankly, had he not -- had he only presented with

3    mental health and not ASD, Your Honor, I don't know if I

4    could -- I couldn't say to The Court, Judge, 5 years is --

5    I couldn't, given the aggravating factor, Your Honor,

6    that's what I mean because that person didn't learn.  But

7    that's not what we have here.

8         Thank you, Your Honor.

9         THE COURT:  Okay.

10        (Off the record discussion with The Court and The

11   Court Reporter.)

12        THE COURT:  Would people like to stretch their

13   legs for five minutes?

14        Okay.  We will take a five-minute break and then

15   I'll come back.

16        (The Court exited at 3:54 p.m.)

17        (* * * * *)

18        (The Court entered at 4:05 p.m.)

19        THE COURT:  Please be seated everyone.

20        (Pause)

21        THE COURT:  Before imposing sentence, I do want

22   to explain the factors that a District Court must take

23   into consideration in determining the sentence to be

24   imposed in a particular case.

25        Under Title 18 United States Code Section 3553,

1     the factors applicable in this case that are to be

2     considered by a court in imposing sentence are as follows:

3            One, the nature and circumstances of the offense

4     and the history and characteristics of the defendant;

5            Two, the need for the sentence imposed to serve

6     the various purposes of a criminal sentence, which I will

7     discuss in a moment;

8            Three, the kinds of sentences available;

9            Four, the kinds of sentence and the sentencing

10    range established for the Defendant's category of offense

11    committed by someone with his criminal history category

12    under the Sentencing Guidelines;

13           Five, any pertinent policy statement issued by

14    the Sentencing Commission;

15           Six, the need to avoid unwarranted sentence

16    disparities among defendants with similar records who have

17    been found guilty of similar conduct;

18           And Seven, the need to provide restitution to any

19    victims of the offense.

20           Mr. Amadeo, I have thought about and taken into

21    account each of these factors and I will explain to you my

22    thinking as to the most appropriate sentence in your case.

23           First of all, I have reviewed the Presentence

24    Report prepared by the Probation Office.  I have

25    considered the remarks made here in court by your Attorney

1    and by you and by counsel for the Government.

2         I did receive sentencing memoranda from both the

3    Government and from the defense.  I also received briefing

4    with respect to the motions to dismiss the indictment and

5    there were documents attached to those memoranda.

6         There were attachments to the Defense sentencing

7    memoranda as well, including the report from Dr. Geysen

8    and the letters from your family members and others.  I

9    got treatment records and school records.

10         I have reviewed the paper that was cited in the

11   Defense memo prepared by Mark Mahoney *Asperger's Syndrome*

12   *and the Criminal Law:  The Special Case of Child*

13   *Pornography*.

14         I read the statement under seal attached to the

15   Government's sentencing memorandum as Exhibit 1.  I

16   considered it for the purposes that I explained earlier

17   today.

18         I read the victim impact statements forwarded by

19   the Probation Office to me on December 1, 2023.

20         And I listened to and carefully considered the

21   testimony of Dr. Geysen.

22         I've also taken into account the need for the

23   sentence in this case to serve the various purposes of a

24   criminal sentence.  Pursuant to Section 3553, the sentence

25   should be sufficient, but not greater than necessary, to

1    serve these purposes.

2           First, I must consider the need for the sentence

3    imposed to provide just punishment for the offense.

4           Second, I must consider whether there is a need

5    for the sentence imposed to protect the public from

6    further crimes committed by you.

7           Third, I must consider the need for the sentence

8    imposed to afford adequate deterrence to criminal conduct.

9           Fourth, I must consider the need for the sentence

10   imposed to reflect the seriousness of the offense and to

11   promote respect for the law.

12          And, finally, I must also consider the need for

13   the sentence imposed to serve the goal of rehabilitation

14   by considering whether there is a need to provide you with

15   educational or vocational training, medical care, or other

16   correctional treatment in the most effective manner.

17          In your case, I am most aware of the need to

18   impose a sentence that protects the public from further

19   crimes committed by you and the need to deter you from

20   committing further offenses.  Secondary to that, I think

21   the sentence should reflect the serious nature of the

22   offense conduct.

23          Give me one second.  I seem to be missing a page

24   here.

25              (Pause)

1          THE COURT:  I have concluded that what is

2     appropriate here is a Non-Guidelines sentence.

3          As I will discuss in a moment, there are respects

4     in which it is difficult to translate considerations that

5     I believe are important into a Guidelines sentence.

6          As I mentioned, the statutory factor that I --

7     well, I didn't say.  The statutory factor that I feel is

8     most important is the purposes of a criminal sentence, and

9     as I mentioned among those purposes, I believe that

10    specific deterrence and protecting the public are the most

11    important considerations and secondary to that is the need

12    for the sentence imposed to reflect the very serious

13    nature of the offense conduct.

14         In the Defense memorandum there are several

15    arguments for a downward departure which I also considered

16    as an argument for a variance.

17         And let me just pull those out.

18         Page 12.

19         There is an argument in the memorandum that there

20    should be a downward departure or variance under section,

21    Guidelines Section 5H1.3.

22         In a few moments I will discuss why I conclude

23    that ASD is not a mitigating factor here.

24         There is an argument that Mr. Amadeo's medical

25    conditions support a downward departure or variance under

1    Section 5H1.4, but I conclude that those conditions are

2    not present to an unusual degree and even if they were, I

3    would not downwardly depart or vary based on them.

4         There is an argument that The Court should vary

5    downward based on, and I'm quoting from Page 14,

6    "Mr. Amadeo's uniquely low risk of recidivism."  I think

7    that position is directly contradicted by everything in

8    the record here including Dr. Geysen's opinion.

9         The fourth argument is that The Court should vary

10   downward based on *United States vs. Dorvee* and I will

11   discuss that in a moment, but the concerns expressed in

12   *Dorvee* is one of the things that, for me at least, makes

13   the Guidelines difficult to apply in this case.

14        There are two other points that were made today.

15   One, is that the length of time on supervision has been

16   over two years and Mr. Amadeo should -- that's a

17   mitigating factor.  However, in my view, the length of

18   time on supervision pretrial and pre-guilty plea

19   supervision -- I'm sorry, presentencing supervision is a

20   product of the motion practice that was engaged in by the

21   Defense.

22        The other argument that was made today that I

23   thought was new was that Mr. Amadeo has been getting

24   medication which makes a difference in the degree to which

25   he is able to interact with others in a way that is most

1    appropriate and this will make -- and there's a

2    possibility he may not have that medication in prison.   I

3    don't believe that that's a persuasive grounds for a

4    variance.

5           So I have identified what I believe are

6    mitigating and aggravating factors.  I am balancing those

7    factors to determine what I believe is the most

8    appropriate sentence here.

9           First mitigating factor I believe is that the

10   Defendant has never before served time in prison.  He got

11   a suspended sentence and probation in connection with the

12   risk of injury to a minor conviction in state court.

13          A second factor is the structure of the child

14   pornography guidelines.  If I were to go the route of a

15   Guidelines sentence, I would depart to a lower Total

16   Offense Level based on considerations that were

17   highlighted in *United States vs. Lauer*sen which I think is

18   cited in the Defense reply brief and/or *Dorvee*.

19          I analyzed how I could go about doing that, but I

20   concluded that a variance better enabled me to put

21   appropriate weight on what I believe are the most

22   important factors here.  I will note a couple of things

23   with respect to these guidelines however.

24          His Base Offense Level I view as adjusted to 20

25   because it starts at 22 and then 1A applies, which is set

1    forth in Paragraph 27 of the Presentence Report.

2         I note that some of the cases that were referred

3    to in the Defense reply memoranda -- memorandum compared

4    or cited to other cases where I've imposed sentencing.

5    Those cases were for possession, not receipt, so the Base

6    Offense Level would of been 18 with respect to those.

7    Moreover, the specific offense conduct not only was the

8    offense of conviction different, the specific offense

9    conduct was dramatically different in each one of those

10   cases.

11        There is an enhancement pursuant to, and this is

12   in Paragraph 29, a four-level increase, because the

13   possession of material that portrayed an infant or toddler

14   and then in addition to that there's a two-level increase

15   in Paragraph 28, because the images involved a

16   prepubescent minor or minor who had not attained the age

17   of 12.

18        If I were going to take the Guidelines route, I

19   would not include the two-level increase in Paragraph 28.

20   I think, and I think as counsel for the Government noted

21   when I said there is no increase for masochistic or

22   sadistic conduct it doesn't apply.

23        And the way I look at these Guidelines, the more

24   serious -- I'll just say what society views, I think, is

25   more serious is images that depict an infant or toddler.

1    And if someone has images, particularly the number of

2    images that triggers the five-level enhancement of an

3    infant or toddler, it would be surprising if they did not

4    also have images that would qualify for the enhancement

5    for the two-level enhancement for a prepubescent minor or

6    a minor who had not attained the age of 12.

7         So I think those are overlapping enhancements and

8    would not have used both of those.  I would have used the

9    enhancement for the number of images because the increase

10   is there, top out at a five-level increase for 600 or more

11   images, and here we're talking about 3600 which is a

12   multiple of 6, so I think it's -- that's an appropriate

13   proxy for the number of images and that's significant

14   because it translates into harm to the victims.

15        Ordinarily, in a lot of these cases I'll say,

16   when I look at the number of images, and I look at the

17   two-level enhancement for use of a computer, it is

18   virtually impossible to collect this many images without a

19   computer, so I would not have made an increase for, a

20   two-level increase for the use of a computer but I pause

21   there because as I look back over before computer use

22   became so commonplace, the harm -- the reason for the

23   computer enhancement was because it sort of showed that

24   there was a plus factor in terms of collecting all of

25   these images and I probably should come up with a more

1    elegant term than that.  I'll work with that for now.

2          Here the plus factor is not the use of the

3    computer, but the use to which the computer was put.  And

4    the aggravating -- the use to which the computer was put

5    here was to add features to it to go to the dark web.  So

6    that's where I found working with the Guidelines

7    problematic or difficult.  I just couldn't figure out a

8    way that I could use a Guidelines analysis that allowed me

9    to put proper weight on that and a couple of other things.

10          So, yes, I would have ordinarily not of made the

11    two-level increase for use of computer, but there's a

12    problem with that in my view.

13          So I would have had something less than the Total

14    Offense Level in the presentencing report, but I was not

15    able to come up with a Guidelines analysis that I found to

16    be workable or helpful for my purposes.

17          So I said there are mitigating factors, there are

18    aggravating factors.  I want to be clear that I have

19    concluded that ASD is not a mitigating factor here.

20    Dr. Geysen's report from 2012, I think clearly makes an

21    argument that ASD was a contributing factor with respect

22    to the prior offense.

23          I think the record is very clear here not

24    withstanding how Mr. Hayes reads the letter, that there is

25    no such argument this time.  It was not within the scope

1   of the engagement.  All I have is argument of counsel.  I

2   put no weight on what I view is extraneous statements that

3   were not within the scope of the extraneous statements in

4   Dr. Geysen's report.

5        There were a lot of problems with his report and

6   his methodology.  I think it's -- his opinions are really

7   not entitled to material weight in this case, but it is

8   clear that the scope of his engagement was limited to

9   talking about the risk of committing another Internet

10  offense.

11       He did concede that there was a moderate to high

12  offense.  I'm sorry, a moderate to high risk of a future

13  Internet offense.  He made it clear that he was saying in

14  a noncontact hands-off context.  He also stated that

15  unless Mr. Amadeo was restricted from the Internet, he

16  will continue to access pornographic images and videos of

17  children.  That's at Page 10 of his report.

18       As I mentioned earlier, there are a number of

19  references in Defense briefs to the Mahoney article which

20  I read from earlier.  In my view, the conclusions in the

21  Mahoney article reinforce the conclusion that ASD was not

22  a contributing factor in terms of commission of the

23  offense.

24       To put it in simple terms, this is an instance

25  where the offense was not committed because of, but rather

1    in spite of the Defendant having ASD.  The Mahoney article

2    at least makes the point that people follow the rules once

3    they know what they are and the rules are very clearly

4    explained.  Well, I'll say Mr. Amadeo had a clear

5    understanding of the rules, in my view at least,

6    wrongfulness of his conduct when he got arrested, when he

7    was taken to court, when he was prosecuted, when there was

8    a big deal made about his ASD, and he then was lucky

9    enough to get a 10-year suspended sentence.  A suspended

10   sentence but 10 years and, you know, when you have that

11   10-year sentence that's suspended, that you're exposed to

12   having to serve it.

13          I cannot think of a more concrete and compelling

14   way to make the rules explicit to someone who has ASD.  I

15   think the message could not have been missed and I think

16   based on Mr. Amadeo's statements it was not missed.

17          Finally, I asked Dr. Geysen to explain what the

18   implications are of the fact that Mr. Amadeo has

19   high-functioning autism when he was on the stand last

20   week.  That term appears at Page 5 of his report and he

21   explained what it meant during his testimony and that was

22   not helpful to the Defendant.

23          I think I mentioned the comparator cases.

24          So as to the aggravating factors here, to be

25   clear, this is not a second conviction for a child

1    pornography offense but it is the second time that

2    Mr. Amadeo had been convicted of a crime because of his

3    receipt of child pornography.

4           It appears to me at least that he was allowed to

5    plead guilty to risk of injury to a minor based on

6    Dr. Geysen's report in the earlier case that there was

7    diminished responsibility with regard to his mental status

8    and that, a term that he uses in that report from the

9    earlier offense.  The 10-year sentence was suspended but

10   it and the 5 years of probation and 10 years on the Sex

11   Offender Registry, in my view, clearly convey to

12   Mr. Amadeo the wrongfulness of his conduct.

13          Second, this is not just a second time that

14   Mr. Amadeo has engaged in such conduct, but he did so

15   while he was on the Sex Offender Registry, and in

16   addition, he escalated his activity and the harm to

17   society.

18          He went from 200 unique images and 140 videos in

19   the prior offense to 3600 images and videos, which as I

20   mentioned is six times the 600 that places you in the most

21   serious group of offenders in terms of numbers of images.

22          And second, and very significantly, he went to

23   the dark web to a site that is dedicated to child sexual

24   exploitation instead of using peer-to-peer programs as

25   were used earlier.  This is much more sophisticated

1    conduct.  You need to take extra steps to do it and the

2    Tor site is explicitly and clearly for, dedicated to child

3    sexual exploitation and as has been explained when I asked

4    my questions at the beginning today, this is something

5    that helps avoid detection.

6            Third, for me a very significant question is how

7    seriously should we take the fact that Mr. Amadeo has

8    repeated his conduct under the circumstances present here.

9    And my conclusion is that we should take it very, very

10   seriously.

11           For example, the statute under which he's

12   convicted does not double the mandatory minimum in cases

13   where there's a second offense.  It triples it.  And

14   that's an indication of the seriousness of repeat conduct.

15   To be clear, this is not a case where there has been a

16   second offense, but I found that an interesting indication

17   as to the very serious way that someone engaging in this

18   kind of conduct is viewed.

19           And finally, I do conclude that there is a high

20   risk that this Defendant will commit this offense or a

21   comparable offense in the future.

22           In my view, the 60-month mandatory minimum

23   sentence is not sufficient under the circumstances here to

24   serve the goals of specific deterrence and protecting the

25   public, and, secondarily, reflecting the very serious

1    nature of the offense conduct.  Rather, in light of the

2    facts and circumstances of this case, I conclude that a

3    sentence of 84 months is sufficient but not greater than

4    necessary to do so.

5            And this will be a Non-Guidelines sentence, as I

6    indicated.

7            Will you please stand, Mr. Amadeo.

8            Mr. Amadeo, I hereby sentence you to the custody

9    of the Bureau of Prisons for a period of 84 months.

10           I am recommending to the Bureau of Prisons that

11   you be designated to FCI Danbury, because it offers the

12   Nonresidential Sex Offender Treatment Program.

13           After imprisonment, you shall be placed on

14   supervised release for a life term.

15           I am doing this based on the need for the

16   sentence to provide specific deterrence and the need to

17   protect the public from further crimes committed by you.

18           A condition of your supervised release will be

19   that you not commit another federal, state, or local crime

20   during the term of supervision.  As a further condition of

21   your supervised release, you shall not possess a

22   controlled substance.  A further condition is that you

23   shall cooperate in the collection of a sample of your DNA.

24           Also, as I will elaborate in the special

25   conditions, you must comply with the requirements of the

1    Sex Offender Registration and Notification Act.

2           I am waiving the mandatory condition that you

3    refrain from any unlawful use of a controlled substance

4    and submit to periodic drug testing because there is a low

5    risk of substance abuse by you in the future.

6           Special conditions of your supervised release

7    shall be as follows:

8           One, you must not associate with or have contact

9    with convicted sex offenders or those considered

10   inappropriate by the Probation Office because of a

11   connection to sexual abuse of minors or sexually explicit

12   materials involving minors, unless as part of an approved

13   counseling program.

14          Two, you must comply with the requirements of the

15   Sex Offender Registration and Notification Act.  Title 34

16   United States Code Section 20901 et seq., this used to be

17   42 U.S.C. Section 16901 et seq., as directed by the

18   Probation Office, the Bureau of Prisons, or any state sex

19   offender registration agency, in which you reside, work,

20   are a student, or were convicted of a qualifying offense.

21          Three, you must participate in mental health

22   treatment with an emphasis on sexual offender treatment as

23   recommended by the United States Probation Office and

24   approved by The Court, and must abide by the policies and

25   procedures of the program, which may include polygraph

1 testing.  You must pay all or a portion of the costs

2 associated with treatment based on your ability to pay as

3 recommended by the United States Probation Office and

4 approved by The Court.

5          Four, you must submit to periodic polygraph

6 testing at the discretion of the Probation Office as a

7 means to ensure that you are in compliance with the

8 requirements of your supervision following the completion

9 of a sex offender treatment program.  You must pay all or

10 a portion of the costs associated with testing based on

11 your ability to pay as recommended by the United States

12 Probation Office and approved by The Court.

13          Five, you must not view, purchase or possess any

14 materials including, but not limited to, pictures,

15 photographs, books, writings, drawings, videos or video

16 games, depicting what are described as child pornography

17 as defined in Title 18 United States Code Section 2256

18 subsection or Clause 8 or otherwise contrary to the

19 anti-pornography laws of the United States.

20          Six, you must not have direct contact with any

21 child you know or reasonably should know to be under the

22 age of 18 without permission of the probation officer.  If

23 applicable, the United States Probation Office, in

24 consultation with appropriate child welfare agencies

25 and/or treatment providers and with the approval of The

1    Court, will determine whether the Defendant may have such

2    contact with his own children or relatives.

3            Seven, you must provide the United States

4    Probation Office with access to any requested financial

5    records, including but not limited to, telephone, cellular

6    phone bills, and credit card statements.  The purpose of

7    this condition is to ensure that the defendant does not,

8    one, purchase software, equipment, or services designed to

9    block or circumvent the computer monitoring condition;

10   two, purchase child pornography or access child

11   pornography; or three, have contact with minors.

12           Eight, you shall avoid and are prohibited from

13   being in any areas or locations where children under the

14   age of 18 are likely to congregate such as schools, day

15   care facilities, playgrounds, and theme parks, unless

16   prior approval has been obtained from the United States

17   Probation Office.

18           Nine, you must not be employed in any position or

19   participate as a volunteer in any activity that involves

20   contact with children under the age of 18, except as

21   approved by the United States Probation Office.

22           Ten, you must submit your person, residence,

23   office, and vehicle to a search --

24           Are you all -- this has gone on for awhile.

25   Would you like to sit down, are you comfortable?

```
 1          MR. HAYES:  No, we are fine.

 2          THE COURT:  Okay.

 3          Ten, you must submit your person, residence,

 4  office, and vehicle to a search conducted by a United

 5  States Probation Officer at a reasonable time and in a

 6  reasonable manner based upon reasonable suspicion of

 7  contraband or evidence of a violation of a condition of

 8  release.  You must warn any other residents of the

 9  premises or users of such vehicles that the premises and

10  vehicles may be subject to searches pursuant to this

11  condition.

12          Eleven, you must submit all computers, as defined

13  in Title 18 United States Code Section 1030 subsection (e)

14  (1), mobile phones, other electronic communications or

15  data storage devices, media cameras, drones, photographic

16  equipment, and other Internet capable devices and related

17  equipment, which I will refer to collectively as

18  "electronic devices", owned, controlled, or used by the

19  Defendant to a search conducted by a United States

20  Probation Office at a reasonable time and in a reasonable

21  manner, based upon reasonable suspicion of contraband or

22  evidence of a violation of a condition of release.

23          You must warn any other users of such items that

24  the items may be subject to searches pursuant to this

25  condition.
```

1          Twelve, you must permit the United States

2   Probation Office to install monitoring software on any and

3   all electronic devices, owned, controlled, or used by the

4   Defendant, for the purpose of determining whether you are

5   viewing or accessing child pornography, as defined in

6   Title 18 United States Code Section 2256(A) and/or whether

7   you have been in contact with minors.  You must pay all or

8   a portion of the costs associated with such monitoring

9   based upon your ability to pay, as recommended by the

10  United States Probation Office and approved by The Court.

11         You must not download, install, or utilize any

12  application, software, or hardware that will prevent the

13  United States Probation Office from monitoring such

14  electronic devices.  This includes, but is not limited to

15  encryption, anonymity, or invisible mode software or

16  devices, or dark web Internet browsers.

17         Thirteen, to ensure compliance with the preceding

18  monitoring condition, you must allow the United States

19  Probation Office or its designee to conduct initial and

20  periodic unannounced reviews of any and all electronic

21  devices subject to monitoring, for the purposes of

22  determining whether, one, the device contains any

23  prohibited data prior to the installation of the

24  monitoring software; two, the monitoring software is

25  functioning effectively after its installation; and three,

1      there have been any attempts to circumvent the monitoring

2      software after its installation.

3            You must warn any other people who use these

4      devices that the devices may be subject to review pursuant

5      to this condition.

6            You must allow the United States Probation Office

7      to use such equipment as is necessary to determine the

8      presence of an Internet or Wi-Fi connection.

9            Fourteen, if the Probation Officer determines

10     that you pose a risk to another person, including an

11     organization, the Probation Officer may, with The Court's

12     prior authorization, require you to notify the person or

13     organization about the risk and you must comply with that

14     instruction.  The Probation Officer may contact the person

15     or organization and confirm that you have notified the

16     person about the risk.

17           Number fifteen, you must consent to third-party

18     disclosure to any employer or potential employer,

19     community service site, or other interested party, with

20     The Court's approval, of any computer-related restrictions

21     that are imposed.

22           Number sixteen, you must not knowingly

23     communicate with anyone you know or reasonably should know

24     to be a minor via telephone, text messaging, email, social

25     media, mobile application, the Internet, or other

1      electronic means.

2              Number seventeen, if restitution is ordered, you

3      must provide the Probation Officer access to any requested

4      financial information and authorize the release of any

5      financial information.

6              The Probation Office may share financial

7      information with the United States Attorney's office and

8      the Assistant Federal Defender's Office.

9              Eighteen, you must pay any restitution that is

10     imposed in this case.  If you are unable to pay the full

11     balance in a lump sum, any remaining balance is payable at

12     a rate of not less than $100 per month or 10 percent of

13     your gross monthly income, whichever is greater.  The

14     monthly payment schedule may be adjusted based on your

15     ability to pay as determined by the Probation Officer and

16     approved by The Court.

17             All of the standard conditions of supervised

18     release in this distract shall also apply in your case and

19     those conditions will be set forth in the judgment in this

20     case.

21             If you violate your conditions of supervised

22     release, The Court could sentence you to additional time

23     in prison of up to 2 years or at least 5 years depending

24     on the circumstances.

25             Do you understand that, Mr. Amadeo?

1           THE DEFENDANT:  I believe I do.

2           THE COURT:  The consequences of a failure to

3    comply with the conditions of supervised release are

4    extremely serious and The Court would not hesitate to

5    sentence you to additional time in prison if you violated

6    the terms of your supervised release.

7           The Court directs that the Probation Office

8    provides the Defendant with a written statement that sets

9    forth all of the conditions of the Defendant's supervised

10   release.

11          Mr. Amadeo, I'm not ordering you to pay a fine

12   because you do not have the ability to pay one.

13          My understanding is that the Government requests

14   that a determination as to the amount of restitution be

15   postponed for 90 days pursuant to Title 18 United States

16   Code Section 3664 subsection (d)(5); is that correct,

17   Ms. Oakes?

18          MS. OAKES:  That's correct, Your Honor.

19          THE COURT:  Thank you.

20          Mr. Amadeo, you shall pay a mandatory special

21   assessment of $100 pursuant to Title 18 United States Code

22   Section 3013, which is due and payable immediately.

23          As to Section 3014, I find that you are indigent

24   and consequently do not impose the additional special

25   assessment of $5,000 pursuant to Title 18 United States

1    Code Section 3014.

2          As to the assessment that would fund the Child

3    Pornography Victims Reserve, after considering the factors

4    set forth in Title 18 United States Code Sections 3353(a)

5    subsection (a), and 3572, I am not imposing an additional

6    assessment under Title 18 United States Code Section 2259

7    Capital A Subsection A, which would have been used to fund

8    the Child Pornography Victims Reserve.

9          Finally as to forfeiture, the order of forfeiture

10   which is ECF Number 174, pursuant to which the Defendant

11   forfeited to the United States of America all right,

12   title, and interest he has in:

13         One, a Seagate hard drive bearing Serial Number

14   NA8F7K84;

15         Two, a Lenovo laptop;

16         Three, a CPU tower;

17         Four, a Dell CPU;

18         Five, 24 thumb drives;

19         Six, three Micro SD cards;

20         Seven, A Lexar SD card;

21         Eight, a Micro SanDisk;

22         Nine, two cell phones;

23         Ten, a Samsung cell phone;

24         Eleven, an LG cell phone -- an LG flip phone, I'm

25   sorry;

1           Twelve, a black Amazon Fire tablet;

2           Thirteen, a red Amazon Fire tablet;

3           Fourteen, a Nook tablet;

4           Fifteen, four CDs;

5           Sixteen, a Western Digital External hard drive

6    bearing serial WCC4NA78JKZN.

7           Seventeen, A Toshiba hard drive.

8           Eighteen a WDL hard drive.

9           Nineteen, a My Passport hard drive;

10          And any and all related other computers, thumb

11   drives, cell phones, tablets, DVDs, CDs and other storage

12   media not otherwise listed, is made final as to the

13   Defendant and is part of his sentence in this case and

14   shall be included in the judgment.

15          Please be seated, sir.

16          The judgment will be prepared for my signature by

17   the Clerk's Office.

18          Mr. Amadeo, I want to inform you that you and the

19   Government have the right to appeal within 14 days any

20   sentence that The Court imposes and The Court will allow

21   you to appeal and to use the services of an attorney at no

22   cost to you if you cannot afford to pay yourself.

23          Do you understand that, Mr. Amadeo?

24          THE DEFENDANT:  I believe so, yes.

25          THE COURT:  Thank you.

1          (Pause)

2          THE COURT:  Mr. Hayes, is there an application

3     for self surrender?

4          MR. HAYES:  There is, Your Honor, we're

5     requesting 30 days from today.

6          THE COURT:  Okay.  With the conditions that are

7     currently in effect?

8          MR. HAYES:  That's what I was going to say,

9     Judge.  I'm sorry, I should of said that.  Yes --

10          THE COURT:  Okay.

11          MR. HAYES:  -- he's been compliant at least since

12     2021.

13          It says the date of his arrest was June 3, 2021.

14     These conditions have been in effect since that date where

15     he's confined to his home.  He does have a curfew.  As The

16     Court is aware, he resides with his parents.

17          When there was talk about use of computer, the

18     only -- so he has an Xbox home and he has a Fire Stick

19     that he watches movies.  The Xbox, of course he just -- he

20     plays video games and then he has a cell phone but that

21     has monitoring software attached to it with Probation.

22          THE COURT:  That wasn't why I asked the question.

23          MR. HAYES:  I'm sorry, Judge.

24          THE COURT:  The reason I asked the question is

25     there've been references in the Defense memoranda at times

1   to the risk of self harm and I just want some

2   reassurance -- well, I just want to make sure that we have

3   taken all possible steps to safeguard against that, with

4   respect to that risk I'll say.

5           MR. HAYES:  I believe we have, Your Honor.  I

6   could also answer it this way, the medication has helped

7   significantly with that to abate that risk and that's --

8   Mr. Amadeo's telling me that.  I believe his family has

9   told me the same.

10          THE COURT:  His parents have told you that also?

11          MR. HAYES:  Yes.

12          THE COURT:  Okay.  Okay.

13          MR. HAYES:  Thank you, Judge.

14          THE COURT:  All right.

15          Does the Government have any position, Ms. Oakes?

16          MS. OAKES:  Yes, Your Honor, the Government

17  requests remand immediately.  I believe the standard needs

18  to be an extraordinary basis presented by the Defense for

19  the Defendant to have the self-report date.  I don't

20  believe that one has been shown here or as to why to

21  extend the self-surrender date.  And I believe since this

22  is a, would fall under the category of an offense of

23  violence, I believe that it is presumed or remand is

24  presumed to be mandatory under the statute.

25          THE COURT:  Absent some exceptional

1    circumstance --

2            MS. OAKES:  Yes, Your Honor.

3            THE COURT:  -- is that the term?

4            MS. OAKES:  Yes.  And just so The Court is aware,

5    in advance of the previous sentencing date we let Defense

6    counsel know that we would be making this request.

7            THE COURT:  Okay.  Mr. Hayes?

8            MR. HAYES:  I can respond.

9            THE COURT:  Please do.

10           MR. HAYES:  Thank you.

11           So that -- yes, the Government did make me aware

12   the day before around 4:00 o'clock, so that was Wednesday,

13   January 3rd, that it would make this request.

14           I reached out to just one attorney in the office

15   because I know this is unusual.  I have not had the

16   Government make this request after the sentence was

17   imposed in years.  I just don't see it often.  I've seen

18   it after trial.  That's different than where we are today.

19   But even those with sex offenses, I have at least two

20   cases, Eric Rundstrom and John Perugini, where at

21   sentencing, after the sentence was imposed, the Government

22   did not make that, this motion, there's been no --

23           THE COURT:  Well, I mean, that doesn't tell me

24   anything.  I mean the question is what are the exceptional

25   circumstances?

1          Yes?

2          MS. OAKES:  Your Honor, I apologize interrupting.

3    I misstated the standard.  Under 3143(a)(2) if a Defendant

4    is convicted of an offense that is a crime of violence and

5    is awaiting imposition or execution of the sentence The

6    Court must order the Defendant detained unless there's a

7    substantial likelihood that a motion for judgment of

8    acquittal or a new trial would be granted or the

9    Government has recommended that no sentence of

10   imprisonment be imposed.  And in that case that The Court

11   finds that by clear and convincing evidence that the

12   person is not likely to flee or to pose a danger to any

13   person or to the community.

14         THE COURT:  But that's after conviction.

15         MS. OAKES:  Yes, Your Honor.

16         THE COURT:  There's another section that deals

17   with --

18         MS. OAKES:  Yes, and when I was originally

19   thinking about our motion I was considering it under 3143

20   that subsection (a)(2) as well as generally (b) and I

21   believe (b) is the one that speaks to the exceptional

22   circumstance.

23         I believe typically in these instances, you know,

24   Defendants that have been, you know, post plea would

25   traditionally have been remanded after he pled guilty,

    1    however --

    2            THE COURT:  Yes.

    3            MS. OAKES:  -- in this circumstance I don't

    4    believe the Government even recommended --

    5            MR. HAYES:  Your Honor, I apologize to interrupt,

    6    but that's not true.  That's not true at all.

    7            So Government counsel has not been around for

    8    some time, but I have not had that happen after the plea

    9    much less at sentencing.  After trial is when I've seen

   10    it.  That's when it's happened.

   11            (Pause)

   12            THE COURT:  The question is what does the statute

   13    require.  Not what you have done.

   14            MR. HAYES:  I understand, Your Honor.

   15            THE COURT:  Let me just talk with Mr. Togninalli

   16    for a minute.  I have question for him that's very

   17    specific to...

   18            (Off the record discussion with The Court and

   19    Probation Officer.)

   20            THE COURT:  I just was trying to find that

   21    language.  I was looking for it.  It's in Section 3145(c),

   22    3145 subsection (c).

   23            I think this is a situation where there are

   24    exceptional reasons.  I have a concern if Mr. Amadeo were

   25    remanded now he'd wind up at HCC, and I take note of the

1  fact that he's been getting his medications and it's made

2  a difference and I don't think it's in the interest of

3  justice that he go there and not have those medications.

4  So the time to voluntarily surrender will give him an

5  opportunity, or Mr. Hayes an opportunity to contact Bureau

6  of Prisons to see what arrangements can be made with

7  respect to his medications so that he at least knows what

8  to expect once he starts his term of imprisonment.

9            MR. HAYES:  Yes, Your Honor.

10           THE COURT:  So the application for voluntary

11  surrender is granted.

12           So the Defendant shall self-surrender directly to

13  the facility designated by the Bureau of Prisons on

14  February 8, 2024, no later than 12:00 noon under his own

15  power and at his own expense.  In the event he does not

16  receive a designation by the Federal Bureau of Prisons

17  prior to that date, he must self-surrender as instructed

18  by the United States Marshals Service on February 8, 2024,

19  no later than 12:00 noon.

20           Mr. Hayes, have you explained to your client what

21  the sanctions to which he would be exposed are if he fails

22  to surrender himself as ordered by The Court?

23           MR. HAYES:  Yes, Your Honor, I have.

24           THE COURT:  Okay.  Thank you.

25           All right.  I'm just -- I can't think of any --

1    well, the judgment will get prepared now.  It will simply

2    make reference to the fact that restitution order will be

3    resolved within the next 90 days.

4           I can't think of anything else that we need to be

5    concerned about in terms of the judgment, can counsel?

6           MS. OAKES:  Nothing from the Government, thank

7    you, Your Honor.

8           THE COURT:  Okay.

9           MR. HAYES:  No, Your Honor, not in terms of the

10   judgment.

11          The only thing I want to say in terms of the

12   restitution, typically when there is request for

13   restitution I find out the attorneys who are involved, the

14   victims' attorneys and then we contact the attorneys to

15   see if there's any, frankly, negotiations that can be

16   made.  So -- I think whenever the Government turns over

17   those names and I will start contacting, so this may take

18   more than 90 days, but if so then I will make an

19   application or the Government.

20          THE COURT:  I think I have to enter the

21   restitution within 90 days.

22          MR. HAYES:  The Court may, and so that's why -- I

23   don't have anything yet, but I really do -- I don't want

24   to just take what's presented.  I think we need -- I need

25   to take time with the attorneys, so the sooner I have the

1   request, then I can start working on it.  But I believe

2   The Court may be correct because I did oppose that

3   recently for more than 90 days.

4            THE COURT:  Okay.  So what steps is the

5   Government going to take, Ms. Oakes, with respect to

6   restitution?

7            MS. OAKES:  Yes, Your Honor, the Government's

8   going to be providing all of the requests or any

9   additional information that Attorney Hayes may need to

10  him, I believe, within probably 48 hours we will be giving

11  him that information.

12           THE COURT:  Okay.  Well, I guess I just don't

13  want to get into a position where the clock is running out

14  and I'm told, well, Mr. Hayes had plenty of time and he

15  didn't do it.  So I don't want that to be an issue I have

16  to resolve, so...

17           MS. OAKES:  Yes.  No, I understand, Your Honor,

18  and perhaps --

19           THE COURT:  If he has plenty of time, then the

20  fact that he didn't do it won't be a factor in not

21  imposing the restitution, just so we're clear.

22           MS. OAKES:  Thank you, Your Honor.

23           THE COURT:  Okay.  All right.

24           Okay.  I think we're ready to adjourn.

25           (The Court exited at 5:07 p.m.)

```
 1                    C E R T I F I C A T E

 2

 3

 4

 5            I, Alicia A. Cayode Kyles, RMR, Official Court

 6    Reporter for the United States District Court for the

 7    District of Connecticut, do hereby certify that the

 8    foregoing pages are a true and accurate transcription of

 9    my shorthand notes taken in the aforementioned matter to

10    the best of my skill and ability.

11

12

13

14

15

16

17

18

19

20    /s/_____

21    ALICIA A. CAYODE KYLES, RMR
      Official Court Reporter
22    United States District Court
      450 Main Street, Room 320
23    Hartford, Connecticut 06103
      (860) 509-8743

24

25
```